Nos. 22-1269, 22-1270

# In The United States Court of Appeals for the Federal Circuit

PARUS HOLDINGS, INC.,

*Appellant,*

v.

GOOGLE LLC, SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., LG ELECTRONICS INC., LG ELECTRONICS USA, INC.,

*Appellees.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2020-00846, IPR 2020-00847.

**BRIEF FOR APPELLANT PARUS HOLDINGS, INC.**

Joel L. Thollander
John B. Campbell
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701
(512) 692-8700
*Attorneys for Appellant*

April 27, 2022

# U.S. Patent No. 7,076,431

1. [Preamble] A system for retrieving information from pre-selected web sites by uttering speech commands into a voice enabled device and for providing to users retrieved information in an audio form via said voice enabled device, said system comprising:

[1a] a computer, said computer operatively connected to the internet;

[1b] a voice enabled device operatively connected to said computer, said voice enabled device configured to receive speech commands from users;

[1c] at least one speaker-independent speech recognition device, said speaker-independent speech recognition device operatively connected to said computer and to said voice enabled device;

[1d] at least one speech synthesis device, said speech synthesis device operatively connected to said computer and to said voice enabled device;

[1e] at least one instruction set for identifying said information to be retrieved, said instruction set being associated with said computer, said instruction set comprising: a plurality of pre-selected web site addresses, each said web site address identifying a web site containing said information to be retrieved;

[1f] at least one recognition grammar associated with said computer, each said recognition grammar corresponding to each said instruction set and corresponding to a speech command;

[1g] said speaker-independent speech recognition device configured to receive from users via said voice enabled device said speech command and to select the corresponding recognition grammar upon receiving said speech command;

[1h] said computer configured to retrieve said instruction set corresponding to said recognition grammar selected by said speaker-independent speech recognition device;

[1i] said computer further configured to access at least one of said plurality of web sites identified by said instruction set to obtain said information to be retrieved;

[1j] said computer configured to first access said first web site of said plurality of web sites and, if said information to be retrieved is not found at said first web site, said computer configured to sequentially access said plurality of web sites until said information to be retrieved is found or until said plurality of web sites has been accessed;

[1k] said speech synthesis device configured to produce an audio message containing any retrieved information from said pre-selected web sites, and said speech synthesis device further configured to transmit said audio message to said users via said voice enabled device.

9. The system of claim 1 wherein said computer is further configured to periodically search said internet to identify new web sites and to add said new web sites to said plurality of web sites.

**U.S. Patent No. 9,451,084**

1. [Preamble] A system for acquiring information from one or more sources maintaining a listing of web sites by receiving speech commands uttered by users into a voice-enabled device and for providing information retrieved from the web sites to the users in an audio form via the voice-enabled device, the system comprising:

[1a] at least one computing device, the computing device operatively coupled to one or more networks;

[1b] at least one speaker-independent speech-recognition device, the speaker-independent speech-recognition device operatively connected to the computing device and configured to receive the speech commands;

[1c] at least one speech-synthesis device, the speech-synthesis device operatively connected to the computing device;

[1d] memory operatively associated with the computing device with at least one instruction set for identifying the information to be retrieved, the instruction set being associated with the computing device, the instruction set comprising: a plurality of web site addresses for the listing of web sites, each web site address identifying a web site containing the information to be retrieved;

[1e] at least one recognition grammar associated with the computing device, each recognition grammar corresponding to each instruction set and corresponding to a speech command, the speech command comprising an information request provided by the user;

[1f] the speaker-independent speech-recognition device configured to receive the speech command from the users via the voice-enable device and to select the corresponding recognition grammar upon receiving the speech command;

[1g] the computing device configured to retrieve the instruction set corresponding to the recognition grammar provided by the speaker-independent speech-recognition device;

[1h] the computing device further configured to access at least one of the plurality of web sites identified by the instruction set to obtain the information to be retrieved,

[1i] wherein the computing device is further configured to periodically search via the one or more networks to identify new web sites and to add the new web sites to the plurality of web sites,

[1j] the computing device configured to access a first web site of the plurality of web sites and, if the information to be retrieved is not found at the first web site, the computer configured to access the plurality of web sites remaining in an order defined for accessing the listing of web sites until the information to be retrieved is found in at least one of the plurality of web sites or until the plurality of web sites have been accessed;

[1k] the speech synthesis device configured to produce an audio message containing any retrieved information from the plurality of websites, and the speech synthesis device further configured to transmit the audio message to users via the voice-enabled device.

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-1269, 22-1270 |
| **Short Case Caption** | Parus Holdings, Inc. v. Google LLC |
| **Filing Party/Entity** | Parus Holdings, Inc. |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date April 27, 2022 Signature: /s/ *Joel L. Thollander*

Name: Joel L. Thollander

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☒ None/Not Applicable |
| Parus Holdings, Inc. | None. | None. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ ADDITIONAL PAGES ATTACHED

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | |
|---|---|
| **Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.:** | Michael McNamara, Michael Renaud, William Meunier |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s). Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

*Apple Inc. v. Parus Holdings, Inc.*, Nos. 22-1143, -1144 (Fed. Cir.)
*Parus Holdings, Inc. v. Apple, Inc.*, No. 6:19-cv-00432 (W.D. Tex.)
*Parus Holdings, Inc. v. Google LLC*, No. 6:19-cv-00433 (consolidated with No. 6:19-cv-00432) (W.D. Tex.)
*Parus Holdings, Inc. v. Samsung Elecs. Co., Ltd.*, No. 6:19-cv-00438 (consolidated with No. 6:19-cv-00432) (W.D. Tex.)
*Parus Holdings, Inc. v. LG Elecs., Inc.*, No. 3:20-cv-05896 (N.D. Cal.)

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i
TABLE OF AUTHORITIES ........ ii
STATEMENT OF RELATED CASES ........ vi
JURISDICTIONAL STATEMENT ........ 1
STATEMENT OF THE ISSUES ........ 1
STATEMENT OF THE CASE ........ 2
A. Preliminary Statement. ........ 2
B. The Parties. ........ 4
C. The Technology. ........ 5
D. The IPR Proceedings. ........ 13
E. The Board's Decisions ........ 18
SUMMARY OF THE ARGUMENT ........ 20
ARGUMENT ........ 23
A. Standard of Review ........ 23
B. The Board Legally Erred When It Chose to Disregard Record Evidence In Determining That Kovatch Was Prior Art. ........ 24
1. The Board's decision to disregard evidence violated the APA ........ 24
2. The Board's decision to disregard evidence reflected a misplacement of the parties' respective burdens ........ 27
3. The Board's decision to disregard evidence conflicted with the governing IPR statutory and regulatory provisions ........ 33
4. The Board's decision to disregard evidence cannot be justified by application of 37 C.F.R. § 42.6(a)(3). ........ 36
C. The Board Legally Erred When It Found That the Remaining Challenged Claims Lacked Written Description Support. ........ 44
1. The Board's written description determinations exceeded its statutory authority. ........ 44
2. The Board's written description analyses were legally deficient ........ 48
CONCLUSION ........ 54
CERTIFICATE OF COMPLIANCE ........ 56

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3M Co. v. Evergreen Adhesives, Inc.*,
860 Fed. App'x 724 (Fed. Cir. 2021) (unpublished) ........................................ 40

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
567 F.3d 1366 (Fed. Cir. 2009) ........................................ 52

*Alacritech, Inc. v. Intel Corp.*,
966 F.3d 1367 (Fed. Cir. 2020) ........................................ 54

*Aqua Prods. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017) (en banc) .................................. 24-26, 34-37, 39

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ........................................ 51

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ........................................ 36

*Bos. Sci. Neuromodulation Corp. v. Nevro Corp.*,
813 Fed. App'x 572 (Fed. Cir. 2020) (unpublished) ........................................ 40

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ........................................ 24

*Cold War Museum, Inc. v. Cold War Air Museum, Inc.*,
586 F.3d 1352 (Fed. Cir. 2009) ........................................ 25, 26, 36

*Cooper v. Goldfarb*,
154 F.3d 1321 (Fed. Cir. 1998) ........................................ 31

*CSR, PLC v. Skullcandy, Inc.*,
594 Fed. App'x 672 (Fed. Cir. 2014) (unpublished) ........................................ 53

*Dir. v. Greenwich Collieries*,
512 U.S. 267 (1994) ........................................ 31, 32, 33

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015) ........................................ 27-32, 36

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018) ....................................................................35

*FanDuel, Inc. v. Interactive Games LLC*,
966 F.3d 1334 (Fed. Cir. 2020) ....................................................24, 35, 37

*General Access Sols., Ltd. v. Sprint Spectrum L.P.*,
811 Fed. App'x 654 (Fed. Cir. 2020) ........................................................ 38-42

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017) ..................................................................54

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ..........................................................25, 54

*In re Magnum Oil Tools Int'l Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ...................................25-27, 30, 32, 33, 35

*Intell. Ventures I LLC v. Motorola Mobility LLC*,
870 F.3d 1320 (Fed. Cir. 2017) ..................................................................52

*Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*,
590 F.3d 1326 (Fed. Cir. 2010) ..................................................................52

*Mahurkar v. C.R. Bard, Inc.*,
79 F.3d 1572 (Fed. Cir. 1996) ...............................................29, 31, 33, 36

*Microsoft Corp. v. i4i Ltd. P'Ship*,
564 U.S. 91 (2011)........................................................................................31

*Nalpropion Pharms., Inc. v. Actavis Labs. FL, Inc.*,
934 F.3d 1344 (Fed. Cir. 2019) ..................................................................51

*Princeton Vanguard LLC v. Frito-Lay N. Am. Inc.*,
786 F.3d 960 (Fed. Cir. 2015) ....................................................................24

*SAP America, Inc. v. Lakshmi Arunachalam*,
IPR2014-00414, Paper 24 (PTAB Aug. 17, 2015).....................................45, 46

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018)...............................................................34, 38, 39, 44

*Scott v. Finney*,
34 F.3d 1058 (Fed. Cir. 1994) ....................................................................32

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)..........................................................................29, 32, 36, 37

*Tech. Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008) ..........................................................29, 30, 31

*Worlds Inc. v. Bungie, Inc.*,
903 F.3d 1237 (Fed. Cir. 2018) ..........................................................27, 30, 37

**STATUTES**

5 U.S.C. § 706 ............................................................................................ 24, 36

28 U.S.C. § 1295 .................................................................................................1

35 U.S.C. § 6 .......................................................................................................1

35 U.S.C. § 103 ..................................................................................................13

35 U.S.C. § 111 ..................................................................................................48

35 U.S.C. § 112 ........................................................................................ 1, passim

35 U.S.C. § 131 ..................................................................................................48

35 U.S.C. § 311 ........................................................................................ 2, passim

35 U.S.C. § 312 ...........................................................................................21, 34

35 U.S.C. § 316 ......................................................................................27, 32, 36

35 U.S.C. § 321 ..................................................................................................45

**REGULATIONS**

37 C.F.R. § 42.6 ...................................................................................... 1, passim

37 C.F.R. § 42.63 .........................................................................................36, 37

37 C.F.R. § 42.107 ...............................................................................................35

37 C.F.R. § 42.120 ...................................................................................21, 35, 42

**COURT RULES**

FED. CIR. R. 32.1 ........................................................................................................38

## STATEMENT OF RELATED CASES

No appeal from these Patent Trial and Appeal Board (the "Board") *inter partes* reviews ("IPRs") on U.S. Patent Nos. 7,076,431 (the "'431 patent") and 9,451,084 (the "'084 patent") has previously been before this Court or any other Court. The same patents are at issue in *Apple Inc. v. Parus Holdings, Inc.*, Nos. 22-1143, 1144 (Fed. Cir.). Claims from the '431 and '084 patents are also at issue in *Parus Holdings, Inc. v. Apple, Inc.*, No. 6:19-cv-00432 (W.D. Tex.); *Parus Holdings, Inc. v. Google LLC*, No. 6:19-cv-00433 (consolidated with No. 6:19-cv-00432) (W.D. Tex.); *Parus Holdings, Inc. v. Samsung Elecs. Co., Ltd.*, No. 6:19-cv-00438 (consolidated with No. 6:19-cv-00432) (W.D. Tex.); and *Parus Holdings, Inc. v. LG Elecs., Inc.*, No. 3:20-cv-05896 (N.D. Cal.). Counsel for Parus know of no other cases pending in this Court or any other court that will directly affect or be affected by the Court's decision in these consolidated appeals.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction over these IPRs under 35 U.S.C. §§ 6(b)(4) and 311—subject to the arguments raised below in the second issue presented—and delivered its final written decisions on October 19, 2021. Parus timely filed its notices of appeal on December 15, 2021. This Court has jurisdiction over these consolidated appeals under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

(1) Whether the Board erred in deciding to disregard evidence of record under a purported application of 37 C.F.R. § 42.6(a)(3) when: (a) the Board's obligation to take all record evidence into account cannot be obviated by rule; (b) the Board's decision reflected a misplacement of the burdens of production and persuasion; (c) the Board's decision conflicted with the governing IPR statute and regulations; and (d) § 42.6(a)(3) does not support the Board's decision in any event. This issue covers every challenged claim of the '431 patent, all found unpatentable through combinations that included a so-called "Kovatch" reference, which the Board held was prior art only after disregarding relevant evidence of record.

(2) Whether the Board erred in determining that the challenged claims of the '084 patent, as well as challenged claim 9 of the '431 patent, lacked written description support sufficient to satisfy 35 U.S.C. § 112, ¶ 1—in their own respective specifications—when: (a) those determinations exceeded the Board's statutory

jurisdiction and authority under 35 U.S.C. § 311(b); and (b) in any event, the Board's written description analyses were legally deficient.

## STATEMENT OF THE CASE

### A. Preliminary Statement.

These consolidated appeals raise fundamental and important, but ultimately straightforward, IPR-related issues of law that require resolution by this Court.

The first relates to the Board's treatment of 37 C.F.R. § 42.6(a)(3)—a simple rule providing that "[a]rguments must not be incorporated by reference from one document into another document." *Id.* IPRs in which the Board has applied this rule are being appealed to this Court with increasing frequency. *Infra* at 40. Typically that application will be subject to an abuse of discretion review. In this case, however, the Board used this rule against incorporating arguments by reference to justify its decision to *disregard evidence of record* in the IPR—evidence that was indisputably relevant to its determination that the central reference asserted by Petitioners was in fact prior art. In so doing, the Board violated the APA, improperly placed a burden of persuasion on the patent owner Parus, and turned upside down the statutory and regulatory rules requiring specific and persuasive argument from the petitioner—not the patent owner. The Supreme Court has made clear that *Petitioners* must shape the scope of the IPR litigation. The burden was therefore *on them* to bring disputes over the record evidence into sharp focus.

The Board cited to an unpublished opinion from this Court as support for its decision. That opinion does not address the issues raised here, but it does show the pressing need for this Court to issue a considered and published opinion here.

The second fundamental issue relates to the Board's statutory jurisdiction and authority under 35 U.S.C. § 311(b). In other contexts, Congress has granted the Board authority to hear challenges based on an asserted lack of written description support. *Infra* at 45. Not so here; Congress has expressly banned the Board from considering § 112 grounds in an IPR proceeding. These IPRs involved two continuation patents, and Petitioners challenged written description for a number of claims based on the specification for a parent—the *same specification* contained in the '431 and '084 patents. Parus thus pointed out that those challenges were nothing more than "a clandestine assertion of invalidity for lack of written description under § 112." Any pretense that they might be something other was dropped in the final written decisions, where the Board cited *exclusively* to the specifications of the '431 and '084 patents, respectively, in its written description analyses. These determinations were beyond the Board's statutory authority under § 311(b).

This issue is also of vital importance. One in five patents granted is a continuation. If the Board is permitted to institute IPR challenges to claims from continuation patents asserting a lack of written description in the—identical—

specification of a parent reference, then a substantial hole will be ripped in the statutory scheme carefully crafted by Congress. *Infra* at 47-48.

**B. The Parties.**

Parus has a twenty-five year history of developing and offering innovative voice-driven products to help businesses of all sizes streamline and simplify their communications. Current product offerings include ParusOne, ParusOffice, ParusSpeak, and ParusMobile products. ParusOne is a voice-enabled assistant and virtual office providing voice-response technology solutions for customers to manage communication technology used for business from laptops, mobile phones, and home offices to answer calls, handle voice mails, faxes and emails, schedule meetings, and establish conference calls. ParusOffice enables small businesses to channel their various phone communications through one main number. ParusOffice combines the power of ParusOne unified communications with a small office multi-extension system. ParusSpeak provides interactive voice response solutions for companies that need business process automation, as well as automated name, address, and caller feedback capture. ParusMobile provides worldwide group messaging for direct selling organizations, professionals, and small businesses.

Parus is a pioneer in its field, and its systems have received numerous industry accolades, including preeminent awards in the CRM, call center, and teleservice fields. ParusOne, for example, was named the 2007 Product of the Year by Internet

Telephony and Unified Communications. Parus has invested over $125 million in its innovations and continues to invest in advancing the technology today.

Google, Samsung, and LG (collectively, "Petitioners") are industry giants who make use of the technology developed and patented by Parus, and who filed these petitions for *inter partes* review on certain claims of the '431 and '084 patents.

**C. The Technology.**

Parus began developing its voice response systems in the mid-1990s. In developing these systems, still in use today, the inventors at Parus foresaw the power and promise in combining fast and flexible access to web sites and other networked devices with a speaker-independent speech recognition device designed to process any user's verbalized request. Appx1303. The '431 and '084 patents—related as continuations, and sharing the same specification—are directed to an "interactive voice system" that allows a user to request information from a voice web browser, which fulfills the request by performing a context-based search through a list of ranked web sites or other networked devices and then provides the retrieved information to the user in audio form. Appx1305, Appx96, Appx116.

In the mid-1990s, portable options for users needing to gather information from a web site accessible over the Internet were limited, and each option had distinct drawbacks. Appx104 (1:30-41). These options included: (1) heavy laptop computers with limited access to power and communication lines; (2) expensive

personal digital assistants (PDAs), which required expensive service plans and could only access the minority of web sites designed to be PDA-compatible; and (3) web-phones or web-pagers that suffered similar drawbacks. Appx104 (1:41-2:24).

The inventors at Parus were able to overcome the drawbacks of these prior art systems with "a robust and highly reliable system that allows users to browse web sites and retrieve information by using conversational voice commands," where the retrieved information is "converted into an audio message [and] transmitted to the user's voice enable device." Appx104 (1:20-24), Appx105 (3:41-56) (describing a "browsing system and method that allows users to browse web sites using conversational voice commands spoken into any type of voice enabled device").

Figure 1 in the specification depicts media servers 106, which include a speech recognition software engine:




FIG. 1

Appx100, Appx105-106. After converting the spoken commands to data messages, the media server processes the resulting data message to recognize keywords. For example, if the request was "what is the weather in Chicago?," the converted data messages may be used to identify the keywords "weather" and "Chicago." Appx106 (6:44-54). The media server then uses those keywords to search web site records stored in database 100. Appx106 (6:44-56). As a result of this search, the media server identifies a first web site likely to have the requested information. *Id.*

A web browsing server 102 retrieves a website record concerning both the web site found in the search and information concerning the user's request.

Appx106-107 (5:5-11, 6:52-56, 7:14-36). For example, the website record includes "extraction agent" commands that identify which information should be retrieved from the web site to fulfill the user's request, and how to accomplish the retrieval. *Id.* The web browsing server uses this web site record to access the identified web site and extract the information identified for retrieval, through a "content extraction" process. Appx106-107 (6:65-7:36). The web browsing server invokes the "extraction agent command" contained in the record to identify the information to retrieve from the web site, where to find that information at the web site, and how to request and extract that information from the web site. Appx107 (7:14-37). After accessing the web site to obtain the information to be retrieved, the web browsing server forwards the retrieved information to the media server. Appx111 (15:32-34). The media server includes a speech synthesis engine, which uses the retrieved information "to create an audio message that is transmitted to the user's voice enabled device." *Id.*

While typical desktop and laptop web browsers searching for information on the Internet could return a long list of web sites without issue, that would not work for a voice enabled browser—an audio response recounting a lengthy list of web sites would be neither desirable nor practicable for a user attempting to retrieve information on a telephone. To overcome this problem, the '431 and '084 patents disclose that the system's instruction set includes a database of pre-selected web

sites that are ranked for speed and usefulness of the information they contain, so that the web sites may be sequentially accessed in their ranked order until the identified information is retrieved. Appx111-112 (16:56-17:28). The patents further disclose a "polling mechanism" that "pings" the web sites periodically to update their ranking based on speed and accuracy, and to ensure that "only those web sites that produce useful and error-free responses will be used by the voice browser system to gather information requested by the user." Appx111-112 (16:56-17:17).

The inventors thus created a voice-enabled information retrieval system that can "dynamically adapt to changes in the rapidly evolving web sites that exist on the Internet." Appx112 (17:26-28), Appx111 (16:44-47) (noting that the invention can "adapt to changes that may occur as web sites evolve").

The patents further describe a second preferred embodiment with networked devices, in which "the devices 500 appear as 'web sites' connected to the network 502. This allows a network interface system, such as a device browsing server 506, a database 508, and a user interface system, such as a media server 510, [to operate] similar to the web browsing server 102, database 100 and media server 106 described in the first preferred embodiment above." Appx112 (17:50-57).



FIG. 5

Appx103. The device browsing embodiment "provides the same robustness and reliability features described in the first embodiment"—including "the ability to detect whether new devices have been added to the system or whether current devices are out-of-service." Appx113 (19:10-16). Using the periodical polling feature, when the system "receives an unexpected response, then the device 500 is marked as being either new or out-of-service. A warning message or a report may then be generated for the user indicating that a new device has been detected or that an existing device is experiencing trouble." Appx113 (19:16-28).

Claim 1 of the '431 patent, with bracketed numbering added, provides:

1. [Preamble] A system for retrieving information from pre-selected web sites by uttering speech commands into a voice enabled device and for

providing to users retrieved information in an audio form via said voice enabled device, said system comprising:

[1a] a computer, said computer operatively connected to the internet;

[1b] a voice enabled device operatively connected to said computer, said voice enabled device configured to receive speech commands from users;

[1c] at least one speaker-independent speech recognition device, said speaker-independent speech recognition device operatively connected to said computer and to said voice enabled device;

[1d] at least one speech synthesis device, said speech synthesis device operatively connected to said computer and to said voice enabled device;

[1e] at least one instruction set for identifying said information to be retrieved, said instruction set being associated with said computer, said instruction set comprising: a plurality of pre-selected web site addresses, each said web site address identifying a web site containing said information to be retrieved;

[1f] at least one recognition grammar associated with said computer, each said recognition grammar corresponding to each said instruction set and corresponding to a speech command;

[1g] said speaker-independent speech recognition device configured to receive from users via said voice enabled device said speech command and to select the corresponding recognition grammar upon receiving said speech command;

[1h] said computer configured to retrieve said instruction set corresponding to said recognition grammar selected by said speaker-independent speech recognition device;

[1i] said computer further configured to access at least one of said plurality of web sites identified by said instruction set to obtain said information to be retrieved;

[1j] said computer configured to first access said first web site of said plurality of web sites and, if said information to be retrieved is not found at said first web site, said computer configured to sequentially access said plurality of web sites until said information to be retrieved is found or until said plurality of web sites has been accessed;

[1k] said speech synthesis device configured to produce an audio message containing any retrieved information from said pre-selected web sites, and said speech synthesis device further configured to transmit said audio message to said users via said voice enabled device.

Appx6-8, Appx113 (claim 1). Claim 9 adds:

> 9. The system of claim 1 wherein said computer is further configured to periodically search said internet to identify new web sites and to add said new web sites to said plurality of web sites.

Appx114 (claim 9). Claim 1 of the '084 patent, again with bracketed numbering added, provides:

> 1. [Preamble] A system for acquiring information from one or more sources maintaining a listing of web sites by receiving speech commands uttered by users into a voice-enabled device and for providing information retrieved from the web sites to the users in an audio form via the voice-enabled device, the system comprising:
>
> [1a] at least one computing device, the computing device operatively coupled to one or more networks;
>
> [1b] at least one speaker-independent speech-recognition device, the speaker-independent speech-recognition device operatively connected to the computing device and configured to receive the speech commands;
>
> [1c] at least one speech-synthesis device, the speech-synthesis device operatively connected to the computing device;
>
> [1d] memory operatively associated with the computing device with at least one instruction set for identifying the information to be retrieved, the instruction set being associated with the computing device, the instruction set comprising: a plurality of web site addresses for the listing of web sites, each web site address identifying a web site containing the information to be retrieved;
>
> [1e] at least one recognition grammar associated with the computing device, each recognition grammar corresponding to each instruction set and corresponding to a speech command, the speech command comprising an information request provided by the user;
>
> [1f] the speaker-independent speech-recognition device configured to receive the speech command from the users via the voice-enable device and to select the corresponding recognition grammar upon receiving the speech command;
>
> [1g] the computing device configured to retrieve the instruction set corresponding to the recognition grammar provided by the speaker-independent speech-recognition device;

> [1h] the computing device further configured to access at least one of the plurality of web sites identified by the instruction set to obtain the information to be retrieved,
>
> [1i] wherein the computing device is further configured to periodically search via the one or more networks to identify new web sites and to add the new web sites to the plurality of web sites,
>
> [1j] the computing device configured to access a first web site of the plurality of web sites and, if the information to be retrieved is not found at the first web site, the computer configured to access the plurality of web sites remaining in an order defined for accessing the listing of web sites until the information to be retrieved is found in at least one of the plurality of web sites or until the plurality of web sites have been accessed;
>
> [1k] the speech synthesis device configured to produce an audio message containing any retrieved information from the plurality of websites, and the speech synthesis device further configured to transmit the audio message to users via the voice-enabled device.

Appx75-76, Appx136 (claim 1).

**D. The IPR Proceedings.**

Petitioners brought these two IPRs, challenging in one claims 1, 2, 4-7, 10, 13, and 14 of the ’431 patent, Appx9, and in the other claims 1, 2, 4-7, 10, and 14 of the ’084 patent, Appx77. Petitioners alleged that these claims were unpatentable under 35 U.S.C. § 103(a), offering a number of purportedly invalidating obviousness combinations for each patent. The Board instituted the requested IPRs on both patents, electing to proceed to trial on a handful of asserted obviousness combinations. Appx9, Appx77. Significantly, each combination started with one of two references: either the so-called “Kovatch” reference or the so-called “Kurganov-

262." Appx9, Appx77, Appx1827-1868, Appx1811-1826. Parus argued that neither of these references were prior art to the '431 and '084 patents.

*The "Kovatch" reference.*

Kovatch had an apparent filing date of July 12, 2001, Appx8, and an earliest possible priority date of January 4, 2000, Appx1332. In its patent owner response, Parus argued that Kovatch was not prior art because the claimed inventions in the '431 and '084 patents had been conceived and reduced to practice prior to Kovatch's critical January 4, 2000 date. At "least by July 12, 1999, Alexander Kurganov and Valery Zhukov conceived of and invented the claimed subject matter while working on the web-based upgrades to" Parus' early "Webley Assistant" voice-enabled system. Appx1333. Following this "conception, the inventors were reasonably and continuously diligent as the Webley Assistant enhancements" project was the only one "they were working on at [Parus] and they were employed full time." Appx1334. These "enhancements to the Webley Assistant reduced the '431 and '084 inventions to practice in a prototype no later than December 31, 1999, five days before Kovatch's earliest filing date of January 4, 2000." Appx1334.

Parus further argued that, to the extent that the Board found that the evidence demonstrated a final reduction to practice on January 7, 2000—"the date the last source code file was added to the source code revision system"—the evidence further showed that "the inventors worked diligently to reduce the invention to

practice from the critical date of January 4, 2000, until the [last] grammar file was entered into the source code revision system on January 7, 2000." Appx1334.

In support of its burden to produce evidence demonstrating prior conception and reduction to practice, Parus offered some forty exhibits, Appx1301-1302—including inventor, employee, and expert testimony, Appx7749-7817, Appx8978-9068, element-by-element claim charts, Appx8155-8262, as well as corroborating source code files, Appx7821-7832, Appx7840-8154, Appx8266-8277, Appx8281-8299, Appx8308-8364, emails, Appx7818-7820, Appx8365-8379, Appx8951-8956, and press releases, Appx8302-8304, Appx8952-8954.

After receiving the evidence on conception and reduction to practice produced with the patent owner response, Petitioners engaged in further discovery on it. Among other things, they deposed the testifying inventor Alexander Kurganov, the testifying Parus employee Paul Mulka, and the testifying expert Benedict Occhiogrosso. *See* Appx6721-6726, Appx6828-6835, Appx6970-6975. Following this discovery, Petitioners filed their reply. Petitioners complained about the amount of antedating evidence Parus had produced, grumbling that they needed "to sift through ***1,300+ pages*** of exhibits to assess" it, including some "***23,000+ words*** of" analysis and "100+ pages of claim charts" supporting the antedating claims. Appx1395-1396. Nevertheless, recognizing their burden to persuade the Board that Kovatch was prior art notwithstanding this evidence, in reply Petitioners offered

"multiple ***independent*** reasons" why the evidence purportedly failed to demonstrate "reduction-to-practice." Appx1397. Thus conceding that Parus had established prior conception, Petitioners argued that the evidence was missing independent corroboration of the reduction to practice. Appx1398-1400. They further argued that the evidence failed to demonstrate a constructed embodiment having a computer meeting all of the claimed limitations, Appx1401-1404, and that the evidence also failed to demonstrate an embodiment that "actually worked to retrieve website information," Appx1404-1406. Finally, Petitioners argued that the specific reduction to practice dates reflected in the evidence were uncorroborated. Appx1407.

Parus answered each of these arguments in its sur-reply, Appx1435-1446, and these particular disputes on the meaning and significance of the evidence were joined at the hearing before the Board, Appx1527-1539, Appx1558-1573.

*The "Kurganov-262" priority reference.*

The other primary reference asserted by Petitioners was what they termed "Kurganov-262"—which was nothing other than the published primary reference to which the '431 and '084 patents claim priority, and from which they are both continuations. Appx8, Appx1811-1826. There was no dispute that this priority document shares a specification with the '431 and '084 patents. Appx54, Appx83. Petitioners had argued that the document was prior art as to all of the challenged claims of the '084 patent, and as to some of the challenged claims of the '431 patent,

because the specification purportedly failed to provide written description support for claim language reciting the periodic search "via the one or more networks to identify new web sites and to add the new web sites" to the system. Appx136 (claim 1), *see also* Appx114 (claim 9). In its preliminary response, Parus pointed out that, because Petitioners' argument amounted to the assertion that the challenged claims were lacking written description support in *their own* specifications, the challenge under so-called "Kurganov-262" was nothing but "a clandestine assertion of invalidity for lack of written description under § 112," Appx9302—beyond the Board's authority under 35 U.S.C. § 311(b). Nevertheless, the Board instituted.

Aside from the question of statutory authority, the written description dispute between the parties' turned on how the specification's description of the second embodiment's devices that "appear as 'web sites' connected to the network" informed a proper understanding of the invention as a whole. Appx112 (17:50-52). Petitioners argued that "[t]he types of 'household devices' described in the second embodiment—lights, sprinklers, air conditioners, etc.—manifestly do not meet the ordinary meaning of 'web sites,' and the specification does not redefine 'web sites' to cover such devices." Appx9174. They acknowledged that while the specification states that devices may appear as "web sites" connected to the network, a "POSA would have understood this to teach that the devices are, of course, not actually web sites, but only 'appear' to the device browsing server as URLs." Appx9175.

Parus argued in response that the devices in the second embodiment may in fact be web sites, citing the same portion of the specification explaining that devices may appear as "web sites" connected to the network. Appx9303, Appx9467. Parus also submitted expert testimony opining that the "disclosure shows that the devices in the second embodiment may in fact be web sites," Appx16757, and that "a POSITA would understand that the disclosure confirms that the features of the first and second embodiments apply equally to each other and are the same, including searching for new devices/web sites," Appx9475-9477.

**E. The Board's Decisions.**

The Board's final written decision on the '431 patent spent some fourteen pages addressing the Kovatch antedating issues relating to the prior conception and reduction to practice of the claimed inventions. Appx12-25. But the Board did not consider the evidence in the record that Parus had produced to meet its burden of production on these issues. *Id.* Instead, the Board considered only the specificity of the attorney arguments presented by Parus relating to its conception and reduction to practice of the claimed inventions. *Id.* Finding those attorney arguments insufficiently specific and persuasive, the Board concluded that Parus had "not complied with Rule 42.6(a)(3)." Appx25. On that basis alone, the Board chose to "disregard" both the arguments presented *and* the evidence produced by Parus, on which the parties had engaged in further discovery and argument. *Id.* And having

disregarded the antedating evidence of record, the Board concluded "that Kovatch is prior art to the '431 patent." *Id.* It then proceeded to find the challenged claims of the '431 patent obvious in view of Kovatch-based combinations. Appx32-52.

On the written description challenge to the claims of the '084 patent, and claim 9 of the '431 patent, the Board found insufficient support in the respective specification for the claim elements requiring a computing device "configured to periodically search via one or more networks to identify new web sites and to add the new web sites to the plurality of web sites." Appx58-61, Appx87-91. The Board did not dispute that the specification disclosed a device browsing server that operated similarly to the web browsing server, and that the device browsing server could detect and incorporate new devices. Appx112-113 (17:50-58, 19:10-28). But the Board concluded that this teaching was inapplicable to the web browsing server because the specification "indicates that the devices '*appear* as 'web sites' connected to the network.'" Appx59. Reasoning that to "'appear' as a web site is not the same as being a web site," the Board concluded that this passage made the teaching of detection and incorporation of new devices that "appear" as "web sites" inapplicable to any teaching of detection and incorporation of new web sites. *Id.*

After concluding that there was insufficient written description support for the challenged claims of the '084 patent, and claim 9 of the '431 patent, the Board made

quick work of finding obviousness combinations satisfying the element for which it had found insufficient support in the specification. Appx61-62, Appx91-93.

These appeals followed.

## SUMMARY OF THE ARGUMENT

A. The Board found that every challenged claim of the '431 patent was unpatentable based on an obviousness combination starting with the Kovatch reference. But it found that the Kovatch reference was prior art only after making the considered decision to disregard substantial evidence of record showing that the invention in the '431 patent was conceived and reduced to practice before Kovatch's earliest priority date. That decision reflected legal error for at least four reasons.

1. The decision violated the Administrative Procedure Act ("APA"). As an administrative agency, the Board is obligated to consider all evidence of record prior to issuing any final substantive determination. And that obligation cannot be obviated by rule or regulation. There is no dispute that the antedating evidence regarding conception and reduction to practice was in the record before the Board; the Board therefore erred as a matter of law in disregarding it.

2. The decision reflected a misplacement of the parties' burdens in the IPR. Petitioners bore the burden of persuasion—to prove through specific argument that, taking all evidence of record into account, Kovatch was prior art. With respect to conception and reduction to practice, Parus bore only the burden of production—to

produce the antedating evidence that Petitioners and the Board were obligated to consider and address. In suggesting that Parus could not meet its antedating burden with the production of evidence, but needed instead to persuade the Board on the antedating issues with specific attorney argument, the Board improperly replaced Parus' burden of production with a burden of persuasion and proof.

3. The decision conflicted with the governing IPR statutory and regulatory provisions. The Board effectively found that it had no obligation to consider the antedating evidence of record in the absence of sufficiently specific and persuasive attorney argument addressing that evidence in the patent owner response. But the IPR statute requires specific and persuasive attorney argument only *from the petitioner*. 35 U.S.C. § 312. It puts no similar obligation *on the patent owner*, nor does it give the Board discretion to put any similar obligation *on the patent owner*. *Id.* § 313. The IPR regulations likewise do not require a patent owner to establish *any* proposition with specific and persuasive argument in a patent owner response—nor even to file *any* patent owner response at all. 37 C.F.R. § 42.120(a).

4. The decision cannot be justified by application of 37 C.F.R. § 42.6(a)(3). The Board determined that § 42.6(a)(3) provided with it with discretion to disregard the antedating evidence in determining whether Petitioners had met their burden to prove that Kovatch was prior art. But that rule—which simply prohibits incorporating attorney arguments by reference—provides the Board with no such

discretion. It does not, and cannot, give the Board discretion to disregard record evidence. It does not, and cannot, give the Board authority to place a burden of proof onto the patent owner in an IPR. It does not, and cannot, require from the patent owner some particular form of argument which the statute holds can only be required from the petitioner. The Board cited to an unpublished opinion from this Court as support for its application of § 42.6(a)(3), but that opinion only confirms the pressing need for a considered and published opinion addressing the issues in this appeal.

B. The Board found that every challenged claim of the ’084 patent, as well as challenged claim 9 of the ’431 patent, lacked written description support—in the challenged patents’ own respective specifications—sufficient to satisfy 35 U.S.C. § 112, ¶ 1. These findings reflect legal error for at least two reasons.

1. They exceeded the Board’s statutory authority under 35 U.S.C. § 311(b). The Supreme Court has made clear that the Director has no discretion to deviate from the statutory scope of IPRs laid out in § 311(b), and that section precludes IPRs from reaching grounds raised under § 112—such as written description. The Board takes the position that § 112 challenges may be raised where they relate *only* to priority and *not* to assertions that challenged claims find insufficient support in the challenged patent’s own specifications. But that is precisely the assertion that the Board analyzed and determined in these IPRs. The Board’s written description opinions in these IPRs, in fact, cite for support *exclusively* to the specifications in

the challenged ’084 and ’431 patents. These determinations are thus nothing more nor less than determinations of grounds raised under § 112, ¶ 1—and the Board has no authority to address those grounds in an IPR under § 311(b). This Court should thus reverse these determinations with instructions to uphold these claims.

2. Even if the Board had authority to address the written description challenges raised by Petitioners, its analyses of those challenges were legally deficient. The Board read a critical passage of the specification describing *relevance and similarity* to posit *irrelevance and dissimilarity*—and to make the teachings in one part of the specification inapplicable to the teachings in another and of the whole. That reading further appeared to rely, at least implicitly, upon an incorrectly limiting construction of the claim term “web sites.” But, notwithstanding the parties’ dispute over its meaning, the Board never explicitly construed that term. Thus, even if the Court determines that the Board had authority to address these written description challenges, it should reverse and remand for the Board to reconsider these challenges following a proper analysis and construction of the claim term “web sites.”

## ARGUMENT

### A. Standard of Review.

“As formal administrative adjudications, IPRs are subject to the APA.” *Hamilton Beach Brands, Inc. v. f’real Foods, LLC*, 908 F.3d 1328, 1338 (Fed. Cir. 2018). The Administrative Procedure Act (“APA”) “requires that [this Court], as the

reviewing court, 'hold unlawful and set aside agency action … not in accordance with law [or] … without observance of procedure required by law.'" *FanDuel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1339 (Fed. Cir. 2020). The Court must also set aside any agency action found to be "arbitrary, capricious, an abuse of discretion [or] … in excess of statutory jurisdiction, authority, or limitations …." 5 U.S.C. § 706(2). This Court reviews "de novo whether the Board's procedures satisfy the APA." *FanDuel*, 966 F.3d at 1339.

### B. The Board Legally Erred When It Chose to Disregard Record Evidence In Determining That Kovatch Was Prior Art.

#### 1. The Board's decision to disregard evidence violated the APA.

In "every case, it remains the Board's essential function to make factual findings based on its view of the record." *FanDuel*, 966 F.3d at 1344. And any "final substantive" findings "must be based" on its view of "*the entirety* of the record." *Aqua Prods. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) (en banc) (O'Malley, J. op.). As Judge O'Malley explained in the *Aqua Products* plurality opinion, the Board's "refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious within the meaning of 5 U.S.C. § 706, which governs review of agency adjudications." *Id.* This means that, under the APA, the Board "must take account of all the evidence of record, including that which detracts from the conclusion [it] ultimately reaches." *Id.*; *see also Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010); *Princeton Vanguard LLC v. Frito-Lay N. Am. Inc.*, 786 F.3d

960, 970 (Fed. Cir. 2015); *In re Magnum Oil Tools Int'l Ltd.*, 829 F.3d 1364, 1378 (Fed. Cir. 2016); *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1357 (Fed. Cir. 2009); *In re Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002).

This "[b]asic principle[] of administrative law," *Aqua Prods.*, 872 F.3d at 1325, was violated in this proceeding. Petitioners bore the burden of persuasion to prove, among other propositions, that Kovatch was prior art. Appx25. There was evidence of record detracting from the conclusion the Board ultimately reached on that issue—including inventor, employee, and expert testimony and charts, Appx7749-7817, Appx8155-8262, Appx8978-9068, as well as source code files, Appx7821-7832, Appx7840-8154, Appx8266-8277, Appx8281-8299, Appx8308-8364, emails, Appx7818-7820, Appx8365-8379, Appx8951-8956, and press releases, Appx8302-8304, Appx8952-8954, among other evidence, Appx1301-1302, all indicating that the challenged claims were conceived and reduced to practice prior to Kovatch. As the ones bearing the burden of proof, Petitioners first engaged in discovery on this record evidence, Appx6721-6726, Appx6828-6835, Appx6970-6975, and then offered arguments purportedly identifying a handful of specific deficiencies they claimed to have uncovered regarding the evidence, Appx1397-1408. Parus answered those arguments, Appx1435-1446, and the parties' particular disputes on the meaning and significance of the evidence were joined at the hearing before the Board, Appx1527-1539, Appx1558-1573.

Nevertheless, the Board refused to consider this evidence bearing on the issue before it—which indisputably detracted from the conclusion it reached. Appx21, Appx25. The Board justified its refusal on the basis of a procedural rule relating to the incorporation of arguments. Appx25. The Board erred in its application of that rule for a number of reasons, addressed below. But no matter: the obligation to "take account of all the evidence of record, including that which detracts from the conclusion" that the Board ultimately reaches, is *not* "one the Director may obviate by rule." *Aqua Prods.*, 872 F.3d at 1325-26. That is, the requirement that the Board's final decision "must be based on *the entirety* of the record" is *not* one the "Board may eschew simply by the adoption of practices it employs when considering" whether a reference is prior art "during the course of an IPR." *See id.*; *see also Cold War Museum*, 586 F.3d at 1357 (finding that, when evidence is "part of the record before the Board," the Board is "required to consider" it in determining whether the petitioner has "met its burden of [proof] by a preponderance of the evidence"); *Magnum Oil Tools*, 829 F.3d at 1378 ("the Board has an obligation to assess [the petitioner's contentions] anew after trial based on the totality of the record").

In short, it should be a "fairly uncontroversial proposition under the APA" that finding Kovatch was prior art "without consideration of the entirety of the IPR record was an abuse of discretion which provides an independent basis" to reverse or vacate and remand "this matter to the Board." *Aqua Prods.*, 872 F.3d at 1326.

### 2. The Board's decision to disregard evidence reflected a misplacement of the parties' respective burdens.

The Board's misplacement of the parties' respective burdens provides another independent reason to reverse and remand. *See Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1246 (Fed. Cir. 2018) (finding that a misplacement of burdens, reflected by a reliance on "attorney argument" rather than "evidence," required remand).

The Board recited the respective burdens to be carried by Petitioners and Parus, but it struggled with allocating those burdens in this proceeding. The Board acknowledged that, in an IPR, "the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." Appx12; *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). The Board also acknowledged that, on the issues of conception and reduction to practice "for the purposes of establishing a priority date, the burden of production can shift from the patent challenger to the patentee." Appx13; *Magnum Oil Tools*, 829 F.3d at 1375-76. But there was uncertainty regarding how the burden of production was to be met. As the Board queried counsel for Petitioners at the hearing: "how much [does Parus] have to present before the burden then would switch over to petitioner to, I guess, prove its case according to the burden of persuasion?" Appx1528. Counsel responded: "*Dynamic Drinkware* says they have to present persuasive argument. The burden is on the patentee to have, you know, not only evidence, but argument showing that

the claim limitations are met by this earlier invention." Appx1528; *see also* Appx1396 (arguing that a "patent owner's burden to antedate a reference cannot be met by non-specific reference to inventor testimony").

That is how the Board proceeded to determine the issue. Finding insufficient specificity in Parus' attorney "arguments regarding prior conception and reduction to practice," Appx16, the Board concluded that Parus had failed to meet its burden of production on that basis alone, Appx21—and thus disregarded both the arguments *and* the evidence produced by Parus tending to show "that the inventors conceived of and reduced to practice the invention claimed in the '431 patent prior to the earliest priority date of Kovatch." Appx25. And having disregarded that evidence, the Board "conclude[d] that Kovatch is prior art to the '431 patent." Appx25.

This was a misapplication of controlling law. *Dynamic Drinkware* does not hold—and could not hold—that, no matter the quantum or character of the evidence produced, satisfying the burden of production *requires* attorney argument. To the contrary, the Court in *Dynamic Drinkware* concluded that the patent owner met its burden of production when it "*produced evidence* that the invention claimed in [its] patent was reduced to practice prior to the filing date of" the asserted reference. 800 F.3d at 1380 (emphasis added). There should be no confusion on this point: a party who has "*offered evidence*" for the purpose of showing "that he invented the subject matter of the patent before publication" of an asserted reference has "*met his burden*

*of production*." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1575-77 (Fed. Cir. 1996) (emphasis added); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("By producing *evidence* (whether ultimately persuasive or not) … petitioners sustained their burden of production.") (emphasis in original).

To be sure, *Dynamic Drinkware* does speak of a "burden of production … to argue *or* produce evidence." 800 F.3d at 1380 (emphasis added). It borrows that language from an earlier decision noting that the burden of production might involve "producing additional evidence and presenting persuasive argument based on new evidence or evidence already of record, *as the case may require*." *Tech. Licensing Corp. v. Videotek, Inc.* ("*TLC*"), 545 F.3d 1316, 1328-29 (Fed. Cir. 2008) (emphasis added). But again, these comments do not mean—and cannot mean—that producing additional evidence is *insufficient* to meet the burden of production. Supreme Court case law holds otherwise. *St Mary's Honor*, 509 U.S. at 509. These comments simply suggest that, in certain cases, the burden of production can be met *without* producing additional evidence—by, for example, presenting persuasive argument based on new evidence produced by another party, or argument based on evidence already of record. *TLC*, 545 F.3d at 1328-29; *Dynamic Drinkware*, 800 F.3d at 1378-80.

The proposition that meeting the burden of production requires some substantial quantum of specific and persuasive attorney argument—as argued by Petitioners and adopted by the Board, Appx16-25—has no support in the controlling

case law. Indeed, in requiring Parus to offer persuasive attorney argument on every issue and element relating to conception, reduction to practice, and reasonable diligence toward reduction to practice, the Board effectively shifted the risk of non-persuasion to Parus. That is nothing more nor less than shifting the burden of persuasion to Parus. *See TLC*, 545 F.3d at 1328-29; *see also Magnum Oil Tools*, 829 F.3d at 1378 (noting that the Board's faulting a patent owner for failing to offer adequate explanations of the evidence reflected an improper shifting of the burden of persuasion onto the patent owner). This is another legal error that requires reversal and remand. *Dynamic Drinkware*, 800 F.3d at 1378-80; *Worlds*, 903 F.3d at 1246.

This legal error also highlights the need for increased clarity in applying the burden of production in the IPR context. Some of the lingering confusion can likely be traced to this Court's terminology regarding the "burden of proof." *See Dynamic Drinkware*, 800 F.3d at 1378-80; *TLC*, 545 F.3d at 1326-27.

The Supreme Court has explained, in the context of interpreting the APA, that for "many years the term 'burden of proof' was ambiguous because the term was used to describe two distinct concepts"—both "the burden of persuasion" and "the burden of production." *Dir. v. Greenwich Collieries*, 512 U.S. 267, 272 (1994). The Supreme Court resolved "to eliminate the ambiguity" by distinguishing between the "burden of proof, which we defined as [the] burden of persuasion," and the separate "burden of production or the burden of going forward with the evidence." *Id.* at 274.

This approach properly differentiates between "the duty of the person alleging the case to prove it" and "the duty of the one party or the other to introduce evidence." *Id.*; *see also Microsoft Corp. v. i4i Ltd. P'Ship*, 564 U.S. 91, 100 n.4 (2011) ("we use 'burden of proof' interchangeably with 'burden of persuasion'").

This Court's decisions in *Dynamic Drinkware* and *TLC* conflict with the Supreme Court's terminological approach—they describe "two distinct burdens of proof: a burden of persuasion and burden of production." *Dynamic Drinkware*, 800 F.3d at 1378-80; *see TLC*, 545 F.3d at 1326-27. In treating the burden of production as a burden of proof, these decisions perpetuate the ambiguity the Supreme Court has worked to eliminate, and invite the kind of confusion and misapplication of the burden of production apparent in this proceeding. This appeal provides the Court with the opportunity to conform its terminology to that of the Supreme Court.

Some of the lingering confusion can likely also be traced to the historical development of the requirements for determining priority. As the Board's final written decision reflects, the seminal opinions setting out the rules regarding conception, reduction to practice, and reasonable diligence toward reduction to practice were issued by this Court in the late 1990s. Appx12; *see Mahurkar*, 79 F.3d at 1576-78; *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998). And as those cases reflect in turn, these relevant "rules of law" were largely "borrowed from the interference context." *Mahurkar*, 79 F.3d at 1576. But in the interference context—

in sharp contrast to the IPR context—the antedating inventor "bore the burden of proving priority by a preponderance of the evidence." *Cooper*, 154 F.3d at 1326. The old case law is thus replete with references to what "the inventor must prove" to "establish" conception and reduction to practice. *See* Appx12.

Those references made sense in the context of proceedings in which the patent owner bore the burden of persuasion to prove conception and reduction to practice by a preponderance of the evidence. *See Scott v. Finney*, 34 F.3d 1058, 1061 (Fed. Cir. 1994). But in the context of IPR proceedings, the patent owner bears no burden of persuasion and, using the Supreme Court's APA terminology, no burden of proof at all. *See* 35 U.S.C. § 316(e); *Dynamic Drinkware*, 800 F.3d at 1378-80; *Greenwich Collieries*, 512 U.S. at 274. Instead, the patent owner bears only the burden of production: the burden "to introduce evidence which, *taken as true*, would *permit* the conclusion" that the requirements for conception and reduction to practice had been met. *See St. Mary's Honor*, 509 U.S. at 509 (emphasis in original). In this context, the burdens of persuasion and proof remain at all times on the petitioner—who, in order to carry those burdens, must convince the Board that the evidence introduced by the patent owner is in fact deficient, and does not in fact show that the requirements for conception and reduction to practice are met. *See Dynamic Drinkware*, 800 F.3d at 1380; *Magnum Oil Tools*, 829 F3d. at 1375-78.

This appeal provides the Court with the further opportunity to eliminate the ambiguities that have resulted from "borrow[ing]" antedating rules "from the interference context," *Mahurkar*, 79 F.3d at 1576, and to ensure that the critical distinctions between the burdens of "proof" and of "production"—highly relevant here, less so in the interference context—are not "blurred by careless speech," *Greenwich Collieries*, 512 U.S. at 274. In this proceeding, the Board concluded that an insufficient quantum of persuasive attorney argument amounted to a failure to meet the burden of production. It supported that conclusion with a cite to *Magnum Oil Tools*, 829 F.3d at 1375-76—which noted, in recounting prior decisions, that an inventor "bears the burden of establishing that its claimed invention is entitled to an earlier priority date than an asserted prior art reference." *Id.*; Appx21. That language is clear in the interference context. In the IPR context, it is less so. But in any event, it does not support the Board's determination here that Parus could not satisfy the burden of production with the production of evidence, but instead only with the presentation of sufficiently specific and persuasive attorney argument. Appx25.

**3. The Board's decision to disregard evidence conflicted with the governing IPR statutory and regulatory provisions.**

The Board's decision is also in conflict with the governing statute and related regulations. The Board held that it had no obligation to consider the antedating evidence in the record, and Petitioners had no obligation to address it, in the absence of sufficiently specific attorney argument in Parus's patent owner response. Appx21,

Appx16-25. Put another way, the Board concluded that specific and persuasive attorney argument in a patent owner response was *required* for Parus to meet a burden of production and "introduce[] evidence properly" into the IPR. Appx21. As discussed above, the Board's approach finds no support in the APA or the burden of production case law. Neither does it find support in the IPR statute or regulations.

The statute requires specific argument *from the petitioner*: it provides that a petition for IPR "may be considered only if," among other things, "the petition identifies, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim …." 35 U.S.C. § 312. The statute puts no similar obligation *on the patent owner*, nor does it give the Director discretion to shape the scope of the litigation by putting any similar obligation on the patent owner. Rather, "the statute tells us that the petitioner's contentions, not the Director's discretion, define the scope of the litigation all the way from institution through to conclusion." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1357 (2018); *see id.* at 1355 ("we see that Congress chose to structure a process in which it's the petitioner, not the Director, who gets to define the contours of the proceeding"); *see also Aqua Prods.*, 872 F.3d at 1309-10 ("This provision confirms that the petitioner, not the patent owner, controls the scope of the IPR.").

This statutory distinction between the petitioner and patent owner—in which only the petitioner's arguments can define the scope of the proceeding—carries through to the regulatory scheme. The "IPR regulations do not require a patent owner to submit *any* response to the petition, either before or after institution." *FanDuel*, 966 F.3d at 1341-42; *see also* 37 C.F.R. §§ 42.107(a) (pre-institution, "[t]he patent owner *may* file a preliminary response to the petition" (emphasis added)), 42.120(a) (post-institution, "[a] patent owner *may* file a response to the petition" (emphasis added)); *Magnum Oil Tools*, 829 F.3d at 1376 n.1 ("the patent owner is not required to use its opportunity under the regulations to file a patent owner response"); *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1008 (Fed. Cir. 2018) ("a patentee technically has no 'burden' to do anything to defend the validity of its patent other than hold the patent challenger to its own burden of persuasion").

In short, nothing in the statute or the regulations gave the Board discretion to ignore evidence of record, or to hold that Petitioners had no burden to overcome it, based on an unspoken requirement for litigation-scope-shaping argument in the patent owner response. *Aqua Prods.*, 872 F.3d at 1309-10. And the Board's oblique reference in a footnote to some made-up rule requiring specific attorney argument in order to "introduce[] evidence properly" into an IPR, Appx21—with no citation to such a rule, because no such rule exists—does not help. It simply highlights the

violations of the APA and of Parus' right to due process in this proceeding. 5 U.S.C. § 706(2); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015).

Furthermore, there is no dispute that the antedating evidence *was* evidence of record. The regulations provide that "[e]vidence consists of affidavits, transcripts of depositions, documents, and things"; that "evidence must be filed in the form of an exhibit"; and that "[e]ach exhibit must be filed with the first document" in which it is cited. 37 C.F.R. §§ 42.6(c), 42.63. The antedating evidence indisputably satisfied all of these requirements, and the Board never suggested otherwise. Appx16-25, Appx1301-1302, Appx7744-9086. Once that evidence was produced, Parus' burden of production was discharged, *Mahurkar*, 79 F.3d at 1575-77; *St. Mary's Honor*, 509 U.S. at 509; the Board's administrative obligation to consider the evidence was triggered, *Aqua Prods.*, 872 F.3d at 1325-26; *Cold War Museum*, 586 F.3d at 1357; and Petitioners bore the burden of persuasion to prove—with specific arguments—that Kovatch was prior art *notwithstanding* the antedating evidence, *Dynamic Drinkware*, 800 F.3d at 1380; 35 U.S.C. § 316(e).

**4. The Board's decision to disregard evidence cannot be justified by application of 37 C.F.R. § 42.6(a)(3).**

The Board determined that 37 C.F.R. § 42.6(a)(3) provided it with authority and discretion to disregard the antedating evidence of record in determining whether Petitioners had met their burden to prove that Kovatch was prior art. Appx25. But 37 C.F.R. § 42.6(a)(3)—which simply states that "[a]rguments must not be

incorporated by reference from one document into another document," *id.*—provides the Board with no such authority or discretion.

Even if the Director had the power to promulgate a rule giving the Board discretion to disregard record evidence, § 42.6(a)(3) is not such a rule. It addresses only attorney argument, not record evidence. And the IPR regulations and case law make clear that attorney argument is *not* record evidence, and cannot be substituted for record evidence. 37 C.F.R. §§ 42.6(a)(3), 42.6(c), 42.63; *Worlds*, 903 F.3d at 1246 (explaining that, in the IPR context, "[a]ttorney argument is not evidence"). In any event, the Director has no power to promulgate a rule giving the Board discretion to disregard record evidence. *Aqua Prods.*, 872 F.3d at 1325-26.

Nor does § 42.6(a)(3) provide support for the Board's decision on any other basis. The rule does not require (nor could it) some specific quantum of attorney argument to meet a burden of production. It does not address the quality or quantity of attorney argument required to meet any burden, nor does it specify any requirement to meet a burden of production. *See St. Mary's Honor*, 509 U.S. at 509. Neither does the rule require some specific quantum of argument in order to introduce evidence into the IPR. Again, it does not address evidentiary requirements at all. The rule certainly does not require that every piece of evidence must be summarized in a patent owner response. *FanDuel*, 966 F.3d at 1341-42. Neither does

the rule provide (nor could it) that the scope of the litigation can be defined by any attorney argument found in the patent owner response. *SAS*, 138 S. Ct. at 1357.

In determining that it would not consider or weigh the antedating evidence in the record, the Board discussed and cited to this Court's unpublished opinion in *General Access Sols., Ltd. v. Sprint Spectrum L.P.*, 811 Fed. App'x 654, 656-57 (Fed. Cir. 2020); Appx15-16, Appx25. As an unpublished opinion, the decision in *General Access* may be mined for "persuasive reasoning," but is not to be treated as "binding precedent" controlling the decision in this appeal. FED. CIR. R. 32.1(d). And with respect, the decision in *General Access* provides insufficient reason to affirm; instead it confirms the pressing need for a considered and published opinion vacating the judgment below and remanding to the Board for further proceedings.

*General Access* addressed a "challenge to the Board's exclusion of arguments" under 37 C.F.R. § 42.6(a)(3) relating to prior conception. 811 Fed. App'x at 657. The opinion noted that the "prohibition against incorporation of arguments" serves policy goals such as minimizing "the chance that an argument may be overlooked," eliminating "abuses that arise from incorporation and combination," and curtailing the necessity for the Board to "play archeologist with the record." *Id.* The opinion further reasoned that arguments had been incorporated by reference in that proceeding, and thus there was no "abuse of discretion in the Board's enforcement of its rules" to exclude those arguments. *Id.* And "[w]ithout the

benefit of the arguments improperly incorporated," the opinion reasoned "that the conclusory assertions in GAS's patent owner response are insufficient to meet GAS's burden of establishing prior conception." *Id.* at 658-59.

The decision in *General Access*—holding at base that the Board did not abuse its discretion in excluding arguments under 37 C.F.R. § 42.6(a)(3)—does not address the critical questions raised in this appeal. It does not speak to whether § 42.6(a)(3) gives the Board authority and discretion to ignore evidence of record. *Supra* at 24-26. In fact, the Board considered the antedating evidence in the IPR underlying *General Access*, 811 Fed. App'x at 657, so that question was not raised there. Neither does the opinion in *General Access* contain any discussion or analysis of the distinction between the burden of production and the burden of proof. And as shown above, the reference to the "burden of establishing prior conception" in *General Access* is a vestige of interference practice reflecting ambiguities that proper application of Supreme Court case law would eliminate. *Supra* at 30-33. The opinion in *General Access* also does not address the Supreme Court's decision in *SAS* or the point that neither the IPR statute nor the IPR regulations place a burden on the patent owner to establish *anything* through attorney argument in a patent owner response. *Supra* at 35. To the contrary, these authorities provide that *the petitioner's* arguments "define the scope of the litigation all the way from institution through to conclusion." *SAS*, 138 S. Ct. at 1357; *see also Aqua Prods.*, 872 F.3d at 1309-10.

The silence of *General Access* on these important issues counsels addressing and resolving them in this appeal. Furthermore, *General Access* is not the only unpublished opinion in which the Board's exclusion of arguments under § 42.6(a)(3) has been upheld. *See* 3*M Co. v. Evergreen Adhesives, Inc.*, 860 Fed. App'x 724, 725-26 (Fed. Cir. 2021) (unpublished); *Bos. Sci. Neuromodulation Corp. v. Nevro Corp.*, 813 Fed. App'x 572, 582-83 (Fed. Cir. 2020) (unpublished). These two more recent unpublished opinions involving § 42.6(a)(3) are distinguishable—neither concerned a burden of production, and neither addressed the questions raised here. But the fact that the Board is turning to § 42.6(a)(3) with increased frequency counsels a published opinion setting out that rule's limitations in this appeal.

While *General Access* does not address the issues raised here, it is important to note that the policy concerns it mentions—overlooking arguments, playing archeologist with the record, 811 Fed. App'x at 657—were not implicated in this proceeding, and should not be threatened if the rules are applied correctly going forward. The key is to recognize that the statute and regulations put the burden and requirement for specific and persuasive briefing *on the petitioner*. *Supra* at 34-35. To the extent that the patent owner may have a burden of production relating to a question of priority, that will be satisfied by the production of evidence. Persuasive argument on that record evidence—pointing out specific elements that are *missing*—will then need to be offered by the petitioner in order to carry the burden to prove

that, when the entire record is taken into account, the asserted references are prior art. *Supra* at 36. Those arguments can then be answered by the patent owner, and the parties' disputes can be joined and explored at the hearing before the Board. Indeed, that is precisely how the procedure worked in this case. *Supra* at 14-16, 25-26.

No argument will be overlooked, *see General Access*, 811 Fed. App'x at 657—so long as the petitioner makes whatever specific arguments are necessary to carry its burden to prove that its asserted references are prior art *notwithstanding* the antedating evidence. In this proceeding, Petitioners offered a number of specific arguments as purported reasons that, taking the antedating evidence into account, there was no reduction to practice, and Kovatch remained prior art. Appx1397-1408. The Board elected not to address those arguments. But it can do so on remand. Neither will there be any need for the Board to play archeologist with the record, *see General Access*, 811 Fed. App'x at 657—so long as the petitioner makes specific reference to the portions of the antedating evidence the Board must examine in order to determine whether the petitioner has met its burden to prove that the asserted references are in fact prior art. In this proceeding, the Board found no issue with any lack of specific reference to the portions of the antedating evidence that, following discovery, were *actually in dispute* between Petitioners and Parus.

Petitioners complained that the substantial amount of antedating evidence produced required *Petitioners* to "sift through ***1,300+ pages*** of exhibits," "***23,000+***

***words*** of analysis/argument from multiple declarations," and "100+ pages of claim charts." Appx1395-1396. But that is simply a function of the burden they carry to prove that Parus' issued patents are unpatentable. Nothing in the statute or the regulations precludes Parus from offering *too much* evidence that its patents are patentable. Put another way, Petitioners' complaint that the record contained *too much* evidence of patentability is not one recognized by Congress or the Director. Neither does it justify the Board's decision to disregard that evidence. Because Petitioners must shape the scope of the litigation, the burden was on them to bring disputes over the record evidence into sharp focus. There is no reason to think that an accurate placement of the burdens will make any extra work for the Board.

With respect to the final policy concern regarding potential "abuses," *see General Access*, 811 Fed. App'x at 657, applying § 42.6(a)(3) in the manner the Board did here promises, if anything, to multiply the opportunities for abuse. The regulations give patent owners like Parus the right, but not the obligation, to file a patent owner response rebutting the contentions in the petition. 37 C.F.R. § 42.120. Patent owners who choose to rebut the petition's contentions are limited to a single response containing no more than 14,000 words—the same as the word limit for petitions. *Id.* § 42.24. The rules thus plainly envision that a patent owner will have the right to spend as many words rebutting the petition's contentions as the petition uses to advance them. *See id.* But under the Board's approach here, a patent owner

who chooses to exercise its right to rebut the petition's contentions must include in its single response—in order to meet a simple burden to produce evidence—specific, persuasive, element-by-element attorney argument on conception, reduction to practice, and reasonable diligence toward reduction to practice. Appx25.

As Petitioners' arguments to the Board demonstrate, the specific and persuasive element-by-element attorney argument necessary to establish all of those issues might easily surpass 14,000 words. In this case, as Petitioners point out, such priority-related arguments could be expected to require some "***23,000+ words***" and "100+ pages of claim charts." Appx1395-1396. And even if a patent owner like Parus were forced to shorten its priority-related attorney argument to 14,000 words, in so doing the patent owner would still be spending its entire response trying to meet a burden of *producing evidence*—and would effectively be losing its guaranteed right to file a response rebutting the contentions advanced by the petitioner in the petition. The Board's approach thus turns upside down the rules mandating specific argument only for the petitioner, and not for the patent owner.

The Board found that every challenged claim of the '431 patent was unpatentable in view of combinations that included Kovatch as the central prior art reference. Those findings are all legally unsupported because they turn on the Board's intentional disregard of record evidence relating to conception and reduction

to practice. The Board's determination that Kovatch is prior art should be reversed, its judgment resting on that determination vacated, and the matter remanded.

### C. The Board Legally Erred When It Found That the Remaining Challenged Claims Lacked Written Description Support.

#### 1. The Board's written description determinations exceeded its statutory authority.

The Board found that every challenged claim of the '084 patent—as well as claim 9 of the '431 patent—lacked written description support sufficient to satisfy 35 U.S.C. § 112, ¶ 1 in the respective (identical) specifications of the '084 and '431 patents. Appx53-61, Appx83-86. Those findings should be reversed for a simple reason: they exceeded the Board's statutory authority under 35 U.S.C. § 311(b).

The Supreme Court's decision in *SAS* confirms that the Director has no discretion to deviate from the statutory scope of IPRs laid out in § 311(b). *SAS*, 138 S. Ct. at 1357. As noted, "Congress chose to structure a process in which it's the petitioner, not the Director, who gets to define the contours of the proceeding." *See id.* at 1355. But § 311(b) also draws clear lines that neither the Director *nor* the petitioner can cross: an IPR may reach no further than "a ground that could be raised under section 102 or 103"—anticipation or obviousness. 35 U.S.C. § 311(b). Under the plain meaning of this statutory limitation, IPRs may not reach grounds that could be raised under section 112—such as written description. *Id.*; *see also id.* § 112.

The limitation makes good sense: in issuing the patent that is being challenged in an IPR, the Patent Office has *already* and *necessarily* considered the written description question, and found that the specification contains written description support sufficient to satisfy § 112, ¶ 1. Excluding § 112 grounds from the proper scope of an IPR thus appears to reflect Congress's intent that IPRs would not be used as an opportunity for a straightforward "redo" of work the Patent Office has already done. In any event, no matter what policy considerations motivated Congress, the limitation is unmistakable. Indeed, Congress knows how to imbue the Board with power to address grounds under § 112 when it finds such power appropriate. The statute establishing "post-grant review," for example, expressly provides for such authority in those proceedings. 35 U.S.C. § 321(b). Congress expressly denied that power to the Board in the institution and determination of IPRs. *Id.* § 311(b).

The Board is aware of this statutory limitation on its authority, but has found that challenges raising § 112, ¶ 1 arguments can be permissible when "the issue is *not* whether there is sufficient description in the [challenged] Patent, but whether the written description in the earlier application supports Patent Owner's claim to priority." *See SAP America, Inc. v. Lakshmi Arunachalam*, IPR2014-00414, Paper 24 (Final Written Decision) (PTAB Aug. 17, 2015) (emphasis added). Whatever the merits of that position, there can be no doubt that the fundamental question presented in these IPRs—the one analyzed and answered by the Board—*was precisely*

"whether there is sufficient description in the [challenged] Patents" for the challenged claims. *See id.*; Appx54, Appx83. That is indisputably a ground raised under § 112, ¶ 1, and in reaching it the Board exceeded its statutory authority.

Petitioners will likely respond that their petition only contends that so-called "Kurganov-262" lacks written description support for the relevant claims of the '431 and '084 patents, and that using "Kurganov-262" as prior art allows for obviousness combinations that render those claims unpatentable. Appx53, Appx82. Substantive statutory limits on the Board's authority, however, should not be evaded by clever naming conventions or manipulative pleading. There is no dispute that the "Kurganov-262" specification is the same as the specifications for the '431 and '084 patents. Appx54, Appx83. In fact, the Board's analysis of the § 112, ¶ 1 issue in both final written decisions cites *exclusively* to the specifications for the '431 and '084 patents. Appx54, Appx83. The Board's determinations in both final written decisions thus stand plainly for the proposition—nothing more and nothing less—that the challenged claims of the '084 patent, and challenged claim 9 of the '431 patent, lack sufficient written description support in the specifications of the '084 and '431 patents, respectively. Appx53-61, Appx82-91. Those determinations, which alone render those claims unpatentable on grounds raised under § 112, ¶ 1, are beyond the Board's statutory authority under § 311(b).

Nor is there any reason to believe that either Petitioners or the Board can manufacture jurisdiction or statutory authority for those determinations simply by stacking some meaningless and unnecessary obviousness combinations on top of the § 112, ¶ 1 grounds. Once the challenged claims were found to lack sufficient written description support in the specifications of the '084 and '431 patents, the claims were unpatentable on that basis alone. Making additional findings that written description support for the purportedly missing limitations could be found in some other references added nothing substantive to the result. Petitioners understand that their purported obviousness combinations add nothing to their written description arguments on these claims—in the district court litigations, they offer no obviousness combinations based on "Kurganov-262"; they simply argue that, for much the same reasons pressed here, the claims of the '084 and '431 patents are invalid for lack of written description support. *Cf.* Appx54, Appx83, Appx9302.

The statute should not be read in a way that permits Petitioners to manipulate the Board's jurisdiction in this way, and to gin-up authority for the Board to decide grounds plainly excluded by § 311(b) simply through artful pleading strategies. As Parus explained to the Board, Petitioners' arguments based on "Kurganov-262" were nothing more than "a clandestine assertion of invalidity for lack of written description under § 112." Appx9302. The Board ignored that argument, and it was error to do so. The Board had no authority under § 311(b) to determine that the

challenged claims lacked written description support in their respective specifications under § 112, ¶ 1. Reversal is appropriate on that basis.

This issue also has broad significance. Continuation patents are subject to heightened scrutiny during examination, as the application to which a continuation claims priority is always subjected to the full review of a patent examiner. 35 U.S.C. §§ 111(b), 131. And continuation patents make up a substantial percentage of the patents being examined and granted by the Patent Office. Late last year, the Patent Office reported that over one in five issued patents gives birth to a continuation, with over 112,000 continuation U.S. patent applications filed in 2021 alone. *See* USPTO, *FY21 Pendency Stats Review*, https://www.uspto.gov/sites/default/files/documents/20211115-PPAC-FY21-pendency-stats-review.pdf at 6-7 (last accessed April 27, 2022). Thus, allowing challenges to the "priority" of continuation claims through clandestine § 112, ¶ 1 arguments—as happened here—threatens to rip a significant hole in the statutory scheme designed by Congress. 35 U.S.C. §§ 311(b), 325(d).

**2. The Board's written description analyses were legally deficient.**

Even if the Board had authority to make its determination that the challenged claims lacked written description support under § 112, ¶ 1, its analysis of this issue in the final written decisions is legally deficient. Thus, if the Court does not reverse with instructions to uphold the claims subject to these challenges, it should reverse

and remand with instructions for the Board to reconsider the written description issues based on a proper analysis and construction of the term “web sites.”

*The Board’s implausible “appear as ‘web sites’” analysis.*

The written description challenge raised by Petitioners alleged a lack of specification support in the respective patents for the claimed element reciting: “wherein the computing device is further configured to periodically search via the one or more networks to identify new web sites and to add the new web sites to the plurality of web sites.” Appx136 (claim 1), Appx 114 (claim 9), Appx58. Parus pointed out, among other things, that the specification discloses two primary preferred embodiments; one involving networked “web sites,” the other involving networked “devices.” Appx54, Appx105-111, Appx112-113. The specification further teaches that the device browsing embodiment “provides the same robustness and reliability features described in the first embodiment”—including the ability to detect “new devices” and mark them “as being … new” in the system. Appx113 (19:10-28). Parus also submitted expert testimony explaining that a person of skill, reading the four corners of the specification, would understand that the disclosure on the second embodiment was applicable to the first embodiment—the teaching that new devices can be detected and added to the list of pre-selected devices also teaches that new web sites can be detected and added to the list of pre-selected web sites. Appx16756-16759 (“The first embodiment disclosed describes using the voice

browser system to browse web sites, and the second embodiment describes using the voice browser system to browse devices. However, the disclosure makes it clear that these embodiments are not exclusive, and a POSITA would understand that the description of the second embodiment concerning a system for browsing devices is equally applicable to web sites and to the first embodiment system for browsing web sites."); Appx9475-9477 ("a POSITA would understand that the disclosure confirms that the features of the first and second embodiments apply equally to each other and are the same, including searching for new devices/web sites").

The Board concluded otherwise. Appx59, Appx88-89. And in a surprising twist, it concluded otherwise principally on the basis of the specification's teaching that, in the second embodiment, the devices "*appear* as 'web sites' connected to the network." Appx59 (emphasis in original). The Board did not dispute that the second embodiment teaches the detection of new devices that "appear" as "web sites." *Id.* But to "'appear' as a web site," the Board reasoned, "is not the same as being a web site." *Id.* The Board thus determined that, in explaining that the second embodiment devices "appear" as "web sites," the specification would be read by one of skill to *silo* the two embodiments, and to make the disclosure regarding detecting and adding new devices in the second embodiment *inapplicable* to the "web sites" in the first embodiment. The Board credited the testimony of Petitioners' expert on that point, but only the ground that it was "supported by [the Board's] reasonable reading of

the '431 [and '084] patent[s]." Appx59, Appx88. To the contrary, however, the specification makes clear that the description of devices that "appear" as "web sites" does not *distinguish* the embodiments or make them *inapplicable* to each other—rather it "allows a network interface system, such as a device browsing server 506, a database 508, and a user interface system, such as a media server 510, to operate similar to the web browsing server 102, database 100 and media server 106 described in the first embodiment above." Appx112 (17:50-57); *supra* at 10.

This specification passage thus explains exactly how and why the two embodiments operate *similarly*—in *both* embodiments, the system treats the networked sources as if they were "web sites." *Id.* The Board's reading of that explanation of *relevance and similarity* to find *irrelevance and dissimilarity*—and to make the teachings in one part of the specification *inapplicable* to the teachings in another—was a clear error in the Board's written description analysis. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (noting that the test requires an inquiry from the perspective of a person of skill into all "four corners of the specification"); *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362 (Fed. Cir. 2022) (noting that "context," "knowledge of those skilled," and "common sense" all matter for written description); *Nalpropion Pharms., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344, 1350-51 (Fed.

Cir. 2019) (noting that claim language need not be found "*in haec verba* in the specification," and "[r]igidity should yield to flexible, sensible interpretation").

*The Board's implicit reliance on a contradictory construction of "web sites."*

The Board's written description analysis is legally deficient for a second reason. It appeared to rely, at least implicitly, on an unexpected and contradictory construction of the claim term "web sites"—one in which "web sites" are not web sites. But the Board never expressly construed the term. Written description determinations necessarily depend on a proper construction of any relevant claim terms. The Board, like any court, "must base its analysis of written description under § 112, ¶ 1 on proper claim construction." *Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1336 (Fed. Cir. 2010); *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1324 (Fed. Cir. 2017) (affirming a finding of no invalidity for lack of written description when claim scope was first determined through proper construction); *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed. Cir. 2009) (reversing a finding that an applicant's written description was adequate because the district court erred in its claim construction).

As noted, the Board's written description conclusion appears assume an implausible and counter-intuitive meaning of the claim term "web sites." Appx58-59, Appx88. In the Board's view, a device that "appears" as a "web site" *cannot be* a "web site." Appx59, Appx88. But the Board did not offer any reasoned claim

construction in the final written decisions prior to performing its written description analysis. That was error. *See Koninklijke*, 590 F.3d at 1336 (finding error where, in performing a written description analysis, "the district court did not construe the disputed term at all"); *Cf. also CSR, PLC v. Skullcandy, Inc.*, 594 Fed. App'x 672, 678 (Fed. Cir. 2014) (unpublished) (holding that "[t]he Board erred by failing to construe 'threshold value' as it is used in claims 1-6 before finding that the [prior art reference] Smith failed to disclose a 'threshold value'").

Parus and the Petitioners plainly disagreed on the meaning of "web sites" as used in the challenged claims. Both Parus and Petitioners offered contested argument and expert testimony regarding this claim scope. Appx9174-9176, Appx1172-1174, Appx16755-16759, Appx9793-97806, Appx9474-9477. As discussed, Parus argued that the devices disclosed in the specification's second embodiment provide written description support for the "web sites" claim limitation because the specification discloses that "the devices 500 appear as 'web sites' connected to the network." Appx9303. Petitioners disagreed, alleging that a POSITA would have understood that same disclosure "to teach that the devices are, of course, not actually web sites, but only 'appear' to the device browsing server as URLs, because the device browsing server can access a URL to communicate with the device." Appx9387. In other words, if "web sites" includes devices that appear as web sites, then the teachings of the second embodiment apply to the invention as a whole.

Given this fully joined dispute, the Board erred in failing to expressly construe the term "web sites"—particularly where its determination appeared to rely, at least implicitly, on a contradictory construction of that term. *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1374 (Fed. Cir. 2017) (finding the Board erred in failing to adopt any explicit construction of the term "setting speed" in its final written decision even though the parties disagreed as to claim construction); *see also Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1370 (Fed. Cir. 2020) (finding error when the Board's analysis failed to acknowledge an aspect of the parties' dispute). Indeed, any claim construction applied by the Board must be explicit; it cannot be implicit. *Alacritech*, 966 F.3d at 1370 ("the Board is obligated to provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions") (citation omitted); *Lee*, 277 F.3d at 1342 ("The agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts. This standard requires that the agency not only have reached a sound decision, but have articulated the reasons for that decision.").

In either event, at the very least, remand is appropriate on this issue.

## CONCLUSION

For these reasons, the judgments should be reversed or vacated and remanded for further proceedings.

Respectfully submitted,

*/s/ Joel L. Thollander*
Joel L. Thollander
John B. Campbell
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701
(512) 692-8700
*Attorneys for Appellant*

# ADDENDUM

**PARUS HOLDINGS, INC. v. GOOGLE LLC**
**Nos. 22-1269, -1270**

**APPELLANT'S ADDENDUM**
**TABLE OF CONTENTS**

**Judgments**

Final Written Decision in IPR2020-00846
(October 19, 2021) (Paper 31)....................Appx1

Final Written Decision in IPR2020-00847
(October 19, 2021) (Paper 31)....................Appx68

**Patents**

Ex. 1001: Kurganov, et al. - U.S. Patent No. 7,076,431
(IPR2020-00846) (July 11, 2006)....................Appx96

Ex. 1001: Kurganov, et al. - U.S. Patent No. 9,451,084
(IPR2020-00847) (September 20, 2016) ....................Appx116

Trials@uspto.gov
571-272-7822

Paper 31
Date: October 19, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

GOOGLE LLC, SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., LG ELECTRONICS INC., and LG ELECTRONICS U.S.A., INC.,
Petitioner,

v.

PARUS HOLDINGS, INC.,
Patent Owner.

---

IPR2020-00846
Patent 7,076,431 B2

---

Before DAVID C. McKONE, STACEY G. WHITE, and SHELDON M. McGEE, *Administrative Patent Judges*.

McKONE, *Administrative Patent Judge*.

# JUDGMENT
## Final Written Decision
## Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

Google LLC, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., LG Electronics Inc., and LG Electronics U.S.A., Inc. (collectively, "Petitioner") filed a Petition requesting an *inter partes* review of claims 1, 2, 4–7, 9, 10, 13, and 14 of U.S. Patent No. 7,076,431 B2 (Ex. 1001, "the '431 patent"). Paper 2 ("Pet."). Parus Holdings, Inc. ("Patent Owner") filed a Preliminary Response to the Petition. Paper 6 ("Prelim. Resp."). Pursuant to 35 U.S.C. § 314, we instituted this proceeding. Paper 9 ("Dec.").

Patent Owner filed a Patent Owner's Response (Paper 14, "PO Resp."), Petitioner filed a Reply to the Patent Owner's Response (Paper 22, "Reply"), and Patent Owner filed a Sur-reply to the Reply (Paper 24, "Sur-reply"). An oral argument was held in this proceeding and IPR2020-00847 on July 27, 2021. Paper 30 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a final written decision under 35 U.S.C. § 318(a) as to the patentability of claims 1, 2, 4–7, 9, 10, 13, and 14. Based on the record before us, Petitioner has proved, by a preponderance of the evidence, that claims 1, 2, 4–7, 9, 10, 13, and 14 are unpatentable.

## *B. Related Matters*

The parties identify the following district court proceedings as related to the '431 patent: *Parus Holdings Inc. v. Apple, Inc.*, No. 6:19-cv-00432 (W.D. Tex.); *Parus Holdings Inc. v. Amazon.com, Inc.*, No. 6:19-cv-00454 (W.D. Tex.); *Parus Holdings Inc. v. Samsung Electronics Co., Ltd.*, No. 6:19-cv-00438 (W.D. Tex.); *Parus Holdings Inc. v. Google LLC*,

No. 6:19-cv-00433 (W.D. Tex.); and *Parus Holdings Inc. v. LG Electronics, Inc.*, No. 6:19-cv-00437 (W.D. Tex.). Pet. xi; Paper 5, 1. The case against LG Electronics, 6:19-cv-00437, has been transferred to the United States District Court for the Northern District of California. Ex. 1032. The remaining cases have been consolidated. Ex. 2017. We refer the consolidated cases collectively as "the Texas case."

The parties also identify the following *inter partes* review proceedings: *Apple Inc. v. Parus Holdings, Inc.*, IPR2020-00686 (challenging the '431 patent) and *Apple Inc. v. Parus Holdings, Inc.*, IPR2020-00687 (challenging U.S. Patent No. 9,451,084 ("the '084 patent")) ("the Apple IPRs"); and *Google LLC v. Parus Holdings, Inc.*, IPR2020-00847 (challenging the '084 patent). Pet. xii–xiii; Paper 5, 1–2.

### *C. The '431 Patent*

The '431 patent describes a system that allows users to browse web sites and retrieve information using conversational voice commands. Ex. 1001, 1:20–23. Figure 1, reproduced below, illustrates an example:




FIG. 1

Figure 1 is a block diagram of a voice browsing system. *Id.* at 4:16–17. Figure 3, reproduced below, shows additional details of media server 106, a component shown in Figure 1:




FIG. 3

Figure 3 is a block diagram of Figure 1's media server 106. *Id.* at 4:20–21.

Media server 106 includes speech recognition engine 300, speech synthesis engine 302, Interactive Voice Response (IVR) application 304, call processing system 306, and telephony and voice hardware 308 to communicate with Public Switched Telephone Network (PTSN) 116. *Id.* at

5:62–6:1. When a user speaks into voice enabled device 112 (e.g., a wireline or wireless telephone), speech recognition engine 300 converts voice commands into data messages. *Id.* at 6:4–8. Media server 106 uses results (e.g., keywords) generated by speech recognition engine 300 to retrieve web site record 200 stored in database 100 that can provide the information requested by the user. *Id.* at 6:44–50. Media server 106 selects the web site record of highest rank and transmits it to web browsing server 102 along with an identifier indicating what information is being requested. *Id.* at 6:52–56. Speech synthesis engine converts the data retrieved by web browsing server 102 into audio messages that are transmitted to voice enabled device 112. *Id.* at 6:57–60.

According to the ’431 patent, with its system,

> [u]sers are not required to learn a special language or command set in order to communicate with the voice browsing system of the present invention. Common and ordinary commands and phrases are all that is required for a user to operate the voice browsing system. The voice browsing system recognizes naturally spoken voice commands and is speaker-independent; it does not have to be trained to recognize the voice patterns of each individual user. Such speech recognition systems use phonemes to recognize spoken words and not predefined voice patterns.

*Id.* at 4:34–43.

Claim 1, reproduced below (bracketed numbering added to track the numbering used in the Petition), is illustrative of the invention:

> 1. A system for retrieving information from pre-selected web sites by uttering speech commands into a voice enabled device and for providing to users retrieved information in an audio form via said voice enabled device, said system comprising:

[1a] a computer, said computer operatively connected to the internet;

[1b] a voice enabled device operatively connected to said computer, said voice enabled device configured to receive speech commands from users;

[1c] at least one speaker-independent speech recognition device, said speaker-independent speech recognition device operatively connected to said computer and to said voice enabled device;

[1d] at least one speech synthesis device, said speech synthesis device operatively connected to said computer and to said voice enabled device;

[1e] at least one instruction set for identifying said information to be retrieved, said instruction set being associated with said computer, said instruction set comprising:

a plurality of pre-selected web site addresses, each said web site address identifying a web site containing said information to be retrieved;

[1f] at least one recognition grammar associated with said computer, each said recognition grammar corresponding to each said instruction set and corresponding to a speech command;

said speech command comprising an information request selectable by the user;

[1g] said speaker-independent speech recognition device configured to receive from users via said voice enabled device said speech command and to select the corresponding recognition grammar upon receiving said speech command;

[1h] said computer configured to retrieve said instruction set corresponding to said recognition grammar selected by said speaker-independent speech recognition device;

[1i] said computer further configured to access at least one of said plurality of web sites identified by said instruction set to obtain said information to be retrieved,

[1j] said computer configured to first access said first web site of said plurality of web sites and, if said information to be retrieved is not found at said first web site, said computer configured to sequentially access said plurality of web sites until said information to be retrieved is found or until said plurality of web sites has been accessed;

[1k] said speech synthesis device configured to produce an audio message containing any retrieved information from said pre-selected web sites, and said speech synthesis device further configured to transmit said audio message to said users via said voice enabled device.

### *D. Evidence*

Petitioner relies on the references listed below.

| Reference | | Date | Exhibit No. |
|---|---|---|---|
| Kovatch | WO 01/50453 A2 | July 12, 2001 | 1005 |
| Neal | US 6,324,534 B1 | Nov. 27, 2001 | 1007 |
| Chakrabarti | US 6,418,433 B1 | July 9, 2002 | 1008 |
| DeSimone | US 5,787,470 | July 28, 1998 | 1009 |
| Kurganov-262 | US 2001/0047262 A1 | Nov. 29, 2001 | 1004 |

Petitioner also relies on the Declaration of Stuart J. Lipoff (Ex. 1002), the Declaration of Martin Walker (Ex. 1053), and the Reply Declaration of Mr. Lipoff (Ex. 1057).

Patent Owner relies on the Declaration of Alexander Kurganov (Ex. 2020), the Declaration of Benedict Occhiogrosso (Ex. 2059), and the Declaration of Paul Mulka (Ex. 2060).

*E. The Instituted Grounds of Unpatentability*

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 2, 4–7, 10, 13, 14 | 103(a)[1] | Kovatch, Neal |
| 1, 2, 4–7, 9, 10, 13, 14 | 103(a) | Kovatch, Neal, Chakrabarti |
| 14 | 103(a) | Kovatch, Neal, DeSimone |
| 14 | 103(a) | Kovatch, Neal, Chakrabarti, DeSimone |
| 9 | 103(a) | Kurganov-262, Chakrabarti |
| 14 | 103(a) | Kurganov-262, DeSimone[2] |

## II. ANALYSIS

*A. Claim Construction*

For petitions filed after November 13, 2018, we construe claims "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2019); *see also Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103. Because the '431 patent was filed before March 16, 2013, the effective date of the relevant amendment, the pre-AIA version of § 103 applies.

[2] In its listing of grounds, Petitioner includes Chakrabarti in its combination with Kurganov-262 and DeSimone. Pet. 2. This appears to be a typographical error, as Petitioner's analysis of claim 14 includes only Kurganov-262 and DeSimone. *Id.* at 63–68.

In the Petition, Petitioner contended that we should give the claim terms their plain and ordinary meaning, and did not identify any claim term for construction. Pet. 6.

In its Response, "Patent Owner relies upon no specialized meanings or disclaimers." PO Resp. 18.

Based on the record before us, we do not find it necessary to provide express claim constructions for any terms. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

In the Institution Decision (Dec. 27–28), we noted that the District Court in the Texas case provided the following constructions (Ex. 2016, 2):

| Claim(s) | Term | Texas Court's Construction |
|---|---|---|
| 1 | "voice enabled device" | Plain and ordinary meaning, where the plain and ordinary meaning is not limited to wireline or wireless telephone, IP phone, wireless PDA, or other wireless device, and where the voice enabled device contains an audio input (e.g., a microphone) |
| 1, 5, 6 | "speaker-independent speech recognition device" | "speech recognition device that recognizes spoken words without adapting to individual speakers or using predefined voice patterns" |
| 1 | "recognition grammar" | "the words, phrases, and/or sounds a user can say that will be recognized by the speech recognition engine" |

| Claim(s) | Term | Texas Court's Construction |
|---|---|---|
| 1, 7, 9, 10, 13, 14 | "web site" | Plain and ordinary meaning |
| 1 | "select the corresponding recognition grammar upon receiving [said/the] speech command" | Plain and ordinary meaning |
| 1 | "instruction set for identifying [said/the] information to be retrieved" | Not subject to § 112, ¶ 6. Plain and ordinary meaning |
| 1 | "access at least one of [said/the] plurality of web sites identified by [said/the] instruction set to obtain [said/the] information to be retrieved" | Plain and ordinary meaning |
| 1 | "said computer configured to first access said first web site of said plurality of web sites and, if said information to be retrieved is not found at said first web site, said computer configured to sequentially access said plurality of web sites until said information to be retrieved is found or until said plurality of web sites has been accessed" | Not subject to § 112, ¶ 6. Plain and ordinary meaning |

Similar to what we observed in the Institution Decision (Dec. 28), we see nothing inconsistent between these constructions and our analysis of the claims, below. Nevertheless, neither party contends that these constructions have any bearing on our application of the claims to the prior art.

### *B. Patent Owner's Earlier Conception and Reduction to Practice Arguments are Improperly Incorporated by Reference and Will Not Be Considered*

Patent Owner contends that the inventors of the '431 patent conceived of their invention before January 4, 2000, the filing date of U.S. Prov. No. 60/174,371 (Ex. 1006), the provisional application to which Kovatch claims the benefit. PO Resp. 31; *see also* Ex. 1005, code (30).

"Conception is the formation, in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998) (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986)). "A reduction to practice can be either a constructive reduction to practice, which occurs when a patent application is filed, or an actual reduction to practice." *Id.* (citing *Hybritech*, 802 F.2d at 1376). "In order to establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations of the [claim]; and (2) he determined that the invention would work for its intended purpose." *Id.* "Where a party is first to conceive but second to reduce to practice, that party must demonstrate reasonable diligence toward reduction to practice from a date just prior to the other party's conception to its reduction to practice." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996).

"In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). Petitioner also bears an initial burden of production to go forward

with prior art that would render the challenged claims obvious. *Id.* at 1379. Petitioner has met that burden by providing detailed allegations that Kovatch and Neal (and for claim 9, Chakrabarti) teach each limitation of the challenged claims and that an ordinarily skilled artisan would have been motivated to combine teachings of the prior art and would have reasonably expected success doing so. Pet. 6–44. The burden of production then shifted to Patent Owner to argue or produce evidence that Kovatch is not prior art. *See Dynamic Drinkware*, 800 F.3d at 1380; *see also In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375–76 (Fed. Cir. 2016) ("In *Dynamic Drinkware*, we noted that, in the context of establishing conception and reduction to practice for the purposes of establishing a priority date, the burden of production can shift from the patent challenger to the patentee. 800 F.3d at 1379. This is because a patent challenger has the burden of producing evidence to support a conclusion of unpatentability under § 102 or § 103, but a patentee bears the burden of establishing that its claimed invention is entitled to an earlier priority date than an asserted prior art reference."); *Mahurkar*, 79 F.3d at 1577 ("Had Dr. Mahurkar not come forward with evidence of an earlier date of invention, the Cook catalog would have been anticipatory prior art under section 102(a) because Dr. Mahurkar's invention date would have been the filing date of his patent.").

Patent Owner alleges, without meaningful explanation in the Response, that the inventors conceived of their invention no later than July 12, 1999, and reduced it to practice in a prototype no later than December 31, 1999. PO Resp. 31–32. Patent Owner avers generally to "time-stamped source code, emails, documents, and the testimony of Paul Mulka and Benedict Occhiogrosso" as evidence that corroborates testimony

of Alexander Kurganov, but does not cite to any such evidence or testimony with specificity. *Id.*

Patent Owner further alleges that, to the extent reduction to practice is found in a prototype supported by computer source code dated January 7, 2000, the inventors worked diligently between January 4 and January 7. *Id.* at 32. In support of this argument, Patent Owner cites generally to large portions of its supporting declarations. *Id.* (citing Ex. 2020 ¶¶ 103–119; Ex. 2059 ¶¶ 44–91; Ex. 2060 ¶¶ 1–6). According to Patent Owner, it "relies on the source code revision logs and emails, as well as the testimony of Paul Mulka," which "shows that from December 1999 to early January 2000, the inventors were employed full-time on the Webley Assistant project, and every file, or file modification they committed to the source code revision system, was for the Webley Assistant project." *Id.* at 33. Patent Owner further argues that "[t]his activity logged in the source code revision system was directed toward and reasonably necessary for a reduction to practice." *Id.* In the Response, Patent Owner does not cite to any evidence with specificity to support these arguments. Patent Owner further argues that "all of the diligence activity here by the inventors was related to the claimed subject matter and other enhancements to the voice browser in which the claimed subject matter operated." *Id.* at 34 (citing generally to Ex. 2058; Ex. 2060). Patent Owner concludes that "the source code revision logs shows that the activity during the diligence period was directed toward and reasonably necessary for a reduction to practice," but does not explain the basis for this conclusion or cite to any evidence to support it. *Id.*

According to our rules, "[a]rguments must not be incorporated by reference from one document into another document." 37 C.F.R. § 42.6(a)(3). For example, the Board has explained that "parties that

incorporate expert testimony by reference in their petitions, motions, or replies without providing explanation of such testimony risk having the testimony not considered by the Board." Patent Trial and Appeal Board Consolidated Trial Practice Guide 35–36 (November 2019) ("TPG")[3] (citing *Cisco Systems, Inc. v. C-Cation Techs., LLC*, IPR2014-00454 (PTAB Aug. 29, 2014) (Paper 12) (informative)).

Petitioner argues that the case made in Patent Owner's Response is "conclusory in fashion," "does not [] identify particular exhibits where the 'source code' and unidentified 'documents' can be found, and never explains the relevance of any evidence or how it maps to any challenged claim." Reply 1. Instead, Petitioner argues, Patent Owner "improperly seeks to make its antedating case in pages of block-cited argument provided in non-word-count-limited declarations which cannot be incorporated by reference into the" PO Response. *Id.* In support of its argument, Petitioner cites to the Federal Circuit's non-precedential case, *General Access Solutions, Ltd. v. Sprint Spectrum L.P.*, 811 Fed. Appx. 654 (Fed. Cir. 2020).

In *General Access*, the Federal Circuit affirmed a Board decision declining to consider arguments on prior conception when those arguments were not substantively presented in the patent owner's briefing and, instead, merely directed the Board to arguments and evidence presented in an inventor declaration and attached claim charts. *Gen. Access*, 811 Fed. Appx. at 656–57. The Federal Circuit noted the "policy goals" of our rule prohibiting such incorporation by reference, including minimizing overlooked arguments, eliminating abuse, and avoiding situations where the Board is "forced to 'play archeologist with the record' and search for

[3] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

arguments that might have made outside of the parties' briefing." *Id.* at 657 (quoting Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77 Fed. Reg. 48,612, 48,617 (Aug. 14, 2012)). The Federal Circuit explained that the patent owner "had to present a case to establish prior conception of every claim limitation," and that patent owner's "briefing failed to meet this burden." *Id.* at 658.

We determine that Patent Owner has not presented its arguments regarding prior conception and reduction to practice in its Response or Sur-reply; rather, Patent Owner presents its arguments in several declarations and improperly incorporates those arguments by reference into its Response and Sur-reply, in violation of Rule 42.6(a)(3). *See, e.g.*, PO Resp. 32 (citing Ex. 2059 ¶¶ 44–91; Ex. 2060 ¶¶ 1–6; Ex. 2020 ¶¶ 103–119).

As to conception, the Patent Owner Response includes two paragraphs making a conclusory allegation, without specificity, that the named inventors conceived of "the claimed subject matter" while working on a system named "the Webley Assistant." PO Resp. 31–32. Patent Owner cites to a single paragraph of Mr. Kurganov's Declaration, without explaining its relevance. *Id.* (citing Ex. 2020 ¶ 13). Patent Owner argues that Mr. Kurganov's testimony regarding a conception date of July 12, 1999, is "corroborated by the time-stamped source code, emails, documents, and the testimony of Paul Mulka and Benedict Occhiogrosso." *Id.* at 31–32. Patent Owner does not cite to any of this evidence with specificity. Patent Owner's Response does not attempt to map any evidence to any limitation of any claim of the '431 patent. Nor does the Response point to where such argument and evidence might be found, in declarations or otherwise. Rather, Patent Owner invites

us to read the Kurganov, Mulka, and Occhiogrosso declarations and construct for ourselves a case for conception of ten claims.

In the Sur-reply, to rebut Petitioner's arguments that Patent Owner had not met its burden of production in the PO Response, Patent Owner argues that "[i]n its[] antedating materials, Parus included claim charts that used excerpts of the source code to demonstrate exactly which parts of the source code met the claim limitations in claim charts and included the entire source code files for Petitioners' inspection." Sur-reply 2–3. The Patent Owner Response does not reference any claim charts. Indeed, the Sur-reply does not indicate where, in the record, the claim charts can be found. Although none of Patent Owner's briefing indicates what "antedating materials" include such claim charts, both the Kurganov Declaration and the Occhiogrosso Declaration appear to provide element-by-element comparison of aspects of the alleged Webley Assistant to claims of the '431 patent, and Mr. Kurganov's declaration references Exhibits 2027 and 2028, one of which, Exhibit 2027, appears to be a claim chart mapping claims of the '431 patent to the Webley System. *See* Ex. 2020 ¶¶ 21–83; Ex. 2059 ¶¶ 47–69; Ex. 2027; Ex. 2028. Although Patent Owner has not been specific, these materials appear to be Patent Owner's arguments explaining the correspondence of the evidence to the limitations of the claims. Thus, Patent Owner seeks to incorporate at least 84 paragraphs (46 pages) of argument from declarations and 50 pages of claim charts into the Response and/or the Sur-reply to support its allegations of prior conception. This is improper under Rule 42.6(a)(3), and Patent Owner's arguments regarding prior conception will be disregarded.

As to reduction to practice, Patent Owner argues that "[t]he evidence produced in Mr. Kurganov's declaration, along with the accompanying

exhibits, demonstrate that the enhancements to the Webley Assistant reduced the ’431 and ’084 inventions to practice in a prototype no later than December 31, 1999, five days before Kovatch’s earliest filing date of January 4, 2000.” PO Resp. 32. Patent Owner does not further explain this contention or cite to any evidence to support it.

As an alternative, Patent Owner contends that the invention was reduced to practice in a prototype on January 7, 2000, when a “grammar file was entered into the source code revision system.” *Id.* Patent Owner provides no further explanation. Instead, Patent Owner cites generally to the Occhiogrosso, Mulka, and Kurganov declarations. *Id.* (citing Ex. 2059 ¶¶ 44–91; Ex. 2060 ¶¶ 1–6; Ex. 2020 ¶¶ 103–119). Even here, it is not clear whether Patent Owner cites to these declarations to support its reduction to practice argument or to show diligence between Kovatch’s January 4, 2000, date and January 7, 2000. *Id.*

Petitioner responds that Patent Owner has not made its case for reduction to practice in its Response, opting instead to incorporate its arguments by reference to multiple declarations, claim charts, and other evidence. Reply 3–5. Petitioner also provides argument as to specific deficiencies in the evidence, should we consider the declarations, claim charts, source code, and emails in the record not addressed with specificity in the Response. *Id.* at 5–12.

As to Petitioner’s arguments in the Reply that Patent Owner did not support its reduction to practice case in the Response, Patent Owner argues that it “included extensive source code versioning records to demonstrate that the versions of the source code that Parus cites, were in fact entered into the source code versioning system by 12/31/1999.” Sur-reply 3. Patent Owner does not provide a citation to support this argument. Later, Patent

Owner argues that "Mr. Mulka pulled the source code commits out of the source code versioning system while creating a detailed report of activity in the source code revision system," and that "[e]ach of the entries in this report demonstrated that the files were indeed committed to the system by the relevant date." *Id.* (citing Ex. 2058). Patent Owner provides no further explanation of Mr. Mulka's testimony or the activity log of Exhibit 2058, which may or may not be the "Exhibit A" referenced in, but not attached to, Mr. Mulka's declaration. Ex. 2060 ¶ 6 (referencing "CVS records between December 1, 1999 and January 10, 2000 (attached as Exhibit A)"). Similarly, Patent Owner argues, without citation, that it "provided email communication that showed that the system was complete." Sur-reply 3.

As noted above, Patent Owner must introduce evidence that the constructed embodiment met all the limitations of the claims at issue. *See Cooper*, 154 F.3d at 1327. In the Sur-reply, Patent Owner argues that its evidence demonstrates such an embodiment, but does not explain where this is shown. Sur-reply 5–10. Rather, the Sur-reply contains empty assertions, without citation, that "the source code alone is an actual reduction to practice of the claimed invention"; "Parus provides source code that defines the functionality of the system, and need not be synthesized into a physical embodiment, in addition to the claimed computer making up an actual reduction of practice of the system of the claims of the '431 and '084 patents"; and "[t]he evidence demonstrates an embodiment having a computer meeting all claimed limitations, contrary to Petitioners' assertions." *Id.* at 5–7. Patent Owner argues that "Mr. Kurganov's testimony and the evidence presented demonstrate that the claimed computer was embodied by a UNIX cluster of servers that was used to provide Parus's Webley Assistant product." *Id.* at 7 (citing Ex. 2020 ¶ 14; Ex. 2025). In the

cited testimony, Mr. Kurganov testifies that source code of the first version of the Webley Assistant was implemented on a UNIX cluster of servers, but says nothing of the later Webley Assistant that appears to be the basis of Patent Owner's allegations of reduction to practice.[4] Ex. 2020 ¶ 14. In any case, Mr. Kurganov does not testify here regarding any claims of the '431 patent. Patent Owner then argues that "Mr. Kurganov makes this clear in his declaration as well in his deposition testimony and email communications that the system was operational." Sur-reply 7. Here, Patent Owner cites, without specificity, to 80 paragraphs of declaration testimony and 36 email and source code exhibits. *Id.* (citing Ex. 2020 ¶¶ 20–102; Exs. 2021–2057; Ex. 1050, 21:17–22:8, 32:17–23)). This is another example of improper incorporation by reference, and Patent Owner's assertions of reduction to practice will be disregarded.

As noted above, as part of its showing for an actual reduction to practice, Patent Owner must introduce evidence that the invention worked for its intended purpose. *See Cooper*, 154 F.3d at 1327. Patent Owner did not contend in its Response that the invention allegedly reduced to practice

---

[4] To show conception and reduction to practice, Patent Owner appears to rely on a later version of the Webley Assistant, namely, "the WA-II enhancements, which embody the Challenged claims." Sur-reply 4. Patent Owner does not explain the relevance of the earlier first version of the Webley Assistant, "WA I," discussed in Mr. Kurganov's declaration (Ex. 2020 ¶ 14).

worked for its intended purpose. Petitioner pointed this out in the Reply. Reply 13–15.[5]

Responding to Petitioner, Patent Owner argues that Mr. Mulka authenticated unspecified source code files and that "Mr. Kurganov recognized the files and detailed how they demonstrated that the code functioned for its intended purpose." Sur-reply 3. Here, Patent Owner cites generally to the entirety of Mr. Kurganov's declaration (Ex. 2020), as well as the claim charts of Exhibits 2027 and 2028. *Id.* Patent Owner continues, arguing that "Mr. Occhiogrosso examined Mr. Kurganov's declaration and his exhibits and testified as a [person of ordinary skill in the art] that the source code worked as Mr. Kurganov testified." *Id.* at 4 (citing Ex. 2059, ¶¶ 44–91). Patent Owner does not provide further explanation or argument; rather, the detailed explanation of the evidence is contained in Mr. Occhiogrosso's declaration rather than the Response or Sur-reply. This is an improper incorporation of over 150 paragraphs of argument from two declarations, as well as over 50 pages of claim charts.

---

[5] Patent Owner argues in several instances that Petitioner has not proved that the Webley System or source code did not work. *See, e.g.*, Sur-reply 4 ("At his deposition, Petitioners did not challenge Mr. Kurganov's testimony related to the functionality of the produced source code. (Ex. 1050). Parus asked Petitioners' expert, Dr. Martin Walker, if the code did not work for its intended purpose, and Dr. Walker indicated that he did not form an opinion as to whether the code functioned for its intended purpose."), 8 ("The source code identified by Mr. Kurganov shows conclusively that the embodiment of the invention memorialized by the source code operated for its intended purpose. Petitioners do not even challenge that showing."), 8 ("Petitioners identify absolutely no error in the source code or alleged failure in the operation of the source code."). This misstates the respective burdens. Petitioner need not introduce evidence or attempt to disprove Patent Owner's evidence until Patent Owner has introduced that evidence properly. *Magnum Oil Tools*, 829 F.3d at 1375–76.

Patent Owner also argues that "Mr. Kurganov makes [] clear in his declaration as well in his deposition testimony and email communications that the system was operational." *Id.* at 7 (citing Ex. 2020 ¶¶ 20–102; Exs. 2021–2057; Ex. 1050, 21:17–22:8, 32:17–23). The explanation of the applicability of this evidence to the claims is in Mr. Kurganov's declaration rather than the Response or the Sur-reply. *Id.* at 8 ("Mr. Kurganov provided evidence that walked through each source code file highlighting where the claimed functionality of the '431 . . . patent[] could be found in the code."). This is another improper incorporation by reference of at least 80 paragraphs of argument from a declaration.

Patent Owner further argues that "Parus demonstrated the system worked for its intended purpose," and gave as examples that "Parus provided an inventor declaration, exhibits, and associated source code that delineated how the claimed system functioned for its intended purpose and practiced the various elements of the Challenged Claims," and concluded that "Mr. Kurganov's testimony regarding the source code, emails between Mr. Kurganov and Mr. Zhukov, and a press release, all included in Mr. Kurganov's declaration, demonstrate a working embodiment." Sur-reply 12. Here, Patent Owner cites generally to Mr. Kurganov's declaration, the claim charts of Exhibits 2027 and 2028, and 34 source code and email files. *Id.* (citing Exs. 2020, 2027, 2028, 2021–2026, 2029–2057). Patent Owner then argues that Mr. Kurganov testifies in his declaration as to work with Mr. Zhukov on "web agents," but does not explain that work or its relevance to the claims in detail. *Id.* at 12–13 (citing Ex. 2020 ¶¶ 12, 112–119; Exs. 1053, 2044, 2050, 2056; Ex. 2061, 41:24–42:15 (Walker deposition)). Once again, any specific argument explaining the relevance of Patent Owner's evidence is in Patent Owner's declarations, which Patent

Owner attempts to incorporate by reference improperly. Patent Owners' assertions that its invention worked for its intended purpose will be disregarded.

As to diligence from a time before Kovatch's priority date until the alleged reduction to practice, Patent Owner argues that "[f]ollowing conception, the inventors were reasonably and continuously diligent as the Webley Assistant enhancements was the only project they were working on at Webley and they were employed full-time." PO Resp. 32. Presumably, here, Petitioner refers to its contended July 12, 1999, conception date and December 31, 1999, reduction to practice date. *Id.* Patent Owner does not cite any evidence to support its diligence argument. *Id.* Here, Patent Owner cites broadly to the Occhiogrosso, Mulka, and Kurganov declarations. *Id.* (citing Ex. 2059 ¶¶ 44–91; Ex. 2060 ¶¶ 1–6; Ex. 2020 ¶¶ 103–119). As noted above, it is not clear whether these citations are intended to support Patent Owner's reduction to practice or diligence contentions.

Limiting the "diligence period" to January 4, 2000, to January 7, 2000, Patent Owner "relies on the source code revision logs and emails, as well as the testimony of Paul Mulka," and argues that "[t]he source code revision logs and Paul Mulka's testimony shows that from December 1999 to early January 2000, the inventors were employed full-time on the Webley Assistant project, and every file, or file modification they committed to the source code revision system, was for the Webley Assistant project." PO Resp. 33. Patent Owner argues that "all of the diligence activity here by the inventors was related to the claimed subject matter and other enhancements to the voice browser in which the claimed subject matter operated." *Id.* at 33–34 (citing Ex. 2058; Ex. 2060). Patent Owner does not cite to Mr. Mulka's declaration, revision logs, or emails with specificity and does

not provide further explanation of the testimony or other evidence. The Patent Owner Response does not meet Patent Owner's burden to introduce evidence of diligence.

The case in Patent Owner's Sur-reply is not any better. Patent Owner argues that "Mr. Mulka created a detailed report of activity in the source code revision system demonstrating that Mr. Kurganov and Mr. Zhukov worked full time and consistently on the WA-II enhancements, which embody the Challenged Claims for at least a month and a half before the effective date of Kovatch." Sur-reply 4. Here, Patent Owner provides no citation to or explanation of Mr. Mulka's report. This is simply an invitation for us to play archeologist with the record, an invitation that we decline.

We note that, at the oral argument, Patent Owner argued that it followed the briefing strategy of the patent owner in *LG Electronics, Inc. v. ATI Technologies ULC*, IPR2015-00325, including simply referencing in the briefing detailed element-by-element analysis performed in declarations. Tr. 45:23–46:14, 50:26–52:13. Patent Owner argues that this approach was affirmed by the Federal Circuit. *Id.* at 46:6–8, 52:2–7.

We do not agree that *LG Electronics* supports Patent Owner's position. It does not appear that the petitioner in that case objected to the manner in which the patent owner presented its evidence and argument, and the panel did not express any views on whether it was appropriate under Rule 42.6(a)(3). IPR2015-00325, Paper 62 at 14–53 (PTAB Apr. 14, 2016). In reviewing the *LG Electronics* decision, the Federal Circuit did not comment on whether the presentation of the evidence was appropriate under our rules. *See ATI Techs. ULC v. Iancu*, 920 F.3d 1362 (Fed. Cir. 2019). Thus, we see nothing in the *LG Electronics* case suggesting that Patent

Owner's presentation of its arguments and evidence via declaration rather than in its Response is appropriate under Rule 42.6(a)(3).

Patent Owner, by presenting its arguments and evidence in the form of declarations, rather than by including the arguments in its Response and Sur-reply, has not complied with Rule 42.6(a)(3). Thus, we disregard Patent Owner's arguments that the inventors conceived of and reduced to practice the invention claimed in the '431 patent prior to the earliest priority date of Kovatch. *See* 37 C.F.R. § 42.6(a)(3); TPG at 35–36; *Gen. Access*, 811 Fed. Appx. at 656–57. We conclude that Kovatch is prior art to the '431 patent.[6]

### *C. Obviousness of Claims 1, 2, 4–7, 10, 13, and 14 over Kovatch and Neal*

Petitioner contends that claims 1, 2, 4–7, 10, 13, and 14 would have been obvious over Kovatch and Neal. Pet. 6–39. For the reasons given below, Petitioner has made a sufficient showing.

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the claimed invention pertains." We resolve the question of obviousness on the

[6] Petitioner contends that Kovatch is prior art under 35 U.S.C. § 102(e) by virtue of its claim of the benefit of U.S. Prov. No. 60/174,371 (Ex. 1006). Pet. 8–12. Patent Owner does not contest that Kovatch is prior art as of the filing date of the provisional application. We have analyzed Petitioner's contentions and, on the complete record, agree that at least claim 1 of Kovatch is supported by the Kovatch Provisional. Accordingly, we agree that Kovatch is entitled to the benefit of the Kovatch Provisional and, therefore, is prior art to the '431 patent. *See Dynamic Drinkware*, 800 F.3d at 1381; *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1380 (Fed. Cir. 2017).

basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.[7] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### 1. *Level of Skill in the Art*

The level of skill in the art is a factual determination that provides a primary guarantee of objectivity in an obviousness analysis. *See Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) (citing *Graham*, 383 U.S. at 17–18 (1966); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991)). Generally, it is easier to establish obviousness under a higher level of ordinary skill in the art. *See Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) ("A less sophisticated level of skill generally favors a determination of nonobviousness . . . while a higher level of skill favors the reverse.").

Petitioner, relying on the testimony of Mr. Lipoff, contends that a person of ordinary skill in the art "would have had a Bachelor's Degree in electrical engineering, computer science or a related field, and at least two years of experience with voice interfaces and information processing," and that "[m]ore education could substitute for less experience, and vice versa." Pet. 5 (citing Ex. 1002 ¶¶ 41–48). Patent Owner does not contest Petitioner's proposal or offer an alternative. On the complete record, we are persuaded that Petitioner's proposal is consistent with the technology

[7] The complete record does not include allegations or evidence of objective indicia of nonobviousness.

described in the Specification and the cited prior art and adopt Petitioner's proposed level of skill.

### 2. *Scope and Content of the Prior Art*

#### a) *Overview of Kovatch*

Kovatch describes an interactive voice response system for accessing information from a computer network via remote telephony devices. Ex. 1005, 1:10–12. The interactive voice response system analyzes utterances spoken by users and matches the utterances with an index of destinations. *Id.* at 4:25–26. The system produces a list of valid destinations and guides the user along a path with pre-recorded voice prompts. *Id.* at 4:26–27. The user accessing the system navigates using speech and/or telephone keypad entry. *Id.* at 4:28–29. Kovatch describes the system in reference to a commercial system, "HeyAnita" or "Anita." *Id.* at 5:25–27. The "Anita" server architecture is illustrated in Figure 1, reproduced below.




FIG. 1

Figure 1 is a schematic representation of the "Anita" server architecture. *Id.* at 6:16.

Anita server 120 is a fault-tolerant, multi-threaded NT service. *Id.* at 14:14–16. It includes Anita speech recognition engine 2 that translates spoken utterances to a set of text phrases (*id.* at 14:28–30); Anita natural language engine 3 that converts natural language sentences to a set of structured commands (*id.* at 15:1–3); Anita query engine 4 that maps commands to web queries (*id.* at 15:9–11, 17:31–32); and Anita web parser 8 that browses Internet/Web 11 to retrieve information based on the web queries (*id.* at 18:1–2).

Figure 2 is reproduced below:




Figure 2 is a schematic representation of the logical structure of the Anita server 120. *Id.* at 6:18.

Anita server 120 consists of three logical servers: Anita phone server 20 implements a computer telephony interface using, *inter alia*, Anita telephone interface 1, Anita speech recognition engine 2, and Anita prompt generator 6 to connect digital lines to accept calls (*id.* at 18:30–32); Anita application server 30 implements applications using, *inter alia*, Anita natural language engine 3, Anita query engine 4, and Anita web parser 8 (*id.* at 19:1–3); and Anita database server 40 implements Anita repository database 7 (*id.* at 19:10).

Kovatch discloses that information is organized in a "tree" structure 140 as shown in Figure 4, reproduced below:

**FIG. 4**




Figure 4 is a block diagram of a tree structure that exemplifies how clarification questions would be asked while narrowing down a search. *Id.* at 6:23–24, 22:27–29.

### *b) Overview of Neal*

Neal describes a system and method for cascading search methodologies on preselected segments, or sets, of data. Ex. 1007, 3:25–27. Each data set is paired with one or more search strategies so that the overall effect is to supply the user with the most advantageous match to a keyword search. *Id.* at 3:27–29.

Figure 2 is reproduced below:

FIG. 2




Figure 2 is a logic block diagram representation of a sequential search methodology. *Id.* at 5:12–14.

In the sequential search of Figure 2, a user inputs a search string (block 202), e.g., "the name of an item, a part number for an item, or any descriptive attribute of the item." *Id.* at 6:23–30. At block 206, a search methodology (e.g., "exact string search") is applied to a first data set. *Id.* at 6:34–40. If the first data set represents a first ("preferred") supplier, and the first supplier has an exact item that matches the search string, a match is recognized and the results of the match are reported to the user (block 236) and the algorithm terminates (block 226). *Id.* at 6:40–44. If the first search methodology does not yield a match, the algorithm 200 proceeds to a second search strategy with a second data set and second search methodology (block 210). *Id.* at 6:48–51. The second data set might be the same as the first (e.g., same supplier) or it might be different (a second supplier). *Id.* at 6:51–58. Similarly, there second search methodology may be the same as the first search methodology. *Id.* at 6:59–61.

If the second search strategy fails to yield a match, the algorithm 200 continues with a third search strategy (block 214), and so on. *Id.* at 7:8–11. If the search fails to identify the desired item from any data set, the algorithm proceeds to block 222, where a negative search result is reported to the user. *Id.* at 7:29–33.

#### 3. *Claims 1, 2, 4–7, 10, 13, and 14, Differences Between the Claimed Subject Matter and Kovatch and Neal; Reasons to Modify or Combine*

##### a) *Preamble of claim 1 and limitations 1a–1i and 1k*

Regarding the preamble of claim 1, Petitioner contends that Kovatch's HeyAnita system ("a system for retrieving information from pre-selected web sites") matches information requests with an index of destinations

("web sites") in response to a user speaking into a telephone (a "voice enabled device") and translates information retrieved from the web sites into speech to play back to the user via the telephone ("providing to users retrieved information in an audio form via said voice enabled device"). Pet. 16–18 (citing Ex. 1005, 4:25–27, 13:23–14:8, 14:18–24, 15:26–34, 16:21, 17:28–32, 18:1–3, 18:13–15, 18:28–32, 20:9–12, 28:17–18; Ex. 1002 ¶¶ 107–116). Patent Owner does not contest Petitioner's allegations for claim 1's preamble. We find, on the basis of Petitioner's evidence, including the disclosure of Kovatch and the credible testimony of Mr. Lipoff, that Kovatch teaches the preamble of claim 1.

Petitioner maps Kovatch's Anita Server to the "computer" of claim limitation 1a and telephone 15 to the "voice enabled device operatively connected to said computer" and "configured to receive speech commands from users" of claim limitation 1b. *Id.* at 18–19 (citing Ex. 1005, 14:11–24, 18:18–19:6, 19:31; Ex. 1002 ¶¶ 117–121). Petitioner further contends that Kovatch's Speech Recognition Engine is a "speaker-independent speech recognition device," as recited in claim limitation 1c. *Id.* at 19–20 (citing Ex. 1005, 13:30–31, 14:11–15:7, 17:21–27, 18:23–19:4; Ex. 1002 ¶¶ 122–128). Petitioner maps Kovatch's Prompt Generator to the "speech synthesis device" of claim limitation 1d. *Id.* at 20–21 (citing Ex. 1005, 5:17–18, 14:7–8, 14:11–16, 14:18–23, 16:19–26, 18:13–15, 18:23–32; Ex. 1002 ¶¶ 129–131). Patent Owner does not contest Petitioner's allegations for these claim limitations. We find, on the basis of Petitioner's evidence, including the disclosure of Kovatch and the credible testimony of Mr. Lipoff, that Kovatch teaches claim limitations 1a–1d.

Regarding claim limitation 1e, Petitioner contends that Kovatch's Anita components, including the destination tree (shown in Figure 4) used to

match information requests to destination web sites and HeyAnita's executable functions for identifying matching web sites and retrieving information from them constitute "at least one instruction set for identifying said information to be retrieved," as recited in claim limitation 1e. Pet. 21–22 (citing Ex. 1005, 4:25–27, 13:33–34, 15:11–34, 26:8–29:51; Ex. 1002 ¶¶ 132–137). According to Petitioner,

> [a]n obvious implementation of the system Kovatch describes would have been to store each destination web site's URL in association with the web site's entry in the destination tree, so the Query Engine can generate the URL for a particular web query as Kovatch describes, by retrieving the stored URL associated with the destination determined for the user's request.

*Id.* at 23 (citing Ex. 1002 ¶¶ 114, 139–140). Petitioner cites Kovatch's examples of a user searching for books or CDs at web sites for Amazon, CD Now, and Barnes and Noble as teaching "said instruction set comprising: a plurality of pre-selected web site addresses, each said web site address identifying a web site containing said information to be retrieved," as recited in claim limitation 1e. *Id.* at 22–24 (citing Ex. 1005, 4:25–27, 13:33–34, 15:9–34, 17:28–18:5, 20:11–12, 20:29–21:3, 21:19–25, 26:8–16, 28:17–18, 28:41–44; Ex. 1002 ¶¶ 138, 141).

Patent Owner does not contest Petitioner's allegations as to claim limitation 1e in the Patent Owner Response or Sur-reply.[8]

---

[8] Patent Owner presented arguments as to this claim limitation in the Preliminary Response (at 39–45), which we found unpersuasive in the Decision to Institute (at 36–40). Patent Owner does not advance those arguments in the Patent Owner Response. Accordingly, those arguments are waived. Paper 10 (Scheduling Order), 8 ("Patent Owner is cautioned that any arguments not raised in the response may be deemed waived.").

Kovatch describes Anita Query Engine 4 generating web queries to fulfill a user's request. Ex. 1005, 17:31–32. Kovatch describes several examples of matching such requests to addresses for web sites that contain the information requested and generating web site URLs to initiate selected applications. *Id.* at 15:19, 20:10–12, 20:29–21:3, 21:19–25. Kovatch's Figure 4 (reproduced above) illustrates how the HeyAnita system organizes this information into a tree structure that helps narrow down a search to particular web sites. *Id.* at 22:25–29. We find that Kovatch's web URLs are pre-selected (chosen before the user executes a search), are web site addresses (URLs for web sites), and identify web sites containing information to be retrieved (information corresponding to keywords). Accordingly, we find, on the basis of Petitioner's evidence, including the disclosure of Kovatch and the credible testimony of Mr. Lipoff, that Kovatch teaches claim limitation 1e.

Regarding claim limitation 1f, Petitioner contends that Kovatch's Speech Recognition Engine translates speech into text phrases using a "recognition grammar." Pet. 24 (citing Ex. 1005, 13:30–31, 14:28–15:7, 17:23–27, 28:30–39; Ex. 1002 ¶¶ 142–143). Petitioner argues that, because the recognition grammar is used to generate web URLs to which the system navigates for information, the recognition grammar "correspond[s] to each said instruction set and correspond[s] to a speech command" and "compris[es] an information request selectable by the user," as recited in claim limitation 1f. *Id.* at 25–29 (citing Ex. 1005, 4:26–27, 13:28–14:1, 14:28–15:34, 22:1–5, 28:17–44; Ex. 1002 ¶¶ 135–137, 144–151). Regarding claim limitation 1g, Petitioner points to Kovatch's description of Speech Recognition Engine 2 translating speech to text phrases and Natural Language Engine 3 converting the text to structured commands representing

the recognition grammar. *Id.* at 29–30 (citing Ex. 1005, 13:30–31, 14:28–15:19, 17:23–27, 28:17–39; Ex. 1002 ¶¶ 152–154). According to Petitioner, the structured commands represent an identification of destination nodes and a mapping of commands to an application for generating destination URLs to retrieve information from web sites, thus meeting claim limitation 1h. *Id.* at 31 (citing Ex. 1005, 15:1–34; Ex. 1002 ¶¶ 155–156). As to claim limitation 1i, Petitioner argues that Kovatch's Web Parser navigates to the identified web site and retrieves requested information. *Id.* at 32 (citing Ex. 1005, 13:33–14:1, 15:1–34, 17:28–18:5; Ex. 1002 ¶ 157). Patent Owner does not contest Petitioner's allegations for these claim limitations. We find, on the basis of Petitioner's evidence, including the disclosure of Kovatch and the credible testimony of Mr. Lipoff, that Kovatch teaches claim limitations 1f–1i.

As to claim limitation 1k, Petitioner points to Kovatch's Prompt Generator, which creates an audio stream of text phrases converted to audio prompts based on information returned by the Web Parser. Pet. 34 (citing Ex. 1005, 14:7–8, 14:18–23, 16:19–26, 18:13–15, 20:5–22:21; Ex. 1002 ¶¶ 161–162). Patent Owner does not contest Petitioner's allegations for this claim limitation. We find, on the basis of Petitioner's evidence, including the disclosure of Kovatch and the credible testimony of Mr. Lipoff, that Kovatch teaches claim limitation 1k.

*b) Claim limitation 1j*

The parties' disputes as to claim 1 are focused on claim limitation 1j, which recites

> said computer configured to first access said first web site of said plurality of web sites and, if said information to be

> retrieved is not found at said first web site, said computer configured to sequentially access said plurality of web sites until said information to be retrieved is found or until said plurality of web sites has been accessed.

Petitioner acknowledges that Kovatch by itself does not teach claim limitation 1j, but contends that a skilled artisan would have modified Kovatch's HeyAnita system according to Neal's teachings. Pet. 12–15. Specifically, Petitioner contends that a skilled artisan would have considered Neal's teaching of searching suppliers' data sets in a hierarchy, as illustrated in Neal's Figure 2 (reproduced above). *Id.* at 12–13 (citing Ex. 1007, 2:54–57, 3:35–36, 3:42–45, 5:55–60, 6:40–7:14, 7:30–33; Ex. 1002 ¶ 100). According to Petitioner,

> In the resulting Kovatch/Neal combination, when the user speaks an information request, HeyAnita first accesses the user's preferred web site for that information, and if the requested information is not found at that preferred web site, HeyAnita accesses the remaining web sites in the "list of valid destinations" that matched the user's request, sequentially (*e.g.*, in order of preference among suppliers as Neal teaches) until the requested information is found in one of the matching web sites or until all the matching web sites have been accessed with negative result.

*Id.* at 14. In terms of the web site examples given in Kovatch, Petitioner argues that,

> in the Kovatch/Neal combination, HeyAnita's computer (Application Server or overall Anita Server) is configured to first access a first web site (e.g., Amazon) of the destination tree's plurality of web sites and, if the information to be retrieved (e.g., the price of a CD the user wants to buy) is not found at that first web site, access the remaining web sites (e.g., CD Now) sequentially (e.g., in order of the user's preference ranking of the web sites) until the information is found ("the results of the match are reported to the user"—Neal, 6:42–44) or until the plurality of web sites has been accessed ("the search

> fails to identify the desired item from any" web site—Neal, 7:30–33).

*Id.* at 32–33 (citing Ex. 1002 ¶ 158).

In the Patent Owner Response, Patent Owner argues that Kovatch does not teach claim limitation 1j because it does not demonstrate sequentially accessing pre-selected web sites until the information to be retrieved has been found or all of the web site addresses have been accessed. PO Resp. 35–36. As noted above, Petitioner does not argue that Kovatch teaches claim limitation 1j by itself and, instead, Petitioner relies on the combination of Kovatch and Neal. Pet. 12–15. Thus, Patent Owner's argument is misplaced. In any case, Patent Owner concedes that Kovatch "discloses one scenario where multiple websites are accessed by the HeyAnita system, and that is when the user wants HeyAnita to find the best price for an item from two websites." PO Resp. 35–36 (citing Ex. 1005, Fig. 4, 20:30–21:3). Thus, Kovatch teaches accessing multiple pre-selected web sites. We further find that Neal teaches accessing a first dataset of a plurality of datasets and, if the information to be retrieved is not found at the first dataset, sequentially accessing the plurality of datasets until the information to be retrieved is found or until the plurality of datasets has been accessed. Ex. 1007, 6:41–7:14. Viewing these teachings together, Kovatch and Neal teach limitation 1j. We address below whether a skilled artisan would have had reasons to combine these teachings.

Patent Owner also argues that Neal does not teach accessing web sites and, instead, describes accessing static datasets in a partitioned database. PO Resp. 37. Petitioner, however, does not cite Neal for a teaching of accessing web sites; rather, Petitioner contends that Kovatch teaches accessing web sites. Pet. 13–14, 32 (citing Ex. 1005, 13:33–14:1, 15:1–34,

17:28–18:5; Ex. 1002 ¶ 157). Patent Owner's argument, therefore, is misplaced. As noted above, we find (and Patent Owner concedes) that Kovatch teaches accessing a plurality of web sites. Ex. 1005, 17:31–18:8, 20:30–21:3, Fig. 4; PO Resp. 35–36.

Patent Owner further argues that Neal teaches away from Petitioner's proposed combination with Kovatch. PO Resp. 37. According to the Federal Circuit, "[a] reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Mouttet*, 686 F.3d 1322, 1333–34 (Fed. Cir. 2012) (quoting *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)) (alteration in original). However, "the 'mere disclosure of alternative designs does not teach away.'" *Id.* at 1334 (quoting *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004)). Indeed, "just because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes." *Id.* (citing *Gurley*, 27 F.3d at 553).

Specifically, Patent Owner (PO Resp. 37), points to disclosure in Neal describing disadvantages of a keyword search strategy (e.g., "users must be familiar with the appropriate key word terms that are likely to yield the desired data records") and disadvantages of a classification search strategy (e.g., "users may not always anticipate the proper classification of certain records, and may search the wrong categories for their desired database record"). Ex. 1007, 2:16–65. Neal then describes a "preferred embodiment" in which "the system manager will expand the scope of the search strategies from 'exact' string matches, along a continuum of search methodologies, including perhaps fuzzy logic strategies." *Id.* at 7:14–17. According to

Neal, "[t]he purpose of expanding the search strategies is to avoid the situation wherein the search fails to identify the desired item from any data set, and thereby drops into logical block 222 a negative search result is reported to the user." *Id.* at 7:28–32. Patent Owner argues that "Neal advocates for employing a sequence of search algorithms from the narrowest to the most broad." PO Resp. 38 (citing Ex. 1007, 7:56–58; Ex. 2059 ¶ 124). Patent Owner contends that Neal teaches away from a combination "that employs a single keyword matching search strategy." *Id.* Patent Owner argues that Petitioner's combination of Kovatch and Neal results in a system that only sequentially searches datasets using a single keyword matching search strategy, and not the cascading sequence of search methodologies described by Neal. *Id.* at 37–39.

We do not agree with Patent Owner that Neal teaches away from a system that employs a single keyword matching search strategy. Indeed, Neal's preferred embodiment expressly contemplates such a system. For example, Neal describes employing a first "exact string search" methodology to search a first data set (Figure 2, block 206). Ex. 1007, 6:34–46. This appears to be what Patent Owner considers a "single keyword matching search strategy." PO Resp. 37–38. Neal describes that if this search of the first data set does not yield a match, the system searches a second data set using a second search methodology (Figure 2, block 210). Ex. 1007, 6:47–52. However,

> in the preferred embodiment there is no requirement that the second search methodology in 210 must be different from the first search methodology in 206. For example, if the first preferred supplier did not yield an exact string match to the input search term, the same search methodology could be applied to a second preferred supplier's catalog.

*Id.* at 6:59–65. Thus, Neal expressly teaches using a single keyword search strategy on a first dataset and the same keyword search strategy on a second dataset, without necessarily employing a cascading sequence of different search methodologies. *See* Reply 19.

Patent Owner further argues that Neal's teaching of searching products in a database would not have been applicable to retrieving information from a web page. PO Resp. 39–40. In particular, Patent Owner argues that Kovatch's HeyAnita system expects a single result when it requests information from web pages, while Neal describes returning multiple results in an example of a search for pens. *Id.* (citing Ex. 1007, 7:34–8:24; Ex. 2059 ¶ 127); *see also* Sur-reply 17. Petitioner responds that it cites Kovatch for using Kovatch's search methodologies (not Neal's) on its web sites and Neal for a teaching to try another supplier if a first supplier does not have a requested item. Reply 20. We agree with Petitioner that Patent Owner does not appear to be addressing Petitioner's proposed combination. Rather, Patent Owner's argument is akin to a contention that one would not have bodily incorporated Neal's particular search of a supplier record into Kovatch's system. However, "[i]t is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements"; rather, "the test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art." *Mouttet*, 686 F.3d at 1332–33.

Patent Owner further argues that Petitioner does not address how a skilled artisan would apply Neal's invention, in which data is pre-segmented into datasets, to Kovatch's web sites, which "do not lend themselves to be segmented into searchable items of multiple tiers." PO Resp. 40 (citing

Ex. 1007, 3:13–17, 5:30–31; Ex. 2059 ¶ 129). Petitioner responds that Kovatch's data is segmented into multiple web sites, which are searched separately. Reply 20. According to Petitioner, in its proposed combination, each dataset searched is a web site. *Id.* at 21. In the Sur-reply, Patent Owner argues that Petitioner "does not explain how a [person of ordinary skill in the art] would apply Neal's hierarchical ordering to Kovatch's websites." Sur-reply 18. According to Patent Owner, Neal describes a system manager that tightly controls and pre-segments the data that are searched and establishes a hierarchical order of multiple tiers in the database. *Id.* at 18–19 (citing Ex. 1007, 3:13–17). Patent Owner once again argues against bodily incorporating Neal into Kovatch without considering Petitioner's proposed combination. As noted above, Petitioner combines Kovatch's teachings of searching web sites with Neal's teaching of searching a next dataset if a first dataset does not have a requested item. Reply 20. Petitioner does not contend that a skilled artisan would have incorporated Neal's complete algorithm in Kovatch's system.

In the Sur-reply, Patent Owner argues that "Kovatch does not teach any search methodology." Sur-reply 16. According to Patent Owner, "a web parser, parses the HTML tags on a web page to expose or render the data to the user; it does not search any data, and Kovatch's web parser is no different." *Id.* Patent Owner does not cite evidence to support this contention (which was not raised in the Patent Owner Response). First, claim 1 does not recite searching. Rather, it recites "access[ing]" web sites and "retriev[ing]" data from the web sites. Petitioner points out where Kovatch teaches this. Pet. 32 (citing Ex. 1005, 13:33–14:1, 15:1–34, 17:28–18:5). According to Kovatch, "Anita Query Engine 4 generates web queries needed to fulfill user's request and sends them to Anita State Machine and

Web Parser 8." Ex. 1005, 17:31–32. "Anita State Machine and Web Parser 8 browses the Internet/web 11 to retrieve information requested by the user. It parses each received page to convert unstructured text into structured datasets." *Id.* at 18:1–3. We find that this teaches accessing web sites and retrieving data from those web sites. Second, we find that this disclosure in Kovatch teaches searching web sites (browse, queries, request), and Patent Owner's attorney argument to the contrary is not persuasive.

We find that, in Petitioner's proposed combination, Kovatch's HeyAnita system would access a first of a plurality of web sites (e.g., using Anita Query Engine 4 and Web Parser 8, Ex. 1005, 17:31–32) and, if the information to be retrieved is not found at the first web site, the HeyAnita system would sequentially access the plurality of web sites until the information is found or until the all of the plurality of web sites have been accessed, per the teachings of Neal (Ex. 1007, 6:41–7:13, 7:28–32, Fig. 2). Accordingly, we find that Kovatch and Neal teach claim limitation 1j.

In sum, the combination of Kovatch and Neal teaches each limitation of claim 1.

*c) Reasons to combine the teachings of Kovatch and Neal*

Petitioner argues that a skilled artisan would have combined the teachings of Kovatch and Neal "to achieve the benefits Neal describes of 'maximiz[ing] the likelihood of finding the desired [information]' while 'efficiently us[ing] computing resources' by 'increasing the efficiency of the search process by first searching in the most desirable data sets.'" *Id.* (quoting Ex. 1007, 3:19–20, 4:65–5:2 (brackets supplied by Petitioner); citing Ex. 1002 ¶¶ 103–105). Although Neal does not describe its

hierarchical search in terms of web sites, Mr. Lipoff testifies that this technique would have been applicable to other types of information requests, including obtaining information from web sites. *Id.* at 15 (citing Ex. 1002 ¶¶ 103–105). Petitioner contends that Neal's product searches are analogous to those described in Kovatch. *Id.* Mr. Lipoff testifies that a skilled artisan would have had a reasonable expectation of success incorporating Neal's functionality in HeyAnita's Application Server. Ex. 1002 ¶ 106.

Patent Owner characterizes Petitioner's allegations as arguing that Neal would "speed up" Kovatch's HeyAnita system. PO Resp. 41–42. Patent Owner argues that Kovatch was not concerned with delay that occurred with web-based retrieval systems and, instead, relied on that delay to provide opportunities for the HeyAnita system to insert advertisements in the "dead space" between a user's question and the system's retrieval of an answer. *Id.* (citing Ex. 1005, 3:13–14, 5:20–22, 6:9–11, 16:14–15; Ex. 2059 ¶¶ 133–134). Mr. Occhiogrosso testifies that "speeding up Kovatch's system would create less dead air time and would inhibit its ability to generate revenue from playing advertisements for the user as it awaited the information to be retrieved from the web site." Ex. 2059 ¶ 134.

Petitioner replies that it does not argue that a skilled artisan would have used Neal's teachings to "speed up" Kovatch's system. Reply 21–22. Rather, Petitioner argues, the Petition focused on efficiently using computing resources. *Id.* (citing Pet. 12–14). According to Mr. Lipoff, the efficiency benefits would have been independent of speed. Ex. 1057 ¶¶ 16–17; Reply 22 ("[W]here Kovatch would search one website . . . , the Kovatch/Neal combination that then tries a second website would not necessarily respond faster."). As Petitioner points out (Reply 22), Patent Owner's expert, Mr. Occhiogrosso, admits that lowering the number of web

sites a system searches to find information would lower the expenditure of resources. Ex. 1051, 42:21–43:10.

Petitioner further responds that Kovatch does not teach playing advertisements while waiting for information to be retrieved; rather, it first retrieves the requested information and then generates an audio stream with both the commercials and retrieved information. Reply 22–23 (citing Ex. 1005, 14:1–8, 18:1–15; Ex. 1057 ¶ 18). Petitioner's characterization of Kovatch is correct (and Patent Owner's incorrect). Kovatch's system first navigates to a destination and retrieves requested information (step 6), then generates commercials (step 8), then intermixes the commercials and information (step 9), and finally returns speech to the user (step 10). Ex. 1005, 14:1–8. We find unavailing Patent Owner's argument that, when combined, Neal's teachings would have an adverse impact on Kovatch's generation and presentation of advertisements.

Patent Owner further argues that a skilled artisan would not have been motivated to make Kovatch's system more fault tolerant because "HeyAnita was already a fault tolerant system that took steps to maximize the likelihood of finding the requested information." PO Resp. 42–43 (citing Ex. 2059 ¶¶ 135–137). Patent Owner argues that Kovatch describes an example in which the HeyAnita system searches multiple web sites for information without being prompted. *Id.* at 43 (citing Ex. 1005, 20:29–21:3; Ex. 2059 ¶¶ 136–137); Sur-reply 22–23. As another example of fault tolerance, Patent Owner argues that Kovatch's system is "highly interactive" and "uses clarification questions if the user's query does not narrow the result set down to one destination." PO Resp. 43–44 (citing Ex. 1005, 4:25–27, 21:10–11, 21:19–25). Petitioner replies that it is not arguing fault tolerance; rather Petitioner argues that the combination would have

increased the efficiency of the search process. Reply 23. In particular, Petitioner argues, the Kovatch/Neal combination improves the likelihood of finding information by searching a next web site rather than stopping after a first failure. *Id.* at 24 (citing Ex. 1057 ¶¶ 19–21). Petitioner argues that this would have been more logical, would have resulted in a shorter dialog, and would automatically provide fallback results from another web site without wasting time reporting a failure and asking for instructions. *Id.* (citing Ex. 1057 ¶ 22). We agree with Petitioner that Patent Owner's arguments regarding fault tolerance are not directed to any arguments or evidence Petitioner is advancing.

We find that Neal's teachings would have made Kovatch's system more efficient and would have conserved computing resources. Neal expressly states that its teachings "would efficiently use computing resources," and would "increas[e] the efficiency of the search process by first searching in the most desirable data sets." Ex. 1007, 3:19–20, 4:65–67. Mr. Lipoff reiterates these benefits in his testimony. Ex. 1002 ¶ 102. Thus, we find that a skilled artisan would have had reasons, with rational underpinning, to combine Kovatch and Neal. We also find, based on Mr. Lipoff's uncontroverted testimony, that a skilled artisan would have had a reasonable expectation of success in combining the teachings of Kovatch and Neal. *Id.* ¶ 106.

*d) Claims 2, 4–7, 10, 13, and 14*

Regarding claim 2, we find that Kovatch describes that its server is connected to and searches "the Internet." *See, e.g.,* Ex. 1005, Fig. 3 (Internet 11); Pet. 34.

Regarding claim 4, we find that Kovatch's voice enabled device can be a standard telephone. *See, e.g.,* Ex. 1005, Fig. 1 (Telephone 15); Pet. 34.

Regarding claim 5, based on Mr. Lipoff's uncontroverted testimony, we find that it would have been obvious to implement HeyAnita's Speech Recognition Engine to analyze phonemes. Ex. 1002 ¶ 166; Pet. 35–36.

Regarding claim 6, we find that Kovatch's description of recognizing and converting "free-form speech" and "natural language sentences" teaches that Kovatch's "speaker-independent speech recognition device is configured to recognize naturally spoken speech commands." Pet. 36; Ex. 1005, 13:28–29, 14:28–15:3, 20:15–22:21; Ex. 1002 ¶ 167.

Regarding claim 7, we find that Kovatch teaches content descriptors that indicate portions of web sites that contain the information to be retrieved, for example indicating in a weather web site where to insert a zip code to retrieve weather information and where on the web site to find the results. Ex. 1005, 15:11–14, 15:23–34; Pet. 36–37; Ex. 1002 ¶¶ 169–180.

Regarding claims 10 and 13, we find that Kovatch teaches a ranking associated with web site addresses indicating the order in which to access a plurality of pre-selected web sites, for example ranking Amazon's web site over that of CD Now and accessing those web sites in that order. Ex. 1005, 16:28–34, 19:8–10, 23:25–29; Pet. 38; Ex. 1002 ¶¶ 171–173.

Regarding claim 14, Mr. Lipoff testifies that

> an obvious implementation of the Kovatch/Neal combination would have been to store the retrieved information in a memory operatively connected to the computer (Application Server or overall Anita Server), to allow the computer to retrieve the information and process it by translating it into the voice prompts as Kovatch describes.

Ex. 1002 ¶ 176. Based on this uncontroverted testimony, we find that Kovatch and Neal teach the additional limitation of claim 14.

Patent Owner does not present separate arguments challenging Petitioner's allegations for claims 2, 4–7, 10, 13, and 14.

#### *4. Conclusion of Obviousness*

As explained above, the combination of Kovatch and Neal teaches each limitation of claims 1, 2, 4–7, 10, 13, and 14. Petitioner has introduced persuasive evidence that a skilled artisan would have had reasons to combine the teachings of Kovatch and Neal with a reasonable expectation of success. Patent Owner does not argue or introduce evidence of objective indicia of nonobviousness. In sum, upon consideration of all the evidence, we conclude that Petitioner has proved by a preponderance of the evidence that claims 1, 2, 4–7, 10, 13, and 14 would have been obvious over Kovatch and Neal.

### *D. Obviousness of Claims 1, 2, 4–7, 9, 10, 13, and 14 over Kovatch, Neal, and Chakrabarti*

Petitioner contends that claims 1, 2, 4–7, 9, 10, 13, and 14 would have been obvious over Kovatch, Neal, and Chakrabarti. Pet. 39–45.

#### *1. Scope and Content of the Prior Art—Overview of Chakrabarti*

Chakrabarti discloses a "[s]ystem and method for focus[]ed Web crawling." Ex. 1008, code (54). The system generates a database of web pages that is focused on a predefined topic or topics, for subsequent efficient searching of the database by users. *Id.* at 2:56–60. The system includes a

"watchdog" module that periodically determines new (not yet visited) and old web pages to consider in searches. *Id.* at 3:15–21.

The system includes a computer that accesses the World Wide Web via the Internet. *Id.* at 4:14–16. The computer includes a focused crawler that may be executed by the computer. *Id.* at 4:26–28. The focused crawler adds outlinks of a web page to a crawl database when the web page is relevant to the predefined topic or topics. *Id.* at 3:41–46; *see also id.* at 6:26–27 (stating that outlinks "lead to Web pages other than the Web page represented by the URL field 36."). The focused crawler accesses a topic analyzer that compares the content of a web page with a predefined topic or topics and generates a response representative of how relevant the web page is to the topic. *Id.* at 4:61–65.

The system generates the crawl database, which solely contains information on web pages that pertain to the topic or topics of interest. *Id.* at 5:14–17. The crawl database includes a web page table that includes corresponding link tables, each of which is an edge table relative to the web page table. *Id.* at 5:17–21. The web page table includes a Uniform Resource Locator (URL) field that represents a web page URL. *Id.* at 5:31–34. The link table is further associated with the URL field. *Id.* at 6:16–17.

Using Chakrabarti's system, a user can generate a query for information and, in response, a conventional browser or searcher associated with the computer accesses the crawl database to retrieve a list of relevant web pages. *Id.* at 6:35–40. The browser responds to the query with web pages relevant to the predefined topic. *Id.* at 6:44–46.

*2. Claim 9, Differences Between the Claimed Subject Matter and Kovatch, Neal, and Chakrabarti / Conclusion of Obviousness*

Claim 9 depends from claim 1 and adds "said computer is further configured to periodically search said internet to identify new web sites and to add said new web sites to said plurality of web sites." Petitioner contends that a skilled artisan would have added Chakrabarti's web crawling feature to the combination of Kovatch and Neal such that the HeyAnita server periodically searches the Internet to identify new web sites and to add the new web sites to its listing of web sites. Pet. 44; *see also id.* at 41–44. Mr. Lipoff testifies that this would have been more efficient and would have increased the likelihood of finding a user's requested information. Ex. 1002 ¶¶ 183–185. Mr. Lipoff further testifies that this would have been a predictable use of prior art elements according their established functions. *Id.* ¶ 186. Patent Owner does not contest Petitioner's allegations as to claim 9.

On the complete record, including Mr. Lipoff's uncontroverted testimony, we find that Kovatch, Neal, and Chakrabarti teach each limitation of claim 9 and that a skilled artisan would have had reasons, with rational underpinning, to combine the references with a reasonable expectation of success. Patent Owner does not argue or introduce evidence of objective indicia of nonobviousness. In sum, upon consideration of all the evidence, we conclude that Petitioner has proved by a preponderance of the evidence that claim 9 would have been obvious over Kovatch, Neal, and Chakrabarti.

*3. Claims 1, 2, 4–7, 10, 13, and 14*

Petitioner asserts Kovatch, Neal, and Chakrabarti against claims 1, 2, 4–7, 10, 13, and 14 "if limitation [1j] were interpreted to require accessing more than two web sites." Pet. 44–45. On the complete record, neither party contends that claim limitation 1j includes this requirement. Accordingly, we need not reach whether claims 1, 2, 4–7, 10, 13, and 14 also would have been obvious over Kovatch, Neal, and Chakrabarti.[9]

*E. Obviousness of Claim 14 over Kovatch, Neal, and DeSimone*

Petitioner contends that claim 14 would have been obvious over Kovatch, Neal, and DeSimone. Pet. 45–49. Petitioner asserts Kovatch, Neal, and DeSimone against claim 14 because, it contends, the combination with DeSimone "meets claim 14 differently than the Kovatch/Neal combination alone." *Id.* at 46. As noted above, Petitioner has shown by a preponderance of the evidence that claim 14 would have been obvious over Kovatch and Neal, and Patent Owner does not dispute Petitioner's additional allegations for claim 14. Accordingly, we need not reach whether claim 14 also would have been obvious over Kovatch, Neal, and DeSimone.[10]

---

[9] Petitioner's allegations also include the contention that claim 9 would have been obvious over Kovatch, Neal, and Chakrabarti by virtue of Chakrabarti teaching limitation 1j. We do not reach this contention. As noted above, we find that Kovatch and Neal teach each limitation of claim 1 and Chakrabarti teaches the additional limitation of claim 9.

[10] For the same reasons, we do not reach Patent Owner's arguments (PO Resp. 45–46) that a skilled artisan would not have had reasons to combine DeSimone with the teachings of Kovatch and Neal.

*F. Obviousness of Claim 14 over Kovatch, Neal, Chakrabarti, and DeSimone*

As noted above, we do not reach whether claim 14 would have been obvious over Kovatch, Neal, and Chakrabarti, as Petitioner has shown that it would have been obvious over Kovatch and Neal. For the same reasons, we need not reach whether claim 14 also would have been obvious over Kovatch, Neal, Chakrabarti, and DeSimone.

*G. Obviousness of Claim 9 over Kurganov-262 and Chakrabarti*

Petitioner contends that claim 9 would have been obvious over Kurganov-262 and Chakrabarti. Pet. 50–63. The parties dispute whether Kurganov-262 is prior art to claim 9.

The ’431 patent claims priority to Application No. 09/776,996 (“the ’996 application”) as a continuation application. Ex. 1001, code (63). Kurganov-262 is the publication of the ’996 application. Ex. 1004, code (21). Petitioner indicates that the disclosure in Kurganov-262 is substantially identical to that of the ’431 patent. Pet. 50, 55. Patent Owner states that “Kurganov-262 is the priority document for the ’431 Patent and provides disclosure of each and every claim element of the challenged claims.” PO Resp. 30.

Petitioner contends that the limitation “said computer is further configured to periodically search said internet to identify ***new*** web sites and to add said ***new*** web sites to said plurality of web sites,” as recited in claim 9, is not disclosed in the ’996 application. Pet. 50–53. Petitioner contends that the ’996 application discloses the rest of claim 9’s limitations (those incorporated from claim 1, from which claim 9 depends). *Id.* at

55–61 (claim chart mapping Kurganov-262 to claim 1). According to Petitioner, Chakrabarti supplies the additional limitation of claim 9.

Patent Owner advances no specific arguments contesting Petitioner's assertions regarding the disclosures of Kurganov-262 and Chakrabarti. PO Resp. 46–50. Rather, Patent Owner argues that Kurganov-262 is not prior art because claim 9 has written description support in the '431 patent, thus entitling these claims to a priority date preceding that of Kurganov-262's publication (November 29, 2001). *Id.*

The parties' dispute, then, is whether Kurganov-262 provides written description support for the additional limitation of claim 9. The parties agree that Kurganov-262 describes all of the limitations of claim 1. If Kurganov-262 does provide written description support for claim 9, then it is not prior art to claim 9, and would not provide a basis to render claim 9 obvious. On the other hand, if Kurganov-262 does not provide written description support for claim 9, it is prior art to claim 9, and we then would evaluate whether Kurganov-262 in combination with Chaktrabarti renders claim 9 obvious.

*1. Kurganov-262 does not provide written description support for claim 9*

A description adequate to satisfy 35 U.S.C. § 112, ¶ 1,

> must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled

> in the art that the inventor had possession of the claimed subject matter as of the filing date.

*Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (citation omitted, alteration in original). "[T]he hallmark of written description is disclosure," and

> the test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan to show that the inventor actually invented the invention claimed.

*Id.*; *see also Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991) (stating that "the applicant must also convey with reasonably clarity to those skilled in the art that, as of the filing date sought, he or she was in possession *of the invention*," which, "for purposes of the 'written description' inquiry, [is] whatever is now claimed").

Petitioner asserts that the '431 patent[11] describes a "first embodiment . . . for allowing users to browse information sources, such as ***web sites***," and a "second embodiment . . . for controlling . . . household devices." Pet. 50 (citing Ex. 1001, 4:30–32, 17:36–46) (alterations by Petitioner). According to Petitioner, neither the first embodiment, the second embodiment, nor "mixing-and-matching" elements from the first and second embodiments provides written description support for claim 9. *Id.* at 51–54. Thus,

---

[11] The panel recognizes that the relevant issue for determining whether Kurganov-262 is prior art is whether the '996 application contains written description support for the challenged claims. However, when identifying such support, Petitioner and Patent Owner both cite to the disclosure of the '431 patent, which both parties agree has the same disclosure (apart from claims) as the '996 application, which published with materially the same disclosure as Kurganov-262. Following the parties' convention, we also cite to the '431 patent.

according to Petitioner, the effective filing date of claim 9 is no earlier than the actual filing date of the ’431 patent (April 9, 2004), and Kurganov-262 is prior art under 35 U.S.C. § 102(b). *Id.* at 54–55; Ex. 1001, code (22).

Patent Owner points to the ’431 patent’s Abstract and Summary of the Invention, and its disclosure that the inventive system “dynamically adapt[s] to changes in the rapidly evolving web sites that exist on the Internet.” PO Resp. 46–47 (citing Ex. 1001, Abstract, 2:66–3:3, 17:26–28). Patent Owner also points to three paragraphs within Kurganov-262 that Patent Owner argues describes “getting information from Lycos and Yahoo, which include[s] web crawling functionality.” *Id.* at 47 (citing Ex. 1004 ¶¶ 30, 39, 42[12]). Based on these disclosures, Patent Owner asserts that a skilled artisan would have understood that a web search system would include the ability to identify new web sites or engage in web crawling, and would need to adapt to the changing Internet by identifying new web sites. *Id.* (citing Ex. 2059 ¶ 149). Patent Owner argues that this is “confirmed by a review of the system that inventors reduced to practice prior to filing the provisional application that led to the issuance of the ’431 Patent, which included this functionality.” *Id.* (citing Ex. 2059 ¶¶ 44–91).

Patent Owner also asserts that the first and second embodiments described in the ’431 patent—one browsing web sites and the other browsing devices—“are not exclusive” and that the skilled artisan would have understood that the description for browsing devices “is equally applicable to web sites and to the first embodiment system for browsing web sites.” PO Resp. 47–48. Patent Owner alleges that “the devices in the

---

[12] These paragraphs correspond to Exhibit 1001, 5:33–53, 7:35–9:40, 14:36–15:30.

second embodiment may in fact be web sites, and operate similarly to the first embodiment." *Id.* at 48 (citing Ex. 1001, 17:50–58; Ex. 1004 ¶ 54). Patent Owner also alleges that "[w]ithout 'identify[ing] new websites' it would be impossible for the system to 'dynamically adapt to changes in the rapidly evolving web sites that exist on the Internet'" as discussed in the '431 patent. *Id.* at 48–49 (quoting Ex. 1001, 17:23–28; citing Ex. 1004 ¶ 51; Ex. 2059 ¶ 153 (second alteration by Patent Owner)). Patent Owner then explains how it believes the '431 patent's discussion of "polling" and "pinging" the devices of the first embodiment would apply equally to the web sites of the second embodiment. *Id.* at 49–50 (citing Ex. 1001, 16:56–17:12, 19:17–19; Ex. 2059 ¶¶ 154–155).

Petitioner contends that Patent Owner provides no evidence that the skilled artisan would have recognized that the '431 patent's web search system would include the ability to identify new web sites or engage in web crawling, and "[e]ven if web crawling were known and obvious to ***add*** to what is described, obviousness is insufficient for written description." Reply 26 (citing Ex. 1049, 84–87; Ex. 1057 ¶¶ 23–24; *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571–72 (Fed. Cir. 1997) ("It is the disclosures of the applications that count. Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed. It extends only to that which is disclosed.")). Petitioner also asserts that Patent Owner has not produced evidence to support its argument that claim 9 was reduced to practice, and "[e]ven if it had, that is irrelevant to written description in ***the parent specification***." *Id.* at 26–27 (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 969 (Fed. Cir. 2002) ("[P]roof of a reduction to practice, absent an adequate description in the specification of what is reduced to

practice, does not serve to describe or identify the invention for purposes of § 112, ¶ 1.”)).

Petitioner disagrees with Patent Owner’s assertion that dynamic adaptation to changes in web sites would not be possible without identifying new web sites because the changes in web sites described by the ’431 patents occur “***within*** **known** websites.” *Id.* at 27 (citing Ex. 1001, 2:30–41, 16:44–55, 17:26–28; Ex. 1057 ¶ 27). We agree with Petitioner that the ’431 patent describes adapting to changes within already known websites, not adapting to changes on the Web involving unknown websites. Thus, the ’431 patent’s description of adapting to changes in web sites does not provide written description support for claim 9.

Petitioner also disagrees with Patent Owner’s argument that “the ‘second embodiment’ ‘could never detect a new device’ unless it polls devices not in the database” because, according to Petitioner, “the specification directly refutes this—the second embodiment polls ‘devices . . . ***listed in database*** 508.’” Reply 27 (quoting PO Resp. 49; citing Ex. 1001, 19:10–28). Petitioner also explains why it believes that Patent Owner’s assertions regarding “polling” of web sites is unsupported and erroneous. *Id.* at 28 (citing Ex. 1057 ¶¶ 28–29).

In response, Patent Owner asserts that the support for claim 9 “comes from the knowledge of one of ordinary skill in the art and the Kurganov[-262] application’s disclosure of its second embodiment.” Sur-reply 23. Patent Owner also asserts that “[t]he polling of devices . . . in the second embodiment is not limited to known devices” because the application expressly discloses adding new devices and, if that “were restricted to known devices, new devices could never be added.” *Id.* at 24. Patent Owner also asserts that “the disclosure of polling or pinging devices 500

should be understood [to] refer to the IP addresses or potential locations of devices, not the devices themselves." *Id.* at 25.

We are persuaded by Petitioner that sufficient written description support does not exist in Kurganov-262 for claim 9, which requires the computing device to be "configured to periodically search via one or more networks to identify new web sites and to add the new web sites to the plurality of web sites." Pet. 50–54. Thus, we determine that Kurganov-262 is available as prior art against the challenged claims.

On the complete record, Patent Owner fails to direct us to specific disclosure within Kurganov-262 that evidences written description for claim 9. Rather, Patent Owner's citations to the '431 patent fail to describe with adequate precision how the computing device is configured to periodically search the network(s) to identify new web sites and add such new web sites to the plurality of web sites that are accessed. PO Resp. 46–50.

For example, Patent Owner provides several citations to the '431 patent that lack specificity regarding claim 9. *Id.* at 46–48. Patent Owner then points to the '431 patent disclosure that

> In the preferred [second] embodiment, **the devices 500 appear as "web sites"** connected to the network 502. This allows a network interface system, such as a device browsing server 506, a database 508, and a user interface system, such as a media server 510, to **operate similar to the web browsing server 102, database 100 and media server 106 described in the first preferred embodiment above**.

PO Resp. 48 (quoting Ex. 1001, 17:50–58) (alteration by Patent Owner). Patent Owner contends that "this disclosure shows that the devices in the second embodiment may in fact be web sites, and operate similarly to the first embodiment." *Id.* We are not persuaded by this argument.

The disclosure referenced by Patent Owner indicates that the devices "*appear* as 'web sites' connected to the network." Ex. 1001, 17:50–52 (emphasis added). To "appear" as a web site is not the same as being a web site. Also, the '431 patent's use of quotation marks around the term "web site" in column 17 strongly suggests that the devices are not actual web sites—particularly considering the '431 patent's numerous listings of actual web sites without such quotation marks. *See, e.g., id.* at 6:19, 6:63, 13:33–34, 14:37–38, 18:37–40. This disclosure within the '431 patent supports Mr. Lipoff's testimony, relied on by Petitioner, that the skilled artisan "would have understood this to teach that the devices are, of course, not actually web sites, but only '***appear***' to the device browsing server as URLs." Ex. 1002 ¶ 220. We credit that testimony because it is supported by a reasonable reading of the '431 patent. We find that Petitioner has shown that this description of devices appearing as web sites does not provide written description support for claim 9.

Furthermore, Patent Owner has not produced evidence sufficient to show why these two embodiments would have been recognized by a skilled artisan as being interchangeable. For example, as we noted in our Institution Decision, "the first embodiment describes polling known web sites and modifying their ranking number based on the individual web site's response and speed, and does not appear to search for new web sites." Dec. 51 (citing Ex. 1001, 7:4–8). We observed that the second embodiment's "detection of a new device appears to be carried out by polling or 'pinging' periodically all known devices listed in a database," and "[i]f . . . the server receives an unexpected response, then the device is identified as being 'new'." *Id.* (citing Ex. 1001, 19:19–28). On the complete record, Patent Owner has not adequately explained how such a periodic polling of known devices

described in the second embodiment could "be applied to identify new web sites—presumably to find additional sources of 'desired data,' which is an objective of the first embodiment." *Id.* (citing Ex. 1001, 4:44–46).

Rather, on the complete record, Patent Owner's evidence is not sufficient to support its assertions regarding what a skilled artisan "would understand" based on the '431 patent's disclosure. *See* PO Resp. 48–50. For example, Patent Owner asserts that "[a] [person of ordinary skill in the art] would understand that" polling or pinging "describes a process where by existing and new devices and/or websites are discovered," and that "'polling' includes asking for information from a website, including a listing of URLs or asking a website of a search engine to provide new website information." *Id.* at 49–50 (citing Ex. 2059 ¶¶ 153–155). We are not persuaded by this line of argument because we afford minimal weight to Patent Owner's reliance on paragraphs 153–155 of Mr. Occhiogrosso's testimony (Ex. 2059). PO Resp. 48–50. This testimony provides very little detail beyond what is argued in the Patent Owner Response. *See* 37 C.F.R. § 42.65 ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

We furthermore agree with Petitioner that the '431 patent distinguishes between "polling" and "searching." Reply 28; Ex. 1001, claim 8 (reciting the computing device of "the system of claim 1 wherein the computer is further configured to periodically poll each of said web sites"). Therefore, we agree with Petitioner (Reply 28) that a skilled artisan would not have understood the "polling" disclosed in column 19 as "including searching for new . . . web sites." PO Resp. 48.

We also are not persuaded by Patent Owner's assertion that a skilled artisan "after reading the specification of the '431 Patent, would understand

that a web search system would include the ability to 'identify new websites' or engage in web crawling," and "would need to adapt to the changing internet by identifying new websites." *Id.* at 47 (citing Ex. 2059 ¶ 149). This contention is also insufficiently supported. The evidence cited in support of this assertion is a document ("Lipoff Dep. (Rough)") that is not part of this proceeding. Ex. 2059 ¶ 149. We also agree with Petitioner that Patent Owner here attempts to argue that it would have been obvious to extend the '431 patent's disclosure to identifying new websites. Reply 26. However, introducing evidence that it would have been obvious in light of the '431 patent's disclosure is not sufficient to support an argument that the '431 patent provides written description support. *See Lockwood*, 107 F.3d at 1571–72.

Furthermore, Patent Owner relies on a reduction-to-practice theory that, even if true, is not relevant to the issue of whether written description exists in the '431 patent for claim 9. *See Enzo Biochem.*, 323 F.3d at 969 ("[P]roof of a reduction to practice, absent an adequate description in the specification of what is reduced to practice, does not serve to describe or identify the invention for purposes of § 112, ¶ 1.")

In sum, Petitioner has shown by a preponderance of the evidence that Kurgonov-262 is prior art to the subject matter of claim 9.

*2. Obviousness of claim 9 over Kurganov-262 and Chakrabarti*

Turning now to obviousness, as noted above, Petitioner contends that Kurganov-262 discloses every limitation of claim 1, but not claim 9, and that Chakrabarti's teachings would have supplied what was missing from Kurganov-262 for claim 9. Pet. 55–63. Petitioner identifies disclosure

within Kurgonov-262 that teaches or suggests the limitations of claim 1. *Id.* at 55–61. Petitioner then argues that a skilled artisan would have incorporated Chakrabarti's web-crawling teachings, and would have done so essentially for the same reasons discussed in Section II.D.2 above for the combination of Kovatch, Neal, and Chakrabarti. *Id.* at 62–63.

Because Patent Owner focused its arguments solely on the issue of whether Kurganov-262 is prior art, Petitioner's assertions regarding the substantive teachings of Kurganov-262 and Chakrabarti remain unrebutted on the complete record. PO Resp. 46–50; Sur-reply 23–25. Patent Owner likewise does not address Petitioner's proffered reasons why a skilled artisan would have combined these teachings. PO Resp. 46–50; Sur-reply 23–25.

We have reviewed the disclosures of Kurganov-262 and Chakrabarti relied on by Petitioner, as well as the explanations provided by Mr. Lipoff, and are persuaded that the limitations of claim 1 are taught in Kurganov-262 and the additional limitations of claim 9 are taught in Chakrabarti. Pet. 55–63; Ex. 1002 ¶¶ 225–228; Ex. 1004; Ex. 1008. Petitioner also persuades us that a skilled artisan would have been motivated to apply Chakrabarti's techniques for web crawling to Kurganov-262's system, and would have had a reasonable expectation of successfully doing so, thus arriving at the subject matter of claim 9 of the '431 patent. Pet. 62–63; Ex. 1002 ¶¶ 229–233.

On the complete record, including Mr. Lipoff's uncontroverted testimony, we find that Kurganov-262 and Chakrabarti teach each limitation of claim 9 and that a skilled artisan would have had reasons, with rational underpinning, to combine the references with a reasonable expectation of success. Patent Owner does not argue or introduce evidence of objective indicia of nonobviousness. In sum, upon consideration of all the evidence,

we conclude that Petitioner has proved by a preponderance of the evidence that claim 9 would have been obvious over Kurganov-262 and Chakrabarti.

### *H. Obviousness of Claim 14 over Kurganov-262 and DeSimone*

Petitioner contends that claim 14 would have been obvious over Kurganov-262 and DeSimone. Pet. 63–68. Petitioner contends that Kurganov-262 does not provide written description support for and, thus, would be prior art to, claim 14 "[i]f claim 14 is interpreted to require more than temporary storage of the user-requested retrieved information in memory for converting the information to audio." *Id.* at 63–64. However, neither party contends that claim 14 should be interpreted to require more than temporary storage of user-requested retrieved information in memory for converting the information to audio. Accordingly, on the complete record, we need not reach whether Kurganov-262 would be prior art to claim 14 in that circumstance, or whether claim 14 would have been obvious over Kurganov-262 and DeSimone.

## III. CONCLUSION[13]

Petitioner has shown by a preponderance of the evidence that claims 1, 2, 4–7, 9, 10, 13, and 14 would have been obvious.

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

In summary:[14]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4–7, 10, 13, 14 | 103(a) | Kovatch, Neal | 1, 2, 4–7, 10, 13, 14 | |
| 1, 2, 4–7, 9, 10, 13, 14 | 103(a) | Kovatch, Neal, Chakrabarti | 9 | |
| 14 | 103(a) | Kovatch, Neal, DeSimone | | |
| 14 | 103(a) | Kovatch, Neal, Chakrabarti, DeSimone | | |
| 9 | 103(a) | Kurganov-262, Chakrabarti | 9 | |
| 14 | 103(a) | Kurganov-262, DeSimone | | |
| **Overall Outcome** | | | 1, 2, 4–7, 9, 10, 13, 14 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED, based on a preponderance of the evidence, that claims 1, 2, 4–7, 9, 10, 13, and 14 are unpatentable;

[14] As noted above, we do not reach whether claims 1, 2, 4–7, 10, 13, and 14 would have been obvious over Kovatch, Neal, and Chakrabarti; whether claim 14 would have been obvious over Kovatch, Neal, Chakrabarti, and DeSimone; whether claim 14 would have been obvious over Kovatch, Neal, and DeSimone; or whether claim 14 would have been obvious over Kurganov-262 and DeSimone.

FURTHER ORDERED, because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Elisabeth Hunt
Gregory Nieberg
Richard Giunta
WOLF, GREENFIELD & SACKS P.C.
Ehunt-ptab@wolfgreenfield.com
Gnieberg-ptab@wolfgreenfield.com
Rgiunta-ptab@wolfgreenfield.com

For PATENT OWNER:

Michael McNamara
Michael Renaud
William Meunier
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.
mmcnamara@mintz.com
mtrenaud@mintz.com
wameunier@mintz.com

Trials@uspto.gov
571-272-7822

Paper No. 31
Date: October 19, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

GOOGLE LLC, SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC.,
LG ELECTRONICS INC. and
LG ELECTRONICS U.S.A., INC.,
Petitioner,

v.

PARUS HOLDINGS, INC.,
Patent Owner.

---

IPR2020-00847
Patent 9,451,084 B2

---

Before DAVID C. MCKONE, STACEY G. WHITE,
and SHELDON M. MCGEE, *Administrative Patent Judges*.

MCGEE, *Administrative Patent Judge*.

# JUDGMENT
## Final Written Decision
## Determining All Challenged Claims Unpatentable

*35 U.S.C. § 318(a)*

## I. INTRODUCTION

Google LLC, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., LG Electronics Inc., and LG Electronics U.S.A., Inc. (collectively "Petitioner") filed a Petition requesting an *inter partes* review of claims 1, 2, 4–7, 10, and 14 of U.S. Patent No. 9,451,084 B2 (Ex. 1001, "the '084 patent"). Paper 2 ("Pet."). Parus Holdings, Inc., ("Patent Owner") filed a Preliminary Response to the Petition. Paper 6 ("Prelim. Resp."). We authorized Petitioner to file a Reply to Patent Owner's Preliminary Response (Paper 7, "Reply to POPR"), and Patent Owner filed a Sur-reply (Paper 8, "Sur-reply to POPR"). After considering these filings by both parties, we instituted an *inter partes* review of claims 1, 2, 4–7, 10, and 14 of the '084 patent on all grounds of unpatentability alleged in the Petition. Paper 9 ("Institution Decision" or "Dec.").

After institution of trial, Patent Owner filed a Patent Owner Response. Paper 14 ("PO Resp."). Petitioner filed a Reply. Paper 22 ("Reply"). Patent Owner filed a Sur-reply. Paper 24 ("Sur-reply").

An oral hearing was held on July 27, 2021, and a transcript of the hearing is included in the record. Paper 30 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine Petitioner has established by a preponderance of the evidence that claims 1, 2, 4–7, 10, and 14 of the '084 patent are unpatentable.

### *A. Related Proceedings*

The parties identify the following district court proceedings as related to the '084 patent: *Parus Holdings Inc. v. Apple, Inc.*, No. 6:19-cv-00432

(W.D. Tex.); *Parus Holdings Inc. v. Amazon.com, Inc.*, No. 6:19-cv-00454 (W.D. Tex.); *Parus Holdings Inc. v. Samsung Electronics Co., Ltd., et al.*, No. 6:19-cv-00438 (W.D. Tex.); *Parus Holdings Inc. v. Google LLC*, No. 6:19-cv-00433 (W.D. Tex.); and *Parus Holdings Inc. v. LG Electronics, Inc., et al.*, No. 6:19-cv-00437 (W.D. Tex.). Pet. –x–[1]; Paper 5, 1.

The parties also identify the following PTAB proceedings that may affect or be affected by a decision in this proceeding: IPR2020-00686; IPR2020-00687; and IPR2020-00846.[2] Pet. –xi–; Paper 5, 1–2.

*B. The '084 Patent (Ex. 1001)*

The '084 patent, titled "Robust Voice Browser System and Voice Activated Device Controller," issued September 20, 2016. Ex. 1001, codes (54), (45). The '084 patent relates to a "robust and highly reliable system that allows users to browse web sites and retrieve information by using conversational voice commands." *Id.* at 1:35–38. Systems disclosed by the '084 patent allow devices connected to a network to be controlled by conversational voice commands spoken into any voice enabled device interconnected with the network. *Id.* at 3:37–41. Systems disclosed by the '084 patent also allow users to access and browse web sites when the users do not have access to computers with Internet access, by providing users with a voice browsing system to browse web sites using conversational voice commands spoken into voice enabled devices, such as wireline or

[1] Petitioner includes its mandatory notices in the preamble section of its Petition, where the preamble section is paginated using lower case Roman numerals (*i.e.*, 'i', 'ii', . . . 'xii').
[2] Petitioner references a concurrently filed IPR challenging U.S. Patent No. 7,076,431, which is IPR2020-00846.

wireless telephones. *Id.* at 3:29–32, 3:52–59. The users' spoken commands are converted into data messages by a speech recognition software engine, and are transmitted to the user's desired web site over the Internet. *Id.* at 3:60–65. Responses sent from the web site are received and converted into audio messages via a speech synthesis engine or a pre-recorded audio concatenation application, and finally transmitted to the user's voice enabled device. *Id.* at 3:65–4:3. The disclosed voice browsing system maintains a database containing a list of information sources (e.g., Internet web sites), with rank numbers assigned to the information sources. *Id.* at 3:17–20, 4:5–20. The '084 patent explains that:

> the voice browser system and method uses a web site polling and ranking methodology that allows the system to detect changes in web sites and adapt to those changes in real-time. This enables the voice browser system of a preferred embodiment to deliver highly reliable information to users over any voice enabled device. This ranking system also enables the present invention to provide rapid responses to user requests. Long delays before receiving responses to requests are not tolerated by users of voice-based systems, such as telephones. When a user speaks into a telephone, an almost immediate response is expected. This expectation does not exist for non-voice communications, such as email transmissions or accessing a web site using a personal computer. In such situations, a reasonable amount of transmission delay is acceptable. The ranking system . . . implemented by a preferred embodiment of the present invention ensures users will always receive the fastest possible response to their request.

*Id.* at 4:4–21. Figure 1 of the '084 patent, reproduced below, illustrates a voice browsing system. *Id.* at 4:29–30.




FIG. 1

Figure 1 illustrates a voice browsing system. *Id.* at 4:29–30.

Voice browsing system 118 illustrated in Figure 1 includes media servers 106 (which may contain a speech recognition engine), database 100, web browsing servers 102, and firewalls 104 and 108. *Id.* at 5:10–18, 6:10–12, 6:20–23, 20:26–34. Voice browsing system 118 connects on one side to voice-enabled device 112 (e.g., a telephone) through public switched telephone network 106, and to individual websites 114 through internet 110 on the other side. *Id.* at 19:56–20:38.

Specifically, a user of the voice browsing system establishes a connection between voice enabled device 112 and media server 106 by, e.g., calling a telephone number associated with the voice browsing system. *Id.* at 19:59–62. Once the connection is established, media server 106 initiates

an interactive voice response (IVR) application that plays audio messages to the user presenting a list of options, such as, "stock quotes," "flight status," "yellow pages," "weather," and "news." *Id.* at 19:62–67. The user selects the desired option (e.g., "yellow pages") by speaking the name of the option into the voice-enabled device 112. *Id.* at 20:4–18. The system asks the user further details of the user's search, and the user speaks into telephone 112 the details of the user's search (e.g., looking for "restaurants," types of restaurants, zip codes for the restaurants). *Id.* Media server 106 uses the speech recognition engine to interpret the user's speech commands; for example, media server 106 may identify keywords in the user's speech. *Id.* at 6:60–7:2, 20:19–21. Media server 106 then uses the recognized keywords to search website records stored in database 100, retrieves an appropriate web site record from the database, and provides the record to the web browsing server 102. *Id.* at 6:65–7:2, 20:20–23. Information then is retrieved from the responding web site and transmitted to media server 106, for conversion into audio messages—performed by a speech synthesis software or by selecting among a database of prerecorded voice responses contained within database 100. *Id.* at 20:35–46.

Database 100 contains sets of records for each web site accessible by the voice browsing system. *Id.* at 5:17–20. Figure 2, reproduced below, illustrates an example of web site record 200 in the database. *Id.* at 4:31–32, 5:19–20.




FIG. 2

Figure 2 illustrates an example of a web site record in database 100. *Id.* at 4:31–32, 5:19–20.

Each web site record 200 contains rank number 202 of the web site, associated Uniform Resource Locator (URL) 204 for the website, and command 206 that enables an extraction agent to generate proper requests to the web site and to format data received from the web site. *Id.* at 5:20–25. For each category searchable by a user, database 100 may list several web sites, each with a different rank number. *Id.* at 20:47–50. As an example, three different web sites may be listed as searchable under the category of "restaurants," and each of those web sites will be assigned a rank number such as 1, 2, or 3. *Id.* at 20:50–53. The web site with the highest rank (i.e., rank=1) will be the first web site accessed by web browsing server 102. *Id.* at 20:53–55. If the information requested by the user cannot be found at this first web site, web browsing server 102 will then search the second ranked web site and so forth down the line, until the requested information is retrieved or no more web sites are left to be checked. *Id.* at 20:55–59.

*C. Illustrative Claim*

Petitioner challenges claims 1, 2, 4–7, 10, and 14, of which sole independent claim 1 is illustrative. Claim 1 is reproduced below with Petitioner's claim element identified in brackets:

> 1. [Preamble] A system for acquiring information from one or more sources maintaining a listing of web sites by receiving speech commands uttered by users into a voice-enabled device and for providing information retrieved from the web sites to the users in an audio form via the voice-enabled device, the system comprising:
>
> [1.a] at least one computing device, the computing device operatively coupled to one or more networks;
>
> [1.b] at least one speaker-independent speech-recognition device, the speaker-independent speech-recognition device operatively connected to the computing device and configured to receive the speech commands;
>
> [1.c] at least one speech-synthesis device, the speech-synthesis device operatively connected to the computing device;
>
> [1.d] memory operatively associated with the computing device with at least one instruction set for identifying the information to be retrieved, the instruction set being associated with the computing device, the instruction set comprising:
>
> a plurality of web site addresses for the listing of web sites, each web site address identifying a web site containing the information to be retrieved;
>
> [1.e] at least one recognition grammar associated with the computing device, each recognition grammar corresponding to each instruction set and corresponding to a speech command, the speech command comprising an information request provided by the user, [1.f] the speaker-independent speech-recognition device configured to receive the speech command from the users

via the voice-enabled device and to select the corresponding recognition grammar upon receiving the speech command;

[1.g] the computing device configured to retrieve the instruction set corresponding to the recognition grammar provided by the speaker-independent speech-recognition device;

[1.h] the computing device further configured to access at least one of the plurality of web sites identified by the instruction set to obtain the information to be retrieved, [1.i] wherein the computing device is further configured to periodically search via the one or more networks to identify new web sites and to add the new web sites to the plurality of web sites, [1.j] the computing device configured to access a first web site of the plurality of web sites and, if the information to be retrieved is not found at the first web site, the computer configured to access the plurality of web sites remaining in an order defined for accessing the listing of web sites until the information to be retrieved is found in at least one of the plurality of web sites or until the plurality of web sites have been accessed;

[1.k] the speech synthesis device configured to produce an audio message containing any retrieved information from the plurality of web sites, and

the speech synthesis device further configured to transmit the audio message to the users via the voice-enabled device.

Ex. 1001, 24:2–59 (limitation numbering designated by Petitioner; *see* Pet. 75–77 ("CLAIMS LISTING APPENDIX")).

### *D. Instituted Challenges to Patentability*

We instituted *inter partes* review of claims 1, 2, 4–7, 10, and 14 of the '084 patent on the following challenges. Dec. 2–3, 48.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4–7, 10, 14 | 103(a)[3] | Kurganov-262[4], Chakrabarti[5] |
| 14 | 103(a) | Kurganov-262, Chakrabarti, DeSimone[6] |
| 1, 2, 4–7, 10, 14 | 103(a) | Kovatch[7], Chakrabarti, Neal[8] |
| 14 | 103(a) | Kovatch, Chakrabarti, Neal, DeSimone |

Petitioner relies, *inter alia*, on two Declarations from Stuart J. Lipoff (Exs. 1002, 1057), and a Declaration from Dr. Martin Walker (Ex. 1053) to support its challenges. Relevant to our disposition of this case, Patent Owner relies on a Declaration from Benedict Occhiogrosso. Ex. 2059.

## II. ANALYSIS

### *A. Claim Construction*

Petitioner filed its Petition on April 18, 2020. Pet. 74, 80. Based on that filing date, we apply the same claim construction standard that is applied in civil actions under 35 U.S.C. § 282(b), which is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* 83 Fed. Reg. 51,340 (Oct. 11, 2018) (applicable to *inter partes* reviews filed on or after November 13, 2018).

[3] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103. Because the '084 patent was filed before March 16, 2013, the effective date of the relevant amendment, the pre-AIA version of § 103 applies.
[4] US 2001/0047262 A1, published November 29, 2001 (Ex. 1004).
[5] US 6,418,433 B1, issued July 9, 2002 (Ex. 1008).
[6] US 5,787,470, issued July 28, 1998 (Ex. 1009).
[7] WO 2001/050453 A2, published July 12, 2001 (Ex. 1005).
[8] US 6,324,534 B1, issued November 27, 2001 (Ex. 1007).

Under *Phillips*, claim terms are afforded "their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

In the Petition, Petitioner does not advance a specific construction for any claim term. *See* Pet. 5. Similarly, Patent Owner proposes no express constructions in the Patent Owner Response. *See* PO Resp. 18.

On the fully developed record, we determine that it is not necessary to provide an express construction for any claim term for purposes of resolving the controversy. *See, e.g.*, *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'") (quoting *Vivid Techs.*, 200 F.3d at 803).

*B. Level of Ordinary Skill in the Art*

Petitioner describes a person having ordinary skill in the art as having "a Bachelor's degree in electrical engineering, computer science or a related field, and at least two years of experience with voice interfaces and information processing. More education could substitute for less experience, and vice versa." Pet. 5 (citing Ex. 1002 ¶¶ 41–47). Patent Owner does not contest Petitioner's definition of the skilled artisan. *See generally*, PO Resp.

Neither party argues that the outcome of this case would differ based on our adoption of any particular definition of one of ordinary skill in the art.

Moreover, the level of ordinary skill in the art is also reflected by the references themselves. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) ("[T]he absence of specific findings on the level of skill in the art does not give rise to reversible error 'where the prior art itself reflects an appropriate level and a need for testimony is not shown.'"); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (finding that the Board of Patent Appeals and Interferences did not err in concluding that the level of ordinary skill in the art was best determined by the references of record).

Thus, on the complete record, we accept Petitioner's assessment of the level of one of ordinary skill in the art.

### *C. Asserted Obviousness based on Kurganov-262 and Chakrabarti (Ground 1)*

Petitioner asserts that claims 1, 2, 4–7, 10, and 14 would have been unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Kurganov-262 and Chakrabarti. Pet. 6–25. For support, Petitioner relies on declaration testimony from Stuart J. Lipoff (Ex. 1002).

#### *1. Overview of Kurganov-262*

The '084 patent claims priority to Application No. 09/776,996 through a chain of continuation applications. Ex. 1001, code (63). Kurganov-262 is the publication of Application No. 09/776,996. Ex. 1004, code (21). Petitioner indicates that the disclosure in Kurganov-262 is substantially identical to that of the '084 patent. Pet. 11. Patent Owner states that "Kurganov-262 is the priority document for the ['084] Patent and

provides disclosure of each and every claim element of the challenged claims." PO Resp. 19.

*2. Overview of Chakrabarti*

Chakrabarti discloses a "[s]ystem and method for focused web crawling." Ex. 1008, code (54). Chakrabarti discloses that the system generates a database of Web pages that is focused on a predefined topic or topics, for subsequent efficient searching of the database by users. *Id.* at 2:56–60. The system is illustrated in Figure 1, reproduced below.



Figure 1 is a block diagram of a system for focused Web crawling, showing an example Web page table entry and associated link table entry in an exploded relationship to a crawl database. *Id.* at 3:65–67.

Figure 1 illustrates system 10 for focused Web crawling. *Id.* at 4:13–14. System 10 includes a digital processing apparatus (*e.g.*, computer 12) that accesses the World Wide Web via Internet 13. *Id.* at 4:14–16. Computer 12 includes focused crawler 14, which may be executed by a processor within computer 12 as a series of computer-executable instructions. *Id.* at 4:26–28. Focused crawler 14 accesses topic analyzer 28. *Id.* at 4:61–62. Topic analyzer 28 compares the content of a Web page with a predefined topic or topics and generates a response representative of how relevant the Web page is to the topic. *Id.* at 4:63–65.

System 10 generates crawl database 30 that solely contains information on Web pages that pertain to the topic or topics of interest. *Id.* at 5:14–17. Crawl database 30 includes Web page table 32 that includes corresponding link tables 34, each of which is an edge table relative to Web page table 32. *Id.* at 5:17–21. Web page table 32 includes Uniform Resource Locator (URL) field 36 that represents a Web page URL. *Id.* at 5:31–34. Link table 34 is further associated with URL field 36. *Id.* at 6:16–17.

Chakrabarti discloses that, using system 10, a user can generate a query for information using keyboard 22 or mouse 24, and in response a conventional browser or searcher 58 associated with computer 12 accesses crawl database 30 to retrieve a list of relevant Web pages therefrom. *Id.* at 6:35–40. Browser 58 responds to the query with Web pages relevant to the predefined topic. *Id.* at 6:44–46.

*3. The Parties' Contentions Regarding Independent Claim 1*

Petitioner asserts that claim 1 would have been obvious over the combined disclosures of Kurganov-262 and Chakrabarti. Pet. 6–25. Specifically, Petitioner notes that Kurganov-262 is the publication of application 09/776,996—within the priority chain of the '084 patent—but "is [35 U.S.C. §] 102(b) prior art because the challenged claims are not entitled to priority earlier than 2004." Pet. 11. Petitioner contends that the limitation recited in sole independent claim 1 that requires periodic search and identification of "new web sites and to add the new web sites to the plurality of web sites"—limitation 1.i—lacks written description support in application 09/776,996. *Id.* at 6, 76. Thus, according to Petitioner, because the full scope of the claim 1 does not have written description support in application 09/776,996, "no challenged claim is entitled to the benefit of application 09/776,996's filing date" under 35 U.S.C. § 120. *Id.* at 6.

Regarding the actual disclosure of Kurganov-262, Petitioner details how it believes this reference discloses each and every limitation recited in claim 1 except for "limitation 1.i." Pet. 11–19. Petitioner asserts limitation 1.i is taught by Chakrabarti, and that the skilled artisan "would have had multiple reasons to modify Kurganov-262's information-retrieval system to periodically search for new web sites as Chakrabarti teaches." *Id.* at 19–23. Specifically, Petitioner asserts that the skilled artisan would have been motivated to apply Chakrabarti's crawling techniques to Kurganov-262's system "to achieve the benefits Chakrabarti discusses of adding 'relevant, valuable' web page addresses to make the information-retrieval database 'comprehensive' to increase the likelihood of finding a user's requested information." *Id.* at 21. Petitioner also asserts that Chakrabarti's focused

crawling techniques would have been well-suited to Kurganov-262's system because the systems of these references "use a database of web site listings categorized by relevance to particular topics" and such techniques "enhance[] the 'efficient' use of a topic-categorized information-retrieval database like Kurganov-262's." *Id.* at 22. Petitioner asserts that incorporating Chakrabarti's crawling techniques into Kurganov-262's system would have been "nothing more than the predictable use of prior-art elements according to their established functions." *Id.* (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007)).

Patent Owner advances no specific arguments contesting Petitioner's assertions regarding the respective disclosures of Kurganov-262 and Chakrabarti, or Petitioner's proffered motivations to combine the teaching of these references. PO Resp. 31–36. Rather, Patent Owner argues that Kurganov-262 is not prior art because the challenged claims have written description support in the '084 patent,[9] thus entitling these claims to a priority date preceding that of Kurganov-262's publication (November 29, 2001). *Id.* Specifically, Patent Owner points to the '084 patent's Abstract and Summary of the Invention, and its disclosure that the inventive system "dynamically adapt[s] to changes in the rapidly evolving web sites that exist on the Internet." *Id.* at 31–32 (citing Ex. 1001, Abstract, 3:13–16, 21:42–

---

[9] The panel recognizes that the relevant issue for determining whether Kurganov-262 is prior art is whether the application 09/776,996 contains written description support for the challenged claims. However, when identifying such support, Patent Owner cites to disclosure in the '084 patent, which both parties agree has the same disclosure (but for the claims) as Kurganov-262 and application 09/776,996. Following the parties' convention, we also cite to the '084 patent.

44). Patent Owner also points to three paragraphs within Kurganov-262 which purport to include "getting information from Lycos and Yahoo, which include[s] web crawling functionality." *Id.* at 32 (citing Ex. 1004 ¶¶ 30, 39, 42).[10] Based on these disclosures, Patent Owner asserts that the skilled artisan would have understood that a web search system would include the ability to identify new web sites or engage in web crawling, and would need to adapt to the changing Internet by identifying new web sites. *Id.* at 32 (citing Ex. 2059 ¶¶ 44–91, 149).

Patent Owner also asserts that the first and second embodiments described in the '084 patent—one browsing web sites and the other browsing devices—"are not exclusive" and that the skilled artisan would have understood that the description for browsing devices "is equally applicable to web sites and to the first embodiment system for browsing web sites." PO Resp. 32. Patent Owner alleges that "the devices in the second embodiment may in fact be web sites, and operate similarly to the first embodiment." *Id.* at 33. Patent Owner also alleges that "[w]ithout 'identify[ing] new websites' it would be impossible for the system to 'dynamically adapt to changes in the rapidly evolving web sites that exist on the Internet'" as discussed in the '084 patent. *Id.* at 33–34. Patent Owner then explains how it believes the '084 patent's discussion of "polling" and "pinging" the devices of the first embodiment would apply equally to the web sites of the second embodiment. *Id.* at 34.

Petitioner responds that most of Patent Owner's arguments simply rehash the Preliminary Response arguments that we rejected in our

---

[10] These paragraphs correspond to Ex. 1001, 5:47–66, 7:48–10:25, 18:53–19:46.

institution decision, and give us no reason to reconsider our earlier determinations. Reply 1. Petitioner also asserts that the Declaration that Patent Owner relies on for support "merely parrots the [Patent Owner Response] verbatim," and is thus entitled to little or no probative weight. *Id.* at 1–2 (citing Ex. 2059 ¶¶ 150–153). Petitioner contends that Patent Owner provides no evidence that the skilled artisan would have recognized that the '084 patent's web search system would include the ability to identify new websites or engage in web crawling, and "[e]ven if web crawling were known and obvious to add to what is described, obviousness is insufficient for written description." *Id.* at 2 (citing Ex. 1049, 84–87; Ex. 1057 ¶¶ 2–3). Petitioner also asserts that Patent Owner has not produced evidence to support its argument that limitation 1.i was reduced to practice, and "[e]ven if it had, that is irrelevant to written description in the parent specification." *Id.* at 2–3.

Petitioner furthermore disagrees with Patent Owner's assertion that dynamic adaptation to changes in web sites would not be possible without identifying new websites because such changes occur "within known websites." *Id.* at 3. Petitioner also disagrees with Patent Owner's argument that "the 'second embodiment' 'could never detect a new device' unless it polls devices not in the database" because, according to Petitioner, "[t]he specification directly refutes this—the second embodiment polls 'devices . . . listed in database 508.'" *Id.* (citing Ex. 1001, 23:26–44). Petitioner also explains why it believes Patent Owner's assertions regarding "polling" of websites is unsupported and erroneous. *Id.* at 4.

In response, Patent Owner asserts that the support for limitation 1.i "comes from the knowledge of one of ordinary skill in the art and the

Kurganov application's disclosure of its second embodiment." Sur-reply 1. Patent Owner also asserts that "[t]he polling of devices . . . in the second embodiment is not limited to known devices" because the application expressly discloses adding new devices and if that "were restricted to known devices, new devices could never be added." *Id.* at 1–2; *see also id.* at 3 (advancing a similar argument). Patent Owner also asserts that "the disclosure of polling or pinging devices 500 should be understood [to] refer to the IP addresses or potential locations of devices, not [the] devices themselves." *Id.* at 3.

*4. Obviousness Analysis of Claim 1*

A description adequate to satisfy 35 U.S.C. § 112, first paragraph, "must 'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.' In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (citation omitted, alteration in original).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made. *KSR*, 550 U.S. at 406. Obviousness is resolved based on underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary

skill in the art; and (4) objective evidence of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

We have analyzed both parties' arguments and evidence consistent with these legal principles and, on the complete record, find Petitioner has met its burden to establish by a preponderance of the evidence that Kurgonov-262 is prior art to the subject matter of claim 1, and that Kurgonov-262 and Chakrabarti render this subject matter obvious under 35 U.S.C. § 103. Our analysis begins with a discussion of written description because it relates to the threshold issue of whether Kurganov-262 is prior art to the '084 patent, even though the '996 application which published as Kurganov-262 appears in the '084 patent's priority chain. Ex. 1001, code 63.

*Written Description of "Limitation 1.i"*

We are persuaded by Petitioner's arguments that sufficient written description support does not exist in the '996 application for "limitation 1.i" which requires the computing device to be "configured to periodically search via the one or more networks to identify new web sites and to add the new web sites to the plurality of web sites." Pet. 6–11. Thus, we determine that Kurganov-262 is available as prior art against the challenged claims.

On the complete record, Patent Owner fails to direct us to specific disclosure within the '996 application that evinces written description for limitation 1.i. Rather, Patent Owner's citations to the '084 patent fail to describe with adequate precision a computing device configured to periodically search the network(s) to identify new web sites and add such new web sites to the plurality of web sites that are accessed. *See* PO Resp. 31–34.

For example, Patent Owner provides several citations to the ’084 patent that lack specificity regarding limitation 1.i. *Id.* at 31–32. Patent Owner then points to the ’084 patent disclosure that

> In the preferred [second] embodiment, the devices 500 appear as ‘web sites’ connected to the network 502. This allows a network interface system, such as a device browsing server 506, a database 508, and a user interface system, such as a media server 510, [to operate] similar to the web browsing server 102, database 100 and the media server 106 described in the first preferred embodiment above.

PO Resp. 33. Patent Owner contends that “this disclosure shows that the devices in the second embodiment may in fact *be* web sites, and *operate similarly to* the first embodiment.” *Id.* at 33 (emphases added). We are not persuaded by this argument.

The disclosure referenced by Patent Owner indicates that the devices “*appear* as ‘web sites’ connected to the network.” Ex. 1001, 21:67–22:1 (emphasis added). To “appear” as a “web site” is not the same as “being” a web site. Also, the ’084 patent’s use of quotation marks around the term “web site” in column 21 strongly suggests that the devices are not actual web sites—particularly considering the ’084 patent’s numerous listings of actual web sites *without* such quotation marks. *See, e.g., id.* at 6:33, 7:9, 17:27–28, 18:55, 22:53–56 (listing actual web sites without quotations). This disclosure within the ’084 patent supports Mr. Lipoff’s testimony, relied on by Petitioner, that the skilled artisan “would have understood this to teach that the devices are, of course, not actually web sites, but only ‘***appear***’ to the device browsing server as URLs.” Ex. 1002 ¶ 90. We credit that testimony because it is supported by a reasonable reading of the ’084 patent.

Furthermore, Patent Owner has not explained sufficiently how the particulars of these two embodiments would have been recognized by the skilled artisan as being interchangeable. For example, as we noted in our institution decision, "the first embodiment describes polling *known* web sites and modifying their ranking number based on the individual web site's response and speed, and *does not appear to search for new web sites*." Dec. 33 (citing Ex. 1001, 7:17–21) (emphases added). We observed that the second embodiment's "detection of a new device appears to be carried out by polling or 'pinging' periodically *all known devices* listed in a database," and "[i]f . . . the server receives an unexpected response, then the device is identified as being 'new'." Dec. 33 (citing Ex. 1001, 23:38–41) (emphasis added). On the complete record, we find that the '084 patent does not disclose that such a periodic polling of known devices described in the second embodiment could "be applied to identify new web sites—presumably to find additional sources of 'desired data,' which is an objective of the first embodiment." Dec. 34 (citing Ex. 1001, 4:57–59).

Rather, on the complete record, Patent Owner makes inadequately supported assertions regarding what the skilled artisan "would understand" based on the '084 patent's disclosure. *See* PO Resp. 33–34. For example, Patent Owner asserts that "[a] POSITA would understand that" polling or pinging "describes a process where by existing and new devices and/or websites are discovered," and that "'polling' includes asking for information from a website, including a listing of URLs or asking a website of a search engine to provide new website information." *Id.* at 34 (citing Ex. 2059 ¶¶ 154–155). We reject this line of argument because we afford minimal weight to Patent Owner's reliance on paragraphs 153–155 of Exhibit 2059.

PO Resp. 33–34. These declaration paragraphs provide little detail beyond what is argued in the Patent Owner Response. *See* 37 C.F.R. § 42.65 ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

We furthermore agree with Petitioner that the '084 patent distinguishes between "polling" and "searching." Reply 4; Ex. 1001, 25:14–23 (claim 8, requiring the computing device of "[t]he system of claim 1 . . . [to be] *further configured* to periodically *poll* each of the web sites" (emphases added)). Therefore, we find that that the skilled artisan would not have understood the "polling" disclosed in column 23 as "including searching for new . . . web sites." PO Resp. 33.

We also reject Patent Owner's assertion that the skilled artisan "after reading the specification of the '084 Patent, would understand that a web search system would include the ability to 'identify new websites' or engage in web crawling," and "would need to adapt to the changing internet by identifying new websites." PO Resp. 32 (citing Ex. 2059 ¶ 149). This contention is also insufficiently supported. The evidence cited in support of this assertion is a document ("Lipoff Dep. (Rough)") that is not part of this proceeding. Ex. 2059 ¶ 149. Furthermore, Patent Owner relies on a reduction-to-practice theory which, even if true, is not relevant to the issue of whether written description exists in the '084 patent for limitation 1.i. *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 969 (Fed. Cir. 2002) ("[P]roof of a reduction to practice, absent an adequate description in the specification of what is reduced to practice, does not serve to describe or identify the invention for purposes of § 112, ¶ 1.")

In sum, Petitioner has shown by a preponderance of the evidence that Kurganov-262 is prior art to the subject matter of claim 1.

*Obviousness over Kurganov-262 & Chakrabarti*

Turning now to obviousness, Petitioner identified disclosure within Kurgonov-262 and Chakrabarti which teaches or suggests the limitations of claim 1. Pet. 11–21. Furthermore, Petitioner identified multiple reasons that would have prompted the skilled artisan to combine the teachings of Kurganov-262 and Chakrabarti to arrive at the subject matter of claim 1. *Id.* at 21–22. Because Patent Owner focused its arguments solely on the issue of whether Kurganov-262 is prior art, Petitioner's assertions regarding the substantive teachings of Kurganov-262 and Chakrabarti remain unrebutted on the complete record. PO Resp. 31–34; Sur-reply 1–3. Patent Owner likewise failed to substantively address Petitioner's proffered reasons why the skilled artisan would have been motivated to combine these teachings. PO Resp. 31–34; Sur-reply 1–3.

We have reviewed the disclosures of Kurganov-262 and Chakrabarti relied on by Petitioner, as well as the explanations provided by Mr. Lipoff, and are persuaded that the limitations of claim 1 are disclosed in the prior art. Pet. 11–21; Ex. 1002 ¶¶ 103–109; Ex. 1004; Ex. 1008. Petitioner also persuades us that the skilled artisan would have been motivated to apply Chakrabarti's techniques for web crawling to Kurganov-262's system, and would have had a reasonable expectation of successfully doing so, thus arriving at the subject matter of claim 1 of the '084 patent. Pet. 21–23; Ex. 1002 ¶¶ 110–114.

Therefore, Petitioner has shown, by a preponderance of the evidence, that the subject matter of claim 1 of the ’084 patent would have been obvious over the combined disclosures of Kurganov-262 and Chakrabarti.

*5. Obviousness Analysis of Claims 2, 4–7, 10, and 14*

Challenged claims 2, 4–7, 10, and 14 each depend from claim 1. Petitioner has identified disclosure within Kurgonov-262 which teaches or suggests the additional limitations of these challenged dependent claims. Pet. 23–25. Petitioner identified multiple reasons that would have prompted the skilled artisan to combine the teachings of Kurganov-262 and Chakrabarti to arrive at the subject matter of claim 1. *Id.* at 21–22.

We have reviewed the disclosures of Kurganov-262 and Chakrabarti relied on by Petitioner, as well as the explanations provided by Mr. Lipoff, and are persuaded that the limitations of claims 2, 4–7, 10, and 14 are disclosed in the prior art. Pet. 23–25; Ex. 1002 ¶ 115; Ex. 1004; Ex. 1008. Petitioner also persuades us that the skilled artisan would have been motivated to apply Chakrabarti’s techniques for web crawling to Kurganov-262’s system, and would have had a reasonable expectation of successfully doing so, thus arriving at the subject matter of claims 2, 4–7, 10, and 14 of the ’084 patent. Pet. 21–23; Ex. 1002 ¶ 115. Patent Owner does not raise any arguments with respect to these claims apart from the arguments discussed above with respect to whether Kurganov-262 is prior art. *See generally* PO Resp., Sur-Reply.

Therefore, Petitioner has shown, by a preponderance of the evidence, that the subject matter of claims 2, 4–7, 10, and 14 of the ’084 patent would have been obvious over the combined disclosures of Kurganov-262 and Chakrabarti.

*D. Asserted Obviousness based on Kurganov-262, Chakrabarti, and DeSimone (Ground 2), Kovatch, Chakrabarti, and Neal (Ground 3), and Kovatch, Chakrabarti, Neal and DeSimone (Ground 4)*

We have determined *supra* that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 4–7, 10, and 14 would have been obvious over the combination of Kurganov-262 and Chakrabarti. Therefore, we need not address Petitioner's separate patentability challenge of these claims based on the combined teachings of Kovatch, Chakrabarti, and Neal, or the alternative challenges to dependent claim 14. Pet. 25–71.

## III. CONCLUSION[11]

We conclude that Petitioner has satisfied its burden of demonstrating, by a preponderance of the evidence, that the subject matter of claims 1, 2, 4–7, 10, and 14 of the '084 patent is unpatentable.

[11] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4–7, 10, 14 | 103(a) | Kurganov-262, Chakrabarti | 1, 2, 4–7, 10, 14 | |
| 14 | 103(a) | Kurganov-262, Chakrabarti, DeSimone | | |
| 1, 2, 4–7, 10, 14 | 103(a) | Kovatch, Chakrabarti, Neal | | |
| 14 | 103(a) | Kovatch, Chakrabarti, Neal, DeSimone | | |
| **Overall Outcome** | | | 1, 2, 4–7, 10, 14 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 4–7, 10, and 14 of U.S. Patent No. 9,451,084 B2 have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Elisabeth H. Hunt
Gregory S. Nieberg
Richard F. Giunta
WOLF, GREENFIELD & SACKS, P.C.
ehunt-ptab@wolfgreenfield.com
gnieberg-ptab@wolfgreenfield.com
rgiunta-ptab@wolfgreenfield.com

FOR PATENT OWNER:

Michael J. McNamara
Michael T. Renaud
William A. Meunier
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
mmcnamara@mintz.com
mtrenaud@mintz.com
wameunier@mintz.com

US007076431B2

(12) **United States Patent**
**Kurganov et al.**

(10) **Patent No.: US 7,076,431 B2**
(45) **Date of Patent: Jul. 11, 2006**

(54) **ROBUST VOICE BROWSER SYSTEM AND VOICE ACTIVATED DEVICE CONTROLLER**

(75) Inventors: **Alexander Kurganov**, Buffalo Grove, IL (US); **Valery Zhukoff**, Deerfield, IL (US)

(73) Assignee: **Parus Holdings, Inc.**, Bannockburn, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/821,690**

(22) Filed: **Apr. 9, 2004**

(65) **Prior Publication Data**

US 2004/0193427 A1 Sep. 30, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/776,996, filed on Feb. 5, 2001, now Pat. No. 6,721,705.

(60) Provisional application No. 60/233,068, filed on Sep. 15, 2000, provisional application No. 60/180,344, filed on Feb. 4, 2000.

(51) **Int. Cl.**
***G10L 21/06*** (2006.01)

(52) **U.S. Cl.** .................................................... **704/275**

(58) **Field of Classification Search** ................ 704/270, 704/275; 379/88.01, 88.02; 455/563
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,728,486 A 4/1973 Kraus
4,058,838 A 11/1977 Crager
4,100,377 A 7/1978 Flanagan
4,313,035 A 1/1982 Jordan
4,327,251 A 4/1982 Fomenko
4,340,783 A 7/1982 Sugiyama
4,371,752 A 2/1983 Matthews
4,481,574 A 11/1984 DeFind
4,489,438 A 12/1984 Hughes

(Continued)

FOREIGN PATENT DOCUMENTS

CA 1329852 5/1994

(Continued)

OTHER PUBLICATIONS

Matthew Talin Marx, "Toward Effective Conversational Messaging" (Thesis). As indicated on the cover page, the thesis was presented to the Departmental Committee on Graduate Students, Program in Media Arts and Sciences, School of Architecture and Planning, Massachusetts Institute of Technology on May 12, 1995. According to the web site http://www.theses.mit.edu/Dienst/Repository/2.0/Body/0018.mit.theses/1995-314/rfc1807bib, attached hereto as Attachment 1, the thesis was indexed on Mar. 21, 2000.

(Continued)

*Primary Examiner*—Susan McFadden
(74) *Attorney, Agent, or Firm*—Kelley Drye & Warren LLP

(57) **ABSTRACT**

The present invention relates to a system for acquiring information from sources on a network, such as the Internet. A voice browsing system maintains a database containing a list of information sources, such as web sites, connected to a network. Each of the information sources is assigned a rank number which is listed in the database along with the record for the information source. In response to a speech command received from a user, a network interface system accesses the information source with the highest rank number in order to retrieve information requested by the user.

**32 Claims, 4 Drawing Sheets**




Google Exhibit 1001
Google v. Parus

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,500,751 | A | 2/1985 | Darland |
| 4,513,390 | A | 4/1985 | Walter |
| 4,523,055 | A | 6/1985 | Hohl |
| 4,549,047 | A | 10/1985 | Brian |
| 4,584,434 | A | 4/1986 | Hashimoto |
| 4,585,906 | A | 4/1986 | Matthews |
| 4,596,900 | A | 6/1986 | Jackson |
| 4,602,129 | A | 7/1986 | Matthews |
| 4,635,253 | A | 1/1987 | Urui |
| 4,652,700 | A | 3/1987 | Matthews |
| 4,696,028 | A | 9/1987 | Morganstein |
| 4,713,837 | A | 12/1987 | Gordon |
| 4,747,127 | A | 5/1988 | Hansen |
| 4,748,656 | A | 5/1988 | Gibbs |
| 4,755,932 | A | 7/1988 | Diedrich |
| 4,757,525 | A | 7/1988 | Matthews |
| 4,761,807 | A | 8/1988 | Matthews |
| 4,763,317 | A | 8/1988 | Lehman |
| 4,769,719 | A | 9/1988 | Endo |
| 4,771,425 | A | 9/1988 | Baran |
| 4,776,016 | A | 10/1988 | Hansen |
| 4,782,517 | A | 11/1988 | Bernardis |
| 4,792,968 | A | 12/1988 | Katz |
| 4,799,144 | A | 1/1989 | Parruch |
| 4,809,321 | A | 2/1989 | Morganstein |
| 4,811,381 | A | 3/1989 | Woo |
| 4,837,798 | A | 6/1989 | Cohen |
| 4,847,891 | A | 7/1989 | Kotani |
| 4,850,012 | A | 7/1989 | Mehta |
| 4,852,149 | A | 7/1989 | Zurich |
| 4,866,758 | A | 9/1989 | Heinzelmann |
| 4,873,719 | A | 10/1989 | Reese |
| 4,879,743 | A | 11/1989 | Burke |
| 4,893,333 | A | 1/1990 | Baran |
| 4,893,335 | A | 1/1990 | Fuller |
| 4,903,289 | A | 2/1990 | Hashimoto |
| 4,905,273 | A | 2/1990 | Gordon |
| 4,907,079 | A | 3/1990 | Turner |
| 4,918,722 | A | 4/1990 | Buehren |
| 4,922,518 | A | 5/1990 | Gordon |
| 4,922,520 | A | 5/1990 | Bernard |
| 4,922,526 | A | 5/1990 | Morganstein |
| 4,926,462 | A | 5/1990 | Ladd |
| 4,930,150 | A | 5/1990 | Katz |
| 4,933,966 | A | 6/1990 | Hird |
| 4,935,955 | A | 6/1990 | Neudorker |
| 4,935,958 | A | 6/1990 | Morganstein |
| 4,941,170 | A | 7/1990 | Herbst |
| 4,942,598 | A | 7/1990 | Davis |
| 4,953,204 | A | 8/1990 | Cuschleg, Jr. |
| 4,955,047 | A | 9/1990 | Morganstein |
| 4,956,835 | A | 9/1990 | Grover |
| 4,959,854 | A | 9/1990 | Cave |
| 4,967,288 | A | 10/1990 | Mizutori |
| 4,969,184 | A | 11/1990 | Gordon |
| 4,972,462 | A | 11/1990 | Shibata |
| 4,974,254 | A | 11/1990 | Perine |
| 4,975,941 | A | 12/1990 | Morganstein |
| 4,985,913 | A | 1/1991 | Shalom |
| 4,994,926 | A | 2/1991 | Gordon |
| 4,996,704 | A | 2/1991 | Brunsen |
| 5,003,575 | A | 3/1991 | Chamberlin |
| 5,003,577 | A | 3/1991 | Ertz |
| 5,008,926 | A | 4/1991 | Misholi |
| 5,020,095 | A | 5/1991 | Morganstein |
| 5,027,384 | A | 6/1991 | Morganstein |
| 5,029,196 | A | 7/1991 | Morganstein |
| 5,036,533 | A | 7/1991 | Carter |
| 5,054,054 | A | 10/1991 | Pessia |
| 5,065,254 | A | 11/1991 | Hishidi |
| 5,086,385 | A | 2/1992 | Launey |
| 5,095,445 | A | 3/1992 | Sekiguchi |
| 5,099,509 | A | 3/1992 | Morganstein |
| 5,109,405 | A | 4/1992 | Morganstein |
| 5,128,984 | A | 7/1992 | Katz |
| 5,131,024 | A | 7/1992 | Pugh |
| 5,133,004 | A | 7/1992 | Heileman, Jr. |
| 5,145,452 | A | 9/1992 | Pekarske |
| 5,166,974 | A | 11/1992 | Morganstein |
| 5,193,110 | A | 3/1993 | Jones |
| 5,195,086 | A | 3/1993 | Baumgartner |
| 5,233,600 | A | 8/1993 | Pekarske |
| 5,243,643 | A | 9/1993 | Sattar et al. |
| 5,243,645 | A | 9/1993 | Bissell |
| 5,249,219 | A | 9/1993 | Morganstein |
| 5,263,084 | A | 11/1993 | Chaput |
| 5,291,302 | A | 3/1994 | Gordon |
| 5,291,479 | A | 3/1994 | Vaziri |
| 5,303,298 | A | 4/1994 | Morganstein |
| 5,307,399 | A | 4/1994 | Dai |
| 5,309,504 | A | 5/1994 | Morganstein |
| 5,325,421 | A | 6/1994 | Hou |
| 5,327,486 | A | 7/1994 | Wolff |
| 5,327,529 | A | 7/1994 | Fults |
| 5,329,578 | A | 7/1994 | Brennan |
| 5,333,266 | A | 7/1994 | Boaz |
| 5,347,574 | A | 9/1994 | Morganstein |
| 5,355,403 | A | 10/1994 | Richardson, Jr. |
| 5,365,524 | A | 11/1994 | Hiller |
| 5,375,161 | A | 12/1994 | Fuller |
| 5,384,771 | A | 1/1995 | Isidoro |
| 5,404,231 | A | 4/1995 | Bloomfield |
| 5,408,526 | A | 4/1995 | McFarland |
| 5,414,754 | A | 5/1995 | Pugh |
| 5,436,963 | A | 7/1995 | Fitzpatrick |
| 4,596,900 | A | 10/1995 | Jackson |
| 5,459,584 | A | 10/1995 | Gordon |
| 5,463,684 | A | 10/1995 | Morduch |
| 5,475,791 | A | 12/1995 | Schalk |
| 5,479,487 | A | 12/1995 | Hammond |
| 5,495,484 | A | 2/1996 | Self |
| 5,497,373 | A | 3/1996 | Hulen |
| 5,499,288 | A | 3/1996 | Hunt |
| 5,517,558 | A | 5/1996 | Schalk |
| 5,526,353 | A | 6/1996 | Henley |
| 5,555,100 | A | 9/1996 | Bloomfield |
| 5,559,611 | A | 9/1996 | Bloomfield |
| 5,559,859 | A | 9/1996 | Dai |
| 5,566,236 | A | 10/1996 | MeLampby |
| 5,603,031 | A | 2/1997 | White |
| 5,608,786 | A | 3/1997 | Gordon |
| 5,610,910 | A | 3/1997 | Focsaneanu |
| 5,610,970 | A | 3/1997 | Fuller |
| 5,611,031 | A | 3/1997 | Hertzfield |
| 5,652,789 | A | 7/1997 | Miner |
| 4,596,900 | A | 8/1997 | Jackson |
| 5,657,376 | A | 8/1997 | Espeut et al. |
| 5,659,597 | A | 8/1997 | Bareis |
| 5,666,401 | A | 9/1997 | Morganstein |
| 5,675,507 | A | 10/1997 | Bobo, II |
| 5,675,811 | A | 10/1997 | Broedner |
| 5,689,669 | A | 11/1997 | Lynch |
| 5,692,187 | A | 11/1997 | Goldman |
| 5,712,903 | A | 1/1998 | Bartholomew |
| 5,719,921 | A | 2/1998 | Vysotsky |
| 5,721,908 | A | 2/1998 | Lagarde |
| 5,724,408 | A | 3/1998 | Morganstein |
| 5,742,905 | A | 4/1998 | Pepe |
| 5,752,191 | A | 5/1998 | Fuller |
| 5,764,736 | A | 6/1998 | Shachar |
| 5,787,298 | A | 7/1998 | Broedner |
| 5,793,993 | A | 8/1998 | Broedner |
| 5,799,065 | A | 8/1998 | Junqua et al. |
| 5,809,282 | A | 9/1998 | Cooper |

| | | | | |
|---|---|---|---|---|
| 5,812,796 | A | | 9/1998 | Broedner |
| 5,819,306 | A | | 10/1998 | Goldman |
| 5,822,727 | A | | 10/1998 | Garberg |
| 5,832,063 | A | | 11/1998 | Vysotsky |
| 5,835,570 | A | | 11/1998 | Wattenbarger |
| 5,838,682 | A | | 11/1998 | Dekelbaum |
| 5,867,494 | A | | 2/1999 | Krishnaswamy |
| 5,867,495 | A | | 2/1999 | Elliott |
| 5,873,080 | A | | 2/1999 | Coden |
| 5,881,134 | A | | 3/1999 | Foster |
| 5,884,032 | A | | 3/1999 | Bateman |
| 5,884,262 | A | | 3/1999 | Wise |
| 5,890,123 | A | | 3/1999 | Brown |
| 5,915,001 | A | | 6/1999 | Uppaluru |
| 5,943,399 | A | | 8/1999 | Bannister |
| 5,953,392 | A | | 9/1999 | Rhie |
| 5,974,413 | A | | 10/1999 | Beauregard |
| 5,999,525 | A | | 12/1999 | Krishnaswamy |
| 6,012,088 | A | | 1/2000 | Li |
| 6,014,437 | A | | 1/2000 | Acker |
| 6,018,710 | A | | 1/2000 | Wynblatt |
| 6,021,181 | A | | 2/2000 | Miner |
| 6,031,904 | A | | 2/2000 | An |
| 6,038,305 | A | | 3/2000 | McAllister |
| 6,047,053 | A | | 4/2000 | Miner |
| 6,067,516 | A | | 5/2000 | Levay |
| 6,078,580 | A | | 6/2000 | Mandalia |
| 6,081,518 | A | | 6/2000 | Bowman-Amuah |
| 6,081,782 | A | * | 6/2000 | Rabin ......................... 704/275 |
| 6,091,808 | A | | 7/2000 | Wood |
| 6,104,803 | A | | 8/2000 | Weser |
| 6,115,742 | A | | 9/2000 | Franklin |
| 6,157,705 | A | * | 12/2000 | Perrone ................... 379/88.01 |
| 6,185,535 | B1 | * | 2/2001 | Hedin et al. ................ 704/270 |
| 6,195,357 | B1 | | 2/2001 | Polcyn |
| 6,208,638 | B1 | | 3/2001 | Rieley |
| 6,230,132 | B1 | * | 5/2001 | Class et al. ................. 704/270 |
| 6,233,318 | B1 | | 5/2001 | Picard |
| 6,243,373 | B1 | | 6/2001 | Turock |
| 6,252,944 | B1 | | 6/2001 | Hansen, II |
| 6,285,745 | B1 | | 9/2001 | Bartholomew |
| 6,366,578 | B1 | | 4/2002 | Johnson |
| 6,269,336 | B1 | | 7/2002 | Ladd |
| 6,446,076 | B1 | | 9/2002 | Burkey |
| 6,477,420 | B1 | | 11/2002 | Lim |
| 6,501,966 | B1 | * | 12/2002 | Bareis et al. ............... 455/563 |
| 6,505,163 | B1 | | 1/2003 | Zhang |
| 6,529,948 | B1 | | 3/2003 | Bowman-Amuah |
| 6,546,393 | B1 | | 4/2003 | Khan |
| 6,721,705 | B1 | | 4/2004 | Kurganov |
| 6,775,264 | B1 | | 8/2004 | Kurganov |
| 6,807,257 | B1 | * | 10/2004 | Kurganov ................ 379/88.22 |
| 2001/0048676 | A1 | | 12/2001 | Jimenez |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2211698 | 7/1989 |
| GB | 2240693 | 8/1991 |
| GB | 2317782 | 1/1998 |
| JP | 1-258526 | 10/1989 |
| WO | WO 9107838 | 5/1991 |
| WO | WO 9118466 | 11/1991 |
| WO | WO 9609710 | 3/1996 |
| WO | WO 97/37481 | 10/1997 |
| WO | WO 9823058 | 5/1998 |

OTHER PUBLICATIONS

Matt Marx & Chris Schmandt, "Mail Call: Message Presentation and Navigation in a Nonvisual Environment," *SIGCHI Conference on Human Factors in Computing Systems,* Vancouver, B.C., Canada, Apr. 13-18, 1996. As shown on Attachment 2, the web site http://www.usabilityviews.com/uv001673.html shows a date of Apr. 16, 1996. The distribution date is not presently known.

F. Kubala, S. Austin, C. Barry, J. Makhoul, P. Placeway & R. Schwartz, "Byblos Speech Recognition Benchmark Results," *Workshop on Speech & Natural Language,* Feb. 19-22, 1991. According to the web site http://portal.acm.org/citation.cfm?id=112405.112415&coll . . . , attached hereto as Attachment 3, the reference was published in 1991, Morgan Kaufman Publishers, San Francisco, CA. The distribution date is not presently known.

Charles T. Hemphill, Philip R. Thrift & John C. Linn, "Speech-Aware Multimedia," *IEEE MultiMedia,* Spring 1996, vol. 3, No. 1, pp. 74-78, IEEE. As indicated on the cover page of the journal, a copy of which is attached hereto as Attachment 4, the reference was received by Cornell University on Mar. 25, 1996.

Yang, C., "INETPhone—Telephone Services and Servers on the Internet," Apr. 1995, University of North Texas, pp. 1-6.

Robert J. Perdue & Eugene L. Rissanen, "Conversant® 1 Voice System: Architecture and Applications," Jul. 17, 1986, AT&T Technical Journal, pp. 1-14.

DAX Systems, Inc., Press Release, "Speech Recognition Success in DAX's Grasp," Nov. 22, 1995, pp. 1-2, Pine Brook, NJ.

AT&T, Press Release, "AT&T customers can teach systems to listen and respond to voice," Jan. 17, 1995, pp. 1-2, Basking Ridge, NJ., available at www.lucent.com/press/0195/950117.gbb.html (accessed Mar. 15, 2005).

Marco Sartori, "Speech Recognition," Apr. 1995, pp. 1-9, Mercury Communications, available at www.gare.co.uk/technology_watch/speech.htm (accessed Mar. 15, 2005).

Judith Markowitz, "The ultimate computer input device may be right under your nose," *Byte,* Dec. 1995, pp. 1-13, available at www.byte.com/art/9512/sec8/art1.htm (accessed Mar. 15, 2005).

"Wildfire Communications, Inc.," Harvard Business School, Mar. 21, 1996, Publ. No. 9-396-305, pp. 1-22.

"GLOBECOM '85 IEEE Global Telecommunications Conference," New Orleans, La., Dec. 2-5, 1985, pp. 1295-1300.

"Introducing PIC SuperFax, First PC/Fax System to Run Under Windows", Pacific Image Communications, Pasadena, CA, Date Unknown, (received at COMDEX show, Nov. 3, 1987), 4 pgs.

Garcia, et al, "Issues in Multimedia Computer-Based Message Systems Design and Standardization," NATO ASI Series, vol. 1-6, 1984, 18 pgs., no month.

Don Hunt & Brian Edwards, "Long-Distance Remote Control to the Rescue," Chicago Tribune, Jun. 15, 2002, Section 4, p. 15.

Schmandt, et al., "Phone Slave: A Graphical Telecommunications Interface," Proceedings of the SID, 1985, vol. 26/1, pp. 79-82, no month.

Schmandt, et al., "Phone Shell: The Telephone as Computer Terminal," ACM Multimedia, 1993, 11 pgs., no month.

Proceedings of the IFIP World Computer Congress, Dublin, Ireland, Sep. 1-5, 1986.

Shimamura, K., et al., "Review of the Electrical Communication Laboratories," vol. 418 (33), No. 1, Tokyo, Japan, 1985, pp. 31-39.

"Secretarial Branch Exchanged," IBM Technical Disclosure Bulletin, vol. 26 (5), Oct. 1983, pp. 2645-2647.

"WordPerfect: New Telephony Features Boost Office", WordPerfect Office TechBrief, 1994, Info-World Publg. Co., vol. 10, Issue 2, pp. 2-3.

Internet web page, "Wildfire Communications, Inc.", Nov. 5, 1997, including the following URL addresses: http://www.wildfire.com (1 pg); http://www.wildfire.com/consumerhome.html (2 pgs.); http://www.wildfire.com/106.html (2pgs.); http://www.wildfire.com/carrierhome.html (2pgs.); http://www.wildfire.com/sfandb.html (3 pgs.); http://www.wildfire.com/about.html (1 pg.); http://www.wildfire.com/abtmgmt.html (3 pgs.); http://www.wildfire.com/scoop.html (2 pgs.); and, no date found.

"A PABX that Listens and Talks," Speech Technology, Jan./Feb. 1984, pp. 74-79.

Maeda, et al., "An Intelligent Customer-Controlled Switching System," IEEE Global Telecommunications Conference, Hollywood, Florida, Nov. 28-Dec. 1, 1988, pp. 1499-1503.

Cole, et al., "An Architecture for a Mobile OSI Mail Access System," IEEE Journal on Selected Areas in Communications, vol. 7 (2), Feb. 1989, pp. 249-256.

"Business Phone Systems for Advanced Offices," NTT Review, vol. 2 (6), Nov. 1990, pp. 52-54.

Ly, "Chatter: A Conversational Telephone Agent," submitted to Program in Media Arts & Sciences, MIT, 1993, pp. 1-130.

Schmandt et al., "A Conversational Telephone Messaging Systems", IEEE Transactions on Consumer Electronics, 1984, vol. CE-30, No. 3, pp. xxi-xxiv, no month.

"Data Communications Networks: Message Handling Systems," Fasciele, VIII. 7- Recommendations X.400-X.430, 38 pages, date unknown.

Bellcore Technology Licensing, "The Electronic Receptionist—A Knowledge-Based Approach to Personal Communications", 1994, pp. 1-8, no month.

"Faxpak Store and Forward Facsimile Transmission Service," Electrical Communication, vol. 54 (3), 1979, pp. 251-255.

Brachman, et al., "Fragmentation in Store-and-Forward Message Transfer," IEEE Communications Magazine, vol. 26(7), Jul. 1988, pp. 18-27.

* cited by examiner


114
WEB SITE 1
WEB SITE 2
WEB SITE N
INTERNET
110
FIREWALL
108
WEB BROWSING SERVER
WEB BROWSING SERVER
102
102
TCP/IP
FIREWALL
104
MEDIA SERVER
MEDIA SERVER
106
106
T1 LINE
PSTN
116
DATABASE
100
118
112
112

FIG. 1


200
RANK NUMBER
URL
EXTRACTION AGENT COMMAND
TIMESTAMP
202
204
206
208

FIG. 2


6
SPEECH RECOGNITION ENGINE
300
SPEECH SYNTHESIS ENGINE
302
IVR APPLICATION
304
CALL PROCESSING SYSTEM
306
TELEPHONY AND VOICE HARDWARE
308
MEDIA SERVER

FIG. 3


102
CONTENT EXTRACTION AGENT
400
CONTENT FETCHER
402
POLLING AND RANKING AGENT
404
CONTENT DESCRIPTOR FILES
406
WEB BROWSING SERVER

FIG. 4



DEVICE N
VCR
TV
OUTDOOR LIGHTING
INDOOR LIGHTING
SECURITY SYSTEM
500
NETWORK
502
DEVICE BROWSING SERVER
506
DEVICE BROWSING SERVER
506
TCP/IP
MEDIA SERVER
510
MEDIA SERVER
510
T1 LINE
DATABASE
508
514
PSTN
512
504
504


FIG. 5

# ROBUST VOICE BROWSER SYSTEM AND VOICE ACTIVATED DEVICE CONTROLLER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 09/776,996, filed Feb. 5, 2001, now U.S. Pat. No. 6,721,705, which claims priority to U.S. Provisional Application Ser. No. 60/180,344, filed Feb. 4, 2000 entitled "Voice-Activated Information Retrieval System" and U.S. Provisional Application Ser. No. 60/233,068, filed Sep. 15, 2000 entitled "Robust Voice Browser System and Voice Activated Device Controller" and these applications are incorporated by reference in their entirety into the present application.

## FIELD OF THE INVENTION

The present invention relates to a robust and highly reliable system that allows users to browse web sites and retrieve information by using conversational voice commands. Additionally, the present invention allows users to control and monitor other systems and devices that are connected the Internet or any other network by using voice commands.

## BACKGROUND OF THE INVENTION

Currently, three options exist for a user who wishes to gather information from a web site accessible over the Internet. The first option is to use a desktop or a laptop computer connected to a telephone line via a modem or connected to a network with Internet access. The second option is to use a Personal Digital Assistant (PDA) that has the capability of connecting to the Internet either through a modem or a wireless connection. The third option is to use one of the newly designed web-phones or web-pagers that are now being offered on the market. Although each of these options provide a user with access to the Internet to browse web sites, each of them have their own drawbacks.

Desktop computers are very large and bulky and are difficult to transport. Laptop computers solve this inconvenience, but many are still quite heavy and are inconvenient to carry. Further, laptop computers cannot be carried and used everywhere a user travels. For instance, if a user wishes to obtain information from a remote location where no electricity or communication lines are installed, it would be nearly impossible to use a laptop computer. Oftentimes, information is needed on an immediate basis where a computer is not accessible. Furthermore, the use of laptop or desktop computers to access the Internet requires either a direct or a dial-up connection tan an Internet Service Provider (ISP). Oftentimes, such connections are not available when a user desires to connect to the Internet to acquire information.

The second option for remotely accessing web sites is the use of PDAs. These devices also have their own set of drawbacks. First, PDAs with the ability to connect to the Internet and access web sites are not readily available. As a result, these PDAs tend to be very expensive. Furthermore, users are usually required to pay a special service fee to enable the web browsing feature of the PDA. A further disadvantage of these PDAs is that web sites must be specifically designed to allow these devices to access information on the web site. Therefore, a limited number of web sites are available that are accessible by these web-enabled



PDAs. Finally, it is very common today for users to carry cell phones, however, users must also carry a separate PDA if they require the ability to gather information from various web sites. Users are therefore subjected to added expenses since they must pay for both cellular telephone service and also for the web-enabling service for the PDA. This results in a very expensive alternative for the consumer.

The third alternative mentioned above is the use of web-phones or web-pagers. These devices suffer many of the same drawbacks as PDAs. First, these devices are expensive to purchase. Further, the number of web sites accessible to these devices is limited since web sites must be specifically designed to allow access by these devices. Furthermore, users are often required to pay an additional fee in order to gain wireless web access. Again, this service is expensive. Another drawback of these web-phones or web-pagers is that as technology develops, the methods used by the various web sites to allow access by these devices may change. These changes may require users to purchase new web-phones or web-pagers or have the current device serviced in order to upgrade the firmware or operating system stored within the device. At the least, this would be inconvenient to users and may actually be quite expensive.

Therefore, a need exists for a system that allows users to easily access and browse the Internet from any location. Such a system would only require users to have access to any type of telephone and would not require users to subscribe to multiple services.

In the rapidly changing area of Internet applications, web sites change frequently. The design of the web site may change, the information required by the web site in order to perform searches may change, and the method of reporting search results may change. Web browsing applications that submit search requests and interpret responses from these web sites based upon expected formats will produce errors and useless responses when such changes occur. Therefore, a need exists for a system that can detect modifications to web sites and adapt to such changes in order to quickly and accurately provide the information requested by a user through a voice enabled device, such as a telephone.

When users access web sites using devices such as personal computers, delays in receiving responses are tolerated and are even expected, however, such delays are not expected when a user communicates with a telephone. Users expect communications over a telephone to occur immediately with a minimal amount of delay time. A user attempting to find information using a telephone expects immediate responses to his search requests. A system that introduces too much delay between the time a user makes a request and the time of response will not be tolerated by users and will lose its usefulness. Therefore, it is important that a voice browsing system that uses telephonic communications selects web sites that provide rapid responses since speed is an important factor for maintaining the system's desirability and usability. Therefore, a need exists for a system that accesses web sites based upon their speed of operation.

## SUMMARY OF THE INVENTION

It is an object of an embodiment of the present invention to allow users to gather information from web sites by using voice enabled devices, such as wireline or wireless telephones.

An additional object of an embodiment of the present invention is to provide a system and method that allows the

searching and retrieving of publicly available information by controlling a web browsing server using naturally spoken voice commands.

It is an object of another embodiment of the present invention to provide a robust voice browsing system that can obtain the same information from several web sites based upon a ranking order. The ranking order is automatically adjusted if the system detects that a given web site is not functioning, is too slow, or has been modified in such a way that the requested information cannot be retrieved any longer.

A still further object of an embodiment of the present invention is to allow users to gather information from web sites from any location where a telephonic connection can be made.

Another object of an embodiment of the present invention is to allows users to browse web sites on the Internet using conversational voice commands spoken into wireless or wireline telephones or other voice enabled devices.

An additional object an embodiment of the present invention is to provide a system and method for using voice commands to control and monitor devices connected to a network.

It is an object of an embodiment of the present invention to provide a system and method which allows devices connected to a network to be controlled by conversational voice commands spoken into any voice enabled device interconnected with the same network.

The present invention relates to a system for acquiring information from sources on a network, such as the Internet. A voice browsing system maintains a database containing a list of information sources, such as web sites, connected to a network. Each of the information sources is assigned a rank number which is listed in the database along with the record for the information source. In response to a speech command received from a user, a network interface system accesses the information source with the highest rank number in order to retrieve information requested by the user.

The a preferred embodiment of the present invention allows users to access and browse web sites when they do not have access to computers with Internet access. This is accomplished by providing a voice browsing system and method that allows users to browse web sites using conversational voice commands spoken into any type of voice enabled device (i.e., any type of wireline or wireless telephone, IP phone, wireless PDA, or other wireless device). These spoken commands are then converted into data messages by a speech recognition software engine running on a user interface system. These data messages are then sent to and processed by a network interface system. This network interface system then generates the proper requests that are transmitted to the desired web site over the Internet. Responses sent from the web site are received and processed by the network interface system and then converted into an audio message via a speech synthesis engine or a pre-recorded audio concatenation application and finally transmitted to the user's voice enabled device.

A preferred embodiment of the voice browser system and method uses a web site polling and ranking methodology that allows the system to detect changes in web sites and adapt to those changes in real-time. This enables the voice browser system of a preferred embodiment to deliver highly reliable information to users over any voice enabled device. This ranking system also enables the present invention to provide rapid responses to user requests. Long delays before receiving responses to requests are not tolerated by users of voice-based systems, such as telephones. When a user speaks into a telephone, an almost immediate response is expected. This expectation does not exist for non-voice communications, such as email transmissions or accessing a web site using a personal computer. In such situations, a reasonable amount of transmission delay is acceptable. The ranking system of implemented by a preferred embodiment of the present invention ensures users will always receive the fastest possible response to their request.

An alternative embodiment of the present invention allows users to control and monitor the operation of a variety of household devices connected to a network using speech commands spoken into a voice enabled device.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a depiction of the voice browsing system of the first embodiment of the present invention;

FIG. **2** is a block diagram of a database record used by the first preferred embodiment of the present invention;

FIG. **3** is a block diagram of a media server used by the preferred embodiment;

FIG. **4** is a block diagram of a web browsing server used by the preferred embodiment; and

FIG. **5** is a depiction of the device browsing system of the second embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

A first embodiment of the present invention is a system and method for allowing users to browse information sources, such as web sites, by using naturally spoken, conversational voice commands spoken into a voice enabled device. Users are not required to learn a special language or command set in order to communicate with the voice browsing system of the present invention. Common and ordinary commands and phrases are all that is required for a user to operate the voice browsing system. The voice browsing system recognizes naturally spoken voice commands and is speaker-independent; it does not have to be trained to recognize the voice patterns of each individual user. Such speech recognition systems use phonemes to recognize spoken words and not predefined voice patterns.

The first embodiment allows users to select from various categories of information and to search those categories for desired data by using conversational voice commands. The voice browsing system of the first preferred embodiment includes a user interface system referred to as a media server. The media server contains a speech recognition software engine. This speech recognition engine is used to recognize natural, conversational voice commands spoken by the user and converts them into data messages based on the available recognition grammar. These data messages are then sent to a network interface system. In the first preferred embodiment, the network interface system is referred to as a web browsing server. The web browsing server then accesses the appropriate information source, such as a web site, to gather information requested by the user.

Responses received from the information sources are then transferred to the media server where speech synthesis engine converts the responses into audio messages that are transmitted to the user. A more detailed description of this embodiment will now be provided.

Referring to FIG. **1**, a database **100** designed by Webley Systems Incorporated is connected to one or more web browsing servers **102** as well as to one or more media servers **106**. The database may store information on mag-

netic media, such as a hard disk drive, or it may store information via other widely acceptable methods for storing data, such as optical disks. The database **100** contains a separate set of records for each web site accessible by the system. An example of a web site record is shown in FIG. **2**. Each web site record **200** contains the rank number of the web site **202**, the associated Uniform Resource Locator (URL) **204**, and a command that enables the appropriate "extraction agent" **206** that is required in order to generate proper requests sent to and to format data received from the web site. The database record **200** also contains the timestamp **208** indicating the last time the web site was accessed. The extraction agent is described in more detail below. The database **100** categorizes each database record **200** according to the type of information provided by each web site. For instance, a first category of database records **200** may correspond to web sites that provide "weather" information. The database **100** may also contain a second category of records **200** for web sites that provide "stock" information. These categories may be further divided into subcategories. For instance, the "weather" category may contain subcategories depending upon type of weather information available to a user, such as "current weather" or "extended forecast". Within the "extended forecast" subcategory, a list of web site records may be stored that provide weather information for multiple days. The use of subcategories may allow the web browsing feature to provide more accurate, relevant, and up-to-date information to the user by accessing the most relevant web site. The number of records contained in each category or subcategory is not limited. In the preferred embodiment, three web site records are provided for each category.

Table 1 below depicts two database records **200** that are used with the preferred embodiment. These records also contain a field indicating the "category" of the record, which is "weather" in each of these examples.

TABLE 1

```
category:   weather
URL:   URL=http://cgi.cnn.com/cgi-
bin/weather/redirect?zip=__zip
rank:   1
command:   web__dispatch.pl weather__cnn
browsingServer:   wportal1
browsingServerBackup:   wportal2
dateTime:   Dec 21 2000   2:15PM
category: weather
URL:   URL=http://weather.lycos.com/wcfiveday.asp?city=zip
rank:        2
command:   web__dispatch.pl weather__lycos
browsingServer:   wportal1
browsingServerBackup:   wportal2
dateTime:   Dec 21 2000   1:45PM
```

The database also contains a listing of pre-recorded audio files used to create concatenated phrases and sentences. Further, database **100** may contain customer profile information, system activity reports, and any other data or software servers necessary for the testing or administration of the voice browsing system.

The operation of the media servers **106** will now be discussed in relation to FIG. **3**. The media servers **106** function as user interface systems. In the preferred embodiment, the media servers **106** contain a speech recognition engine **300**, a speech synthesis engine **302**, an Interactive Voice Response (IVR) application **304**, a call processing system **306**, and telephony and voice hardware **308** required to communicate with the Public Switched Telephone Network (PSTN) **116**. In the preferred embodiment, each media server is based upon Intel's Dual Pentium III 730 MHz microprocessor system.

The speech recognition function is performed by a speech recognition engine **300** that converts voice commands received from the user's voice enabled device **112** (i.e., any type of wireline or wireless telephone, Internet Protocol (IP) phones, or other special wireless units) into data messages. In the preferred embodiment, voice commands and audio messages are transmitted using the PSTN **116** and data is transmitted using the TCP/IP communications protocol. However, one skilled in the art would recognize that other transmission protocols may be used for either voice or data. Other possible transmission protocols would include SIP/VoIP (Session Initiation Protocol/Voice over IP), Asynchronous Transfer Mode (ATM) and Frame Relay. A preferred speech recognition engine is developed by Nuance Communications of 1380 Willow Road, Menlo Park, Calif. 94025 (www.nuance.com). The Nuance engine capacity is measured in recognition units based on CPU type as defined in the vendor specification. The natural speech recognition grammars (i.e., what a user can say that will be recognized by the speech recognition engine) were developed by Webley Systems.

Table 2 below provides a partial source code listing of the recognition grammars used by the speech recognition engine of the preferred embodiment for obtaining weather information.

TABLE 2

```
?WHAT__IS ?the weather ?[info information report conditions]
            ? ( (?like in )
            [
UScities.n
            {<param1 $n.zip> <param2   $n.city> <param3
            $n.state>}
            ( (area code) AREA__CODE:n ) {<param1 $n>}
            ( AREA__CODE:n (area code) ) {<param1 $n>}
            ( (zip ?code)   ZIP__CODE:n )   {<param1 $n>}
            ( ZIP__CODE:n (zip ?code) )   {<param1 $n>}
            ]
            )
                        ) {<menu 194>}
```

The media server **106** uses recognition results generated by the speech recognition engine **300** to retrieve a web site record **200** stored in the database **100** that can provide the information requested by the user. The media server **106** processes the recognition result data identifying keywords that are used to search the web site records **200** contained in the database **100** For instance, if the user's request was "What is the weather in Chicago?", the keywords "weather" and "Chicago" would be recognized. A web site record **200** with the highest rank number from the "weather" category within the database **100** would then be selected and transmitted to the web browsing server **102** along with an identifier indicating that Chicago weather is being requested.

The media servers **106** also contain a speech synthesis engine **302** that converts the data retrieved by the web browsing servers **102** into audio messags that are transmitted to the user's voice enabled device **112**. A preferred speech synthesis engine is developed by Lemout and Hauspie Speech Products, 52 Third Avenue, Burlington, Mass. 01803 (www.lhsl.com).

A further description of the web browsing server **102** will be provided in relation to FIG. **4**. The web browsing servers **102** provide access to any computer network such as the Internet **110**. These servers are also capable of accessing

databases stored on Local Area Networks (LANs) or Wide Area Networks (WANs). The web browsing servers receive responses from web sites and extract the data requested by the user. This task is also known as "content extraction." The web browsing servers **102** also perform the task of periodically polling or "pinging" various web sites and modifying the ranking numbers of these web sites depending upon their response and speed. This polling feature is further discussed below. The web browsing server **102** is comprised of a content extraction agent **400**, a content fetcher **402**, a polling and ranking agent **404**, and the content descriptor files **406**. Each of these are software applications and will be discussed below.

Upon receiving a web site record **200** from the database **100** in response to a user request, the web browsing server **102** invokes the "content extraction agent" command **206** contained in the record **200**. The content extraction agent **400** allows the web browsing server **102** to properly format requests and read responses provided by the web site **114** identified in the URL field **204** of the web site record **200**. Each content extraction agent command **206** invokes the content extraction agent and identifies a content description file associated with the web page identified by the URL **204**. This content description the directs the extraction agent where to extract data from the accessed web page and how to format a response to the user utilizing that data. For example, the content description for a web page providing weather information would indicate where to insert the "city" name or ZIP code in order to retrieve Chicago weather information. Additionally, the content description file for each supported URL indicates the location on the web page where the response information is provided. The extraction agent **400** uses this information to properly extract from the web page the information requested by the user.

Table 3 below contains source code for a content extraction agent **400** used by the preferred embodiment.

TABLE 3

```
#!/usr/local/www/bin/sybperl5
#$Header:
/usr/local/cvsroot/webley/agents/service/web__dispatch.pl,v
1.6
# Dispatches all web requests
#http://wcorp.itn.net/cgi/flstat?carrier=ua&flight__no=155&mo
n__abbr=jul&date=
6&stamp=OhLN~PdbuuE*itn/ord,itn/cb/sprint__hd
#http://cgi.cnnfn.com/flightview/rlm?airline=amt&number=300
require "config__tmp.pl";
# check parameters
die "Usage: $0 service [params]\n" if $#ARGV < 1;
#print STDERR @ARGV;
# get parameters
my ( $service, @param ) = @ARGV;
# check service
my %Services = (
                    weather__cnn => 'webget.pl weather__cnn',
                    weather__lycos => 'webget.pl
weather__lycos',
                    weather__weather => 'webget.pl
weather__weather',
                    weather__snap => 'webget.pl
weather__snap',
                    weather__infospace => 'webget.pl
weather__infospace',
                    stockQuote__yahoo => 'webget.pl stock',
                    flightStatus__itn => 'webget.pl
flight__delay',
                    yellowPages__yahoo => 'yp__data.pl',
                    yellowPages__yahoo => 'yp__data.pl',
                    newsHeaders__newsreal => 'news.pl',
                    newsArticle__newsreal => 'news.pl',
                    );
```

TABLE 3-continued

```
# test param
my $date = `date`;
chop( $date );
my ( $short__date ) = $date =~ /\s+(\w{3}\s+\d{1,2})\s+/;
my %Test = (
                    weather__cnn => '60053',
                    weather__lycos => '60053',
                    weather__weather => '60053',
                    weather__snap => '60053',
                    weather__infospace => '60053',
                    stockQuote__yahoo => 'msft',
                    flightStatus__itn => 'ua 155 ' .
$short__date,
                    yellowPages__yahoo => 'tires 60015',
                    newsHeaders__newsreal => '1',
                    newsArticle__newsreal => '1 1',
                    );
die "$date: $0: error: no such service: $service (check this
script)\n"
unless $Services{$service };
# prepare absolute path to run other scripts
my ( $path, $script ) = $0 =~ m|^(.*/) ([^/]*)|;
# store the service to compare against datatable
my $service__stored = $service;
# run service
while( !( $response = `$path$Services{$service }@param` ) )
{
        # response failed
        # check with test parameters
        $response = `$path$Services{$service }$Test{$service
}`;
#s{    print "test: $path$Service{$service }$Test{$service
}";
        if ( $response ) {
                $service = &switch__service( $service );
#               print "Wrong parameter values were supplied:
$service -
@param\n";
#               die "$date: $0: error: wrong parameters: $service
-
@param\n";
        }
        else {
                # change priority and notify
                $service = &increase__attempt ( $service );
        }
}
# output the response
print $response;
sub increase__attempt {
        my ( $service ) = @__;
        my ( $service__name ) = split( /__/, $service );
        print STDERR "$date: $0: attn: changing priority for
service:
$service\n";
        # update priority
        &db__query( "update mcServiceRoute "
                        . "set priority = ( select max( priority )
from
mcServiceRoute "
                        . "where service = '$service__name' ) + 1,
"
                        . "date = getdate( ), "
                        . "attempt = attempt + 1 "
                        . "where route = '$script $service'" );
#       print "---$route= = =\n";
        # find new route
        my $route = @{&db__query( "select route from
mcServiceRoute "
                                . "where service =
'$service__name' "
                                . "and attempt < 5
                                . "order by
priority ")
                    }-> [ 0 ] {route };
        &db__query( "update mcServiceRoute "
                        . "set attempt = 0 "
                        . "where route = '$script $service'" )
                if ( $route eq "$script $service"
```

TABLE 3-continued

```
                    or $route eq "$script $service__stored" );
        ( $service__name, $service ) = split ( /\s+/, $route );
        die "$date: $0: error: no route for the service:
$service (add
more)\n"
                unless $service;
        return $service;
}
sub switch__service {
        my ( $service ) = @__;
        my ( $service__name ) = split ( /__/, $service );
        print STDERR "$date: $0: attn: changing priority for
service:
$service\n";
        # update priority
        &db__query( "update mcServiceRoute "
                        . "set priority = ( select max( priority )
from
mcServiceRoute "
                        . "where service = '$service__name' ) + 1,
"
                        . "date = getdate( ) "
                        . "where route = '$script $service'" );
#       print "---$route= = =\n";
        # find new route
        my $route = @{&db__query( "select route from
mcServiceRoute "
                                . "where service =
'$service name' "
                                . "and attempt < 5
"
                                . "order by
priority ")
                        }-> [ 0 ]{route };
        die "$date: $0: error: there is the only service:
$ route (add
more)\n"
                if ( $route eq "$script $service"
                    or $route eq "$script $service__stored" );
        ( $service__name, $service ) = split (/\s+/, $route );
        die "$date: $0: error: no route for the service:
$service (add
more)\n"
                unless $service;
        return $service;
}       —
```

Table 4 below contains source code of the content fetcher **402** used with the content extraction agent **400** to retrieve information from a web site.

TABLE 4

```
#!/usr/local/www/bin/sybperl5
#-T
# -w
# $Header:
/usr/local/cvsroot/webley/agents/service/webget.pl,v 1.4
# Agent to get info from the web.
# Parameters: service__name [service__parameters], i.e. stock
msft or weather
60645
# Configuration stored in files service__name.ini
# if this file is absent the configuration is received from
mcServices table
# This script provides autoupdate to datatable if the .ini
file is newer.
$debug = 1;
use URI::URL;
use LWP::UserAgent;
use HTTP::Request::Common;
use Vail::VarList;
use Sybase::CTlib;
use HTTP::Cookies;
#print "Sybase::CTlib $DB__USR, $DB__PWD, $DB__SRV;";
open( STDERR, ">>$0.log" ) if $debug;
#open( STDERR, ">&STDOUT" );
```

TABLE 4-continued

```
$log = 'date';
#$response = './url.pl
"http://cgi.cnn.com/cgi-bin/weather/redirect?zip=60605"';
#$response = 'pwd';
#print STDERR "pwd = $response\n";
#$response = 'ls';
#print STDERR "ls = $response\n";
chop( $log );
$log .= "pwd=" . 'pwd';
chop( $log );
#$debug2 = 1;
my $service = shift;
$log .= " $service: ". join( ':', @ARGV ) . "\n";
print STDERR $log if $debug;
#$response = './url.pl
"http://cgi.cnn.com/cgi-bin/weather/redirect?zip=60605"';
my @ini = &read__ini( $service );
chop( @ini );
my $section = "";
do {$section = &process__section( $section ) }while $section;
#$response = './url.pl
"http://cgi.cnn.com/cgi-bin/weather/redirect?zip=60605"';
exit;
#######################################################
sub read__ini {
        my ( $service ) = @__;
        my @ini = ( );
        # first, try to read file
        $0 =~ m|^(.*/)[^;/]*|;
        $service = $1 . $service;
        if ( open( INI, "$service.ini" ) ) {
            @ini = ( <INI> );
            return @ini unless ( $DB__SRV );
            # update datatable
            my $file__time = time − int( ( −M "$service.ini" )
* 24 *
3600 );
#           print "time $file__time\n";
            my $dbh = new Sybase::CTlib $DB__USR,
            $DB__PWD,
$DB__SRV;
            unless ( $dbh ) {
                print STDERR "webget.pl: Cannot connect to
dataserver $DB__SRV:$DB__USR:$DB__PWD\n";
                return @ini;
            }
            my @row__refs = $dbh−>ct__sql( "select
            lastUpdate
from
mcServices where service = '$service'", undef, 1 );
            if ( $dbh−>{RC }= = CS__FAIL ) {
                print STDERR "webget.pl: DB select from
mcServices
failed\n";
                return @ini;
            }
            unless ( defined @row__refs ) {
                # have to insert
                my ( @ini__escaped ) = map {
                    ( my $x = $__) =~ s/\'/\'\'/g;
                    $x;
                }@ini;
                $dbh−>ct__sql( "insert mcServices values(
'$service',
'@ini__escaped', $file__time )" );
                if ( $dbh−>{RC }= = CS__FAIL ) {
                    print STDERR "webget.pl: DB insert to
mcServices failed\n";
                }
                return @ini;
            }
#           print "time $file__time:".$row__refs[ 0 ]−
>{'lastUpdate'
}."\n";
            if ( $file__time > $row__refs[ 0 ]−>{'lastUpdate' })
{
                # have to update
                my ( @ini__escaped ) = map {
                    ( my $x = $__) =~ s/\'/\'\'/g;
```

TABLE 4-continued

```
                    $x;
                }@ini;
                $dbh->ct_sql( "update mcServices set
                config =
'@ini_escaped', lastUpdate = $file_time where service =
'$service'" );
                if ( $dbh->{RC }= = CS_FAIL ) {
                    print STDERR "webget.pl: DB update to
mcServices failed\n";
                }
            }
            return @ini;
        }
        else {
            print STDERR "$0: WARNING: $service.ini n/a
            in " .
'pwd'
                . "Try to read DB\n";
        }
        # then try to read datatable
        die "webget.pl: Unable to find service $service\n"
unless ( $DB_SRV
);
        my $dbh = new Sybase::CTlib $DB_USR, $DB_PWD,
        $DB_SRV;
        die "webget.pl: Cannot connect to dataserver
$DB_SRV:$DB_USR:$DB_PWD\n" unless ( $dbh );
        my @row_refs = $dbh->ct_sql( "select config from
mcServices where
service = '$service'", undef, 1 );
        die "webget.pl: DB select from mcServices failed\n" if
$dbh->{RC }
= = CS_FAIL;
        die "webget.pl: Unable to find service $service\n"
unless ( defined
@row_refs );
        $row_refs[ 0 ]->{'config' }=~ s/\n /\n\r/g;
        @ini = split ( /\r/, $row_refs[ 0 ]->{'config' });
        return @ini;
}       -
##########################################################
sub process_section {
        my ( $prev_section ) = @_;
        my ( $section, $output, $content );
        my % Param;
        my % Content;
#       print"#################################### \n";
        foreach ( @ini ) {
#           print;
#           chop;
            s/\s+$//;
            s/^\s+//;
            # get section name
            if ( /^\[(.*)\]/ ) {
#               print "$_: $section:$prev_section\n";
                last if $section;
                next if $1 eq "print";
#               next if $prev_section ne "" and
                $prev_section
ne $1;
                if ( $prev_section eq $1 ) {
                    $prev_section = "";
                    next;
                }
                $section = $1;
            }
            # get parameters
            push( @{$Param{$1 }}, $2 ) if $section and
/{[^=]+)=(.*)/;
        }
#       print"++++++++++++++++++++++++++++++++++++++\n";
        return 0 unless $section;
#       print "section $section\n";
        # substitute parameters with values
        map {$Param{URL }->[ 0 ] =~ s/$Param{Input }->[$_
]/$ARGV[ $_
]/g
        }0 .. $#{$Param{Input }};
        # get page content
```

TABLE 4-continued

```
        ( $Content{'TIME' }, $content ) = &get_url_content(
${$Param{URL
}}[ 0 ] );
        # filter it
        map {
            if ( /^\"([^\"]+)\"([^\"]*)\"/ or
/\/([^\/]+)\/([^\/]*)\// )
{
                my $out = $2; $content =~ s/$1/$out/g;
            }
        }@{$Param{"Pre-filter" }};
#print STDERR $content;
        # do main regular expression
        unless ( @values = $content =~
/${$Param{Regular_expression }}[ 0
]/ ) {
            &die_hard( ${$Param{Regular_expression }}
            [ 0 ],
$content
);
            return $section;
        }
        %Content = map {( $Param{Output }->[ $_], $values
        [ $_
] )
        }0 .. $#{$Param{Output }};
        # filter it
        map {
            if ( /([^\"]+)\"([^\"]+)\"([^\"]*)\"/
                or /([^\/]+)\/([^\/]+)\/([^\/]*)\// ) {
                 my $out = $3;
                $Content{$1 }=~ s/$2/$out/g;
            }
        }@{$Param{"Post-filter" }};
        # calculate it
        map {
            if ( /( [^=]+)=(.*)/ ) {
                my $eval = $2;
                map {$eval =~ s/$_/$Content{$_}/g
                }keys %Content;
              $Content{$1 }= eval( $eval );
            }
        }@{$Param{Calculate }};
        # read section [print]
    foreach $i (0 .. $#ini ) {
            next unless $ini [ $i ] =~ /^\[print\]/;
            foreach ( $i + 1 .. $#ini ) {
                last if $ini[ $_] =~ /^\[.+\]/;
              $output .= $ini[ $_] . "\n";
            }
            last;
        }
        # prepare output
        map {$output =~ s/$_/$Content{$_}/g
        }keys %Content;
        print $output;
        return 0;
}
##########################################################
sub get_url_content {
        my ( $url ) = @_;
        print STDERR $url if $debug;
#       $response = './url.pl '$url'';
        $response = './url.pl '$url'';
        return( $time - time, $response );
        my $ua = LWP::UserAgent->new;
        $ua->agent( 'Mozilla/4.0 [en] (X11; I; FreeBSD 2.2.8-
STABLE i386)'
);
#       $ua->proxy( ['http', 'https'],
'http://proxy.webley:3128/' );
#       $ua->no_proxy( 'webley', 'vail' );
        my $cookie = HTTP::Cookies->new;
        $ua->cookie_jar( $cookie );
        $url = url $url;
        print "$url\n" if $debug2;
        my $time = time;
        my $res = $ua->request( GET $url );
        print "Response: " . ( time - $time ) . "sec\n" if
```

TABLE 4-continued

```
$debug2;
        return( $time − time, $res−>content );
}
########################################################
sub die__hard {
        my ( $re, $content ) = @__;
        my ( $re__end, $pattern );
        while ( $content !~ /$re/ ) {
            if ( $re =~ s/(\([^\(\)]+\)[^\(\)]*$)// ) {
                $re__end = $1 . $re__end;
            }
            else {
                $re__end = $re;
                last;
            }
        }
        $content =~ /$re/;
        print STDERR "The regular expression did not
        match:\n
$re\n
Possible misuse:
$re__end:\n
Matched:
$&\n
Mismatched:
$'\n
" if $ debug;
            if ( $debug ) {
                print STDERR "Content:\n $content\n" unless
$';
            }
}
########################################################
```

Table 5 below contains the content descriptor file source code for obtaining weather information from the web site www.cnn.com that is used by the extraction agent **400** of the preferred embodiment.

TABLE 5

```
[cnn]
Input=__zip
URL=http://cgi.cnn.com/cgi-bin/weather/redirect?zip=__zip
Pre-filter="\n" "
Pre-filter="<[^<>]+>""
Pre-filter=/\s+/ /
Pre-filter="[\(\)\|]"!"
Output=__location
Output=first__day__name
Output=first__day__weather
Output=first__day__high__F
Output=first__day__high__C
Output=first__day__low__F
Output=first__day__low__C
Output=second__day__name
Output=second__day__weather
Output=second__day__high__F
Output=second__day__high__C
Output=second__day__low__F
Output=second__day__low__C
Output=third__day__name
Output=third__day__weather
Output=third__day__high__F
Output=third__day__high__C
Output=third__day__low__F
Output=third__day__low__C
Output=fourth__day__name
Output=fourth__day__weather
Output=fourth__day__high__F
Output=fourth__day__high__C
Output=fourth__day__low__F
Output=fourth__day__low__C
Output=undef
Output=__current__time
Output=__current__month
```

TABLE 5-continued

```
Output=__current__day
Output=__current__weather
Output=__current__temperature__F
Output=__current__temperature__C
Output=__humidity
Output=__wind
Output=__pressure
Output=__sunrise
Output=__sunset
Regular__expression=Author   (.+) Four Day Forecast
(\S+) (\S+) HIGH
(\S+) F (\S+) C LOW (\S+) F (\S+) C (\S+) (\S+) HIGH (\S+) F
(\S+) C LOW
(\S+) F (\S+) C (\S+) (\S+) HIGH (\S+) F (\S+) C LOW (\S+) F
(\S+) C (\S+)
(\S+) HIGH (\S+) F (\S+) C LOW (\S+) F (\S+) C (.+) Current
Conditions(.+)
!local!, (\S+) (\S+) (.+) Temp: (\S+) F, (\S+) C Rel.
Humidity: (\S+) Wind:
(.+) Pressure: (.+) Sunrise: (.+) Sunset: (.+) Related Links
Post-filter=__current__weather"p/"partly "
Post-filter=__current__weather"l/"little "
Post-filter=__current__weather"m/"mostly "
Post-filter=__current__weather"t-/"thunder "
Post-filter=__wind"N"North "
Post-filter=__wind"E"East "
Post-filter=__wind"S"South "
Post-filter=__wind"W"West "
Post-filter=__wind/mph/miles per hour/
Post-filter=__wind/kph!/kilometers per hour/
Post-filter=__wind"\s+!", "
[print]
Current weather in __location is __current__weather.
Temperature is __current__temperature__F Fahrenheit,
__current__temperature__C
Celsium.
Humidity is __humidity.
Wind from the __wind.
```

Table 6 below contains the content descriptor file source code for obtaining weather information from the web site www.lycos.com that is used by the extraction agent **400** of the preferred embodiment.

TABLE 6

```
[lycos]
Input=zip
Input=__city
URL=http://weather.lycos.com/wcfiveday.asp?city=zip
Pre-filter="\n" "
Pre-filter="</TD>"td"
Pre-filter="<!.*?−>""
Pre-filter="<br>"__br__"
Pre-filter=/alt="/>alt=/
Pre-filter="<[^<>]+>""
Pre-filter=" " "
Pre-filter=/\s+/ /
Output=__location
Output=__current__weather
Output=__current__temperature__F
Output=__humidity
Output=__winddir
Output=__windspeed
Output=__windmeasure
Output=__pressure
Output=first__day__name
Output=second__day__name
Output=third__day__name
Output=fourth__day__name
Output=fifth__day__name
Output=first__day__weather
Output=second__day__weather
Output=third__day__weather
Output=fourth__day__weather
Output=fifth__day__weather
```

TABLE 6-continued

```
Output=first__day__high__F
Output=first__day__low__F
Output=second__day__high__F
Output=second__day__low__F
Output=third__day__high__F
Output=third__day__low__F
Output=fourth__day__high__F
Output=fourth__day__low__F
Output=fifth__day__high__F
Output=fifth__day__low__F
Output=__windkmh
Regular__expression=Guide My Lycos (.+) Click image to
enlarge
alt=([^”] +)”(?:.+) Temp: (\d+)(?:.+)F __br__ Humidity:
(\S+)(?:.+) Wind: (.+?)
__br__
Output=__current__temperature__C
Post-filter=__location”__br__””
Post-filter=__current__weather”p/”partly ”
Post-filter=__current__weather”m/”mostly ”
Post-filter=__current__weather”t-/”thunder ”
Post-filter=__winddir”@” at ”
Post-filter=__winddir/mph/miles per hour/
Post-filter=__wind/kph!/kilometers per hour/
Calculate=__current__temperature__C=int((__current__temperature__F
–32)*5/9)
Calculate=__windkmh=int(__windspeed*1.6)
[print]
The current weather in __location is __current__weather.
The current temperature is __current__temperature__F Farenheit
__current__temperature__C Celcius.
Humidity is __humidity.
Winds __winddir.
```

Once the web browsing server **102** accesses the web site specified in the URL **204** and retrieves the requested information, the information is forwarded to the media server **106**. The media server uses the speech synthesis engine **302** to create an audio message that is then transmitted to the user's voice enabled device **112**. In the preferred embodiment, each web browsing server **102** is based upon Intel's Dual Pentium III 730 MHz microprocessor system.

Referring to FIG. **1**, the operation of the robust voice browser system will be described. A user establishes a connection between his voice enabled device **112** and a media server **106**. This may be done using the Public Switched Telephone Network (PSTN) **116** by calling a telephone number associated with the voice browsing system **118**. Once the connection is established, the media server **106** initiates an interactive voice response (IVR) application **304**. The IVR application plays audio messages to the user presenting a list of options, such as, "stock quotes", "flight status", "yellow pages", "weather", and "news". These options are based upon the available web site categories and may be modified as desired. The user selects the desired option by speaking the name of the option into the voice enabled device **112**.

As an example, if a user wishes to obtain restaurant information, he may speak into his telephone the phrase "yellow pages". The IVR application would then ask the user what he would like to find and the user may respond by stating "restaurants". The user may then be provided with further options related to searching for the desired restaurant. For instance, the user may be provided with the following restaurant options, "Mexican Restaurants", "Italian Restaurants", or "American Restaurants". The user then speaks into the telephone **112** the restaurant type of interest. The IVR application running on the media server **106** may also request additional information limiting the geographic scope of the restaurants to be reported to the user. For instance. the IVR application may ask the user to identify the zip code of the area where the restaurant should be located. The media server **106** uses the speech recognition engine **300** to interpret the speech commands received from the user. Based upon these commands, the media server **106** retrieves the appropriate web site record **200** from the database **100**. This record and any additional data, which may include other necessary parameters needed to perform the user's request, are transmitted to a web browsing server **102**. A firewall **104** may be provided that separates the web browsing server **102** from the database **100** and media server **106**. The firewall provides protection to the media server and database by preventing unauthorized access in the event the firewall for web browsing server **108** fails or is compromised. Any type of firewall protection technique commonly known to one skilled in the art could be used, including packet filter, proxy server, application gateway, or circuit-level gateway techniques.

The web browsing server **102** then uses the web site record and any additional data and executes the extraction agent **400** and relevant content descriptor file **406** to retrieve the requested information.

The information received from the responding web site **114** is then processed by the web browsing server **102** according to the content descriptor file **406** retrieval by the extraction agent. This processed response is then transmitted to the media server **106** for conversion into audio messages using either the speech synthesis software **302** or selecting among a database of prerecorded voice responses contained within the database **100**.

As mentioned above, each web site record contains a rank number **202** as shown in FIG. **2**. For each category searchable by a user, the database **100** may list several web sites, each with a different rank number **202**. As an example, three different web sites may be listed as searchable under the category of "restaurants". Each of those web sites will be assigned a rank number such as 1, 2, or 3. The site with the highest rank (i.e., rank=1) will be the first web site accessed by a web browsing server **102**. If the information requested by the user cannot be found at this first web site, then the web browsing server **102** will search the second ranked web site and so forth down the line until the requested information is retrieved or no more web sites left to check.

The web site ranking method and system of the present invention provides robustness to the voice browser system and enables it to adapt to changes that may occur as web sites evolve. For instance, the information required by a web site **114** to perform a search or the format of the reported response data may change. Without the ability to adequately monitor and detect these changes, a search requested by a user may provide an incomplete response, no response, or an error. Such useless responses may result from incomplete data being provided to the web site **114** or the web browsing server **102** being unable to recognize the response data messages received from the searched web site **114**.

The robustness and reliability of the voice browsing system of the present invention is further improved by the addition of a polling mechanism. This polling mechanism continually polls or "pings" each of the sites listed in the database **100**. During this polling function, a web browsing server **102** sends brief data requests or "polling digital data" to each web site listed in database **100**. The web browsing server **102** monitors the response received from each web site and determines whether it is a complete response and whether the response is in the expected format specified by the content descriptor file **406** used by the extraction agent **400**. The polled web sites that provide complete responses in

the format expected by the extraction agent **400** have their ranking established based on their "response time". That is, web sites with faster response times will be will be assigned higher rankings than those with slower response times. If the web browsing server **102** receives no response from the polled web site or if the response received is not in the expected format, then the rank of that web site is lowered. Additionally, the web browsing server contains a warning mechanism that generates a warning message or alarm for the system administrator indicating that the specified web site has been modified or is not responsive and requires further review.

Since the web browsing servers **102** access web sites based upon their ranking number, only those web sites that produce useful and error-free responses will be used by the voice browser system to gather information requested by the user. Further, since the ranking numbers are also based upon the speed of a web site in providing responses, only the most time efficient sites are accessed. This system assures that users will get complete, timely, and relevant responses to their requests. Without this feature, users may be provided with information that is not relevant to their request or may not get any information at all. The constant polling and re-ranking of the web sites used within each category allows the voice browser of the present invention to operate efficiently. Finally, it allows the voice browser system of the present invention to dynamically adapt to changes in the rapidly evolving web sites that exist on the Internet.

It should be noted that the web sites accessible by the voice browser of the preferred embodiment may use any type of mark-up language, including Extensible Markup Language (XML), Wireless Markup Language (WML), Handheld Device Markup Language (HDML), Hyper Text Markup Language (HTML), or any variation of these languages.

A second embodiment of the present invention is depicted in FIG. **5**. This embodiment provides a system and method for controlling a variety of devices **500** connected to a network **502** by using conversational speech commands spoken into a voice enabled device **504** (i.e., wireline or wireless telephones, Internet Protocol (IP) phones, or other special wireless units). The networked devices may include various household devices. For instance, voice commands may be used to control household security systems, VCRs, TVs, outdoor or indoor lighting, sprinklers, or heating and air conditioning systems.

Each of these devices **500** is connected to a network **502**. These devices **500** may contain embedded microprocessors or may be connected to other computer equipment that allow the device **500** to communicate with network **502**. In the preferred embodiment, the devices **500** appear as "web sites" connected to the network **502**. This allows a network interface system, such as a device browsing server **506**, a database **508**, and a user interface system, such as a media server **510**, to operate similar to the web browsing server **102**, database **100** and media server **106** described in the first preferred embodiment above. A network **502** interfaces with one or more network interface systems, which are shown as device browsing servers **506** in FIG. **5**. The device browsing servers perform many of the same functions and operate in much the same way as the web browsing servers **102** discuss above in the first preferred embodiment. The device browsing servers **506** are also connected to a database **508**.

Database **508** lists all devices that are connected to the network **502**. For each device **500**, the database **508** contains a record similar to that shown in FIG. **2**. Each record will contain at least a device identifier, which may be in the form of a URL, and a command to "content extraction agent" contained in the device browsing server **506**. Database **508** may also include any other data or software necessary to test and administer the device browsing system.

The content extraction agent operates similarly to that described in the first embodiment. A device descriptor file contains a listing of the options and functions available for each of the devices **500** connected on the network **502**. Furthermore, the device descriptor file contains the information necessary to properly communicate with the networked devices **500**. Such information would include, for example, communication protocols, message formatting requirements, and required operating parameters.

The device browsing server **506** receives messages from the various networked devices **500**, appropriately formats those messages and transmits them to one or more media servers **510** which are part of the device browsing system. The user's voice enabled devices **504** can access the device browsing system by calling into a media server **510** via the Public Switched Telephone Network (PSTN) **512**. In the preferred embodiment, the device browsing server is based upon Intel's Dual Pentium III 730 MHz microprocessor system.

The media servers **510** act as user interface systems and perform the functions of natural speech recognition, speech synthesis, data processing, and call handling. The media server **510** operates similarly to the media server **106** depicted in FIG. **3**. When data is received from the device browser server **506**, the media server **510** will convert the data into audio messages via a speech synthesis engine that are then transmitted to the voice enabled device of the user **504**. Speech commands received from the voice enabled device of the user **504** are converted into data messages via a speech recognition engine running on the media server **510**. A preferred speech recognition engine is developed by Nuance Communications of 1380 Willow Road, Menlo Park, Calif. 94025 (www.nuance.com). A preferred speech synthesis engine is developed by Lemout and Hauspie Speech Products, 52 Third Avenue, Burlington, Mass. 01803 (www.lhsl.com). The media servers **510** of the preferred embodiment are based on Intel's Dual Pentium III 730 MHz microprocessor system. A specific example for using the system and method of this embodiment of the invention will now be given.

First, a user may call into a media server **510** by dialing a telephone number associated with an established device browsing system. Once the user is connected, the ITJR application of the media server **510** will provide the user with a list of available systems that may be monitored or controlled based upon information contained in database **508**.

For example, the user may be provided with the option to select "Home Systems" or "Office Systems". The user may then speak the command "access home systems". The media server **510** would then access the database **508** and provide the user with a listing of the home subsystems or devices **500** available on the network **502** for the user to monitor and control. For instance, the user may be given a listing of subsystems such as "Outdoor Lighting System", "Indoor Lighting System", "Security System", or "Heating and Air Conditioning System". The user may then select the indoor lighting subsystem by speaking the command "Indoor Lighting System". The IUR application would then provide the user with a set of options related to the indoor lighting system. For instance the media server **510** may then provide a listing such as "Dining Room", "Living Room", "Kitchen", or "Bedroom". After selecting the desired room,

the IUR application would provide the user with the options to hear the "status" of the lighting in that room or to "turn on", "turn off", or "dim" the lighting in the desired room. These commands are provided by the user by speaking the desired command into the users voice enabled device **504**. The media server **510** receives this command and translates it into a data message. This data message is then forwarded to the device browsing server **506** which routes the message to the appropriate device **500**.

The device browsing system **514** of this embodiment of the present invention also provides the same robustness and reliability features described in the first embodiment. The device browsing system **514** has the ability to detect whether new devices have been added to the system or whether current devices are out-of-service. This robustness is achieved by periodically polling or "pinging" all devices **500** listed in database **508**. The device browsing server **506** periodically polls each device **500** and monitors the response. If the device browsing server **506** receives a recognized and expected response from the polled device, then the device is categorized as being recognized and in-service. However, if the device browsing server **506** does not receive a response from the polled device **500** or receives an unexpected response, then the device **500** is marked as being either new or out-of-service. A warning message or a report may then be generated for the user indicating that a new device has been detected or that an existing device is experiencing trouble.

Therefore, this embodiments allows users to remotely monitor and control any devices that are connected to a network, such as devices within a home or office. Furthermore, no special telecommunications equipment is required for users to remotely access the device browser system. Users may use any type of voice enabled device (i.e., wireline or wireless telephones, IP phones, or other wireless units) available to them. Furthermore, a user may perform these functions from anywhere without having to subscribe to additional services. Therefore, no additional expenses are incurred by the user.

The descriptions of the preferred embodiments described above are set forth for illustrative purposes and are not intended to limit the present invention in any manner. Equivalent approaches are intended to be included within the scope of the present invention. While the present invention has been described with reference to the particular embodiments illustrated, those skilled in the art will recognize that many changes and variations may be made thereto without departing from the spirit and scope of the present invention. These embodiments and obvious variations thereof are contemplated as falling within the scope and spirit of the claimed invention.

The invention claimed is:

**1**. A system for retrieving information from pre-selected web sites by uttering speech commands into a voice enabled device and for providing to users retrieved information in an audio form via said voice enabled device, said system comprising:

a computer, said computer operatively connected to the internet;

a voice enabled device operatively connected to said computer, said voice enabled device configured to receive speech commands from users;

at least one speaker-independent speech recognition device, said speaker-independent speech recognition device operatively connected to said computer and to said voice enabled device;

at least one speech synthesis device, said speech synthesis device operatively connected to said computer and to said voice enabled device;

at least one instruction set for identifying said information to be retrieved, said instruction set being associated with said computer, said instruction set comprising:

a plurality of pre-selected web site addresses, each said web site address identifying a web site containing said information to be retrieved;

at least one recognition grammar associated with said computer, each said recognition grammar corresponding to each said instruction set and corresponding to a speech command;

said speech command comprising an information request selectable by the user;

said speaker-independent speech recognition device configured to receive from users via said voice enabled device said speech command and to select the corresponding recognition grammar upon receiving said speech command;

said computer configured to retrieve said instruction set corresponding to said recognition grammar selected by said speaker-independent speech recognition device;

said computer further configured to access at least one of said plurality of web sites identified by said instruction set to obtain said information to be retrieved, said computer configured to first access said first web site of said plurality of web sites and, if said information to be retrieved is not found at said first web site, said computer configured to sequentially access said plurality of web sites until said information to be retrieved is found or until said plurality of web sites has been accessed;

said speech synthesis device configured to produce an audio message containing any retrieved information from said pre-selected web sites, and said speech synthesis device further configured to transmit said audio message to said users via said voice enabled device.

**2**. The system of claim **1** wherein said internet is the Internet.

**3**. The system of claim **1** wherein said internet is a local area network.

**4**. The system of claim **1** wherein said voice enabled device is a standard telephone, an IP telephone, a cellular phone, a PDA, a personal computer, a DVD player, a television or other video display device, a CD player, a MP3 player, or any other device capable of transmitting said audio message.

**5**. The system of claim **1** wherein said speaker-independent speech recognition device is configured to analyze phonemes to recognize said speech commands.

**6**. The system of claim **1** wherein said speaker-independent speech recognition device is configured to recognize naturally spoken speech commands.

**7**. The system of claim **1** wherein said instruction set further comprises a content descriptor associated with each said web site address, said content descriptor pre-defining a portion of said web site containing said information to be retrieved.

**8**. The system of claim **1** wherein said computer is further configured to periodically poll each of said web sites without being instructed by said user to determine the availability of each said web site, the duration of time for each said web site to respond to a request from said computer, and changes to the location of said information to be retrieved from each

said web site, said computer further configured to create a ranking of said plurality of web sites based on said periodic polling.

9. The system of claim 1 wherein said computer is further configured to periodically search said internet to identify new web sites and to add said new web sites to said plurality of web sites.

10. The system of claim 1 wherein said instruction set further comprises a ranking associated with each said web site address, said ranking indicating the order in which the plurality of pre-selected web sites are accessed.

11. The system of claim 10 wherein said computer is configured to modify said rankings based upon at least one of a plurality of criteria, said plurality of criteria comprising:

the availability of each said web site;

the duration of time for each said web site to respond to a request from said computer; and

changes to the location of said information to be retrieved from each said web site.

12. The system of claim 11 wherein said computer is configured to weigh said criteria with respect to one another when modifications to said rankings are based on more than one of said plurality of criteria.

13. The system in claim 10 wherein said computer is configured to access said plurality of web sites in order of ranking to retrieve said information requested by said user, said computer further configured to first access said web site having the highest ranking.

14. The system of claim 1 further comprising a database operatively connected to said computer, said database configured to store said information gathered from said web sites in response to said information requests.

15. The system of claim 10 wherein said computer is further configured to modify said rankings associated with said plurality of web sites such that said web site having said information to be retrieved is associated the highest ranking and any web sites not having said information to be retrieved are assigned lower rankings.

16. The system of claim 14 wherein each said recognition grammar and each said instruction set are stored in said database.

17. The system of claim 9 wherein said computer is configured to search each of said new web sites without being instructed by said user to determine the availability of each said new web site, the duration of time for each said new web site to respond to a request from said computer, and changes to the location of said information to be retrieved from each said new web site, said computer further configured to create a ranking of said plurality of new web sites based on said periodic searches.

18. A method for retrieving information from pre-selected web sites by uttering speech commands into a voice enabled device and for providing to users retrieved information in an audio form via said voice enabled device, said method comprising the steps of:

providing a computer operatively connected to the internet, said computer further being operatively connected to at least one speaker-independent speech recognition engine and to at least one speech synthesis engine;

providing a voice enabled device operatively connected to said computer, said voice enabled device configured to receive speech commands from users;

providing at least one instruction set stored in a database operatively connected to said computer, said instruction set comprising:

a plurality of pre-selected web site addresses, each said web site address identifying a web site containing said information to be retrieved;

providing a speech command to said speaker-independent speech recognition engine, said speech command corresponding to said instruction set;

said speaker-independent speech recognition engine assigning said speech command to a recognition grammar, said speech command and said recognition grammar corresponding to said instruction set;

transmitting said speech command to said speaker-independent speech recognition engine;

said speaker-independent speech recognition engine receiving said speech command and selecting the corresponding recognition grammar upon receiving said speech command;

said computer retrieving said instruction set corresponding to said recognition grammar selected by said speaker-independent speech recognition engine;

said computer accessing at least one of said plurality of web sites identified by said instruction set to obtain said information to be retrieved, said computer first accessing said first web site of said plurality of web sites and, if said information to be retrieved is not found at said first web site, said computer sequentially accessing said plurality of web sites until said information to be retrieved is found or until said plurality of web sites has been accessed;

said speech synthesis engine producing an audio message containing any retrieved information from said pre-selected web sites; and

said speech synthesis engine transmitting said audio message to said users via said voice enabled device.

19. The method of claim 18 wherein said instruction set further comprises a content descriptor associated with each said web site address, said content descriptor pre-defining a portion of said web site containing said information to be retrieved.

20. The method of claim 18 wherein said instruction set further comprises a ranking from highest to lowest associated with each said web site, said ranking indicating the order in which the plurality of pre-selected web sites are accessed.

21. The method of claim 20 wherein said computer accesses said plurality of web sites based on said ranking, said computer first accessing said web site having the highest ranking.

22. The method of claim 21 further comprising the step of adjusting said rankings associated with said plurality of web sites such that said web site having said information to be retrieved is assigned the highest ranking and any web sites not having said information to be retrieved are assigned lower rankings.

23. The method of claim 18 further comprising the step of periodically polling each said web site to determine whether said web site contains said information to be retrieved.

24. The method of claim 23 wherein the computer periodically polls each said web site without being instructed by said user to determine the availability of each said web site, the duration of time for each said web site to respond to a request from said computer, and changes to the location of said information to be retrieved from each said web site, said computer creating a ranking of said plurality of web sites based on said periodic polling.

25. The method of claim 18 further comprising the step of periodically searching said internet to find new web sites

containing said information to be retrieved, and adding said new web sites to said plurality of web sites.

**26**. A system for retrieving information from pre-selected web sites by uttering speech commands into a phone and for providing to users retrieved information in an audio form via said phone, said system comprising:

a computer, said computer operatively connected to the internet and to at least one phone;

at least one speaker-independent speech recognition engine, said speaker-independent speech recognition engine operatively connected to said computer;

at least one speech synthesis engine, said speech synthesis engine operatively connected to said computer;

a database, said database operatively connected to said computer;

at least one instruction set stored in said database for identifying said information to be retrieved, said instruction set comprising:

a plurality of pre-selected web site addresses, each said web site address identifying a web site containing said information to be retrieved;

a content descriptor associated with each said web site address, said content descriptor pre-defining a portion of said web site containing said information to be retrieved;

a ranking from highest to lowest associated with each said web site address, said ranking indicating the order in which the plurality of pre-selected web sites are accessed;

at least one recognition grammar stored in said database, each said recognition grammar corresponding to each said instruction set and corresponding to a speech command;

said speaker-independent speech recognition engine configured to receive from users via said phone a speech command and to select the corresponding recognition grammar upon receiving said speech command;

said computer configured to retrieve said instruction set corresponding to said recognition grammar selected by said speaker-independent speech recognition device;

said computer further configured to access at least one of said plurality of web sites identified by said instruction set to obtain said information to be retrieved, said computer configured to first access said web site having the highest ranking and, if said information to be retrieved is not found at said web site having the highest ranking, said computer configured to subsequently access said plurality of web sites in order of rankings until said information to be retrieved is found or until said plurality of web sites has been accessed;

said computer further configured to establish or adjust said rankings associated with said plurality of web sites such that said web site having said information to be retrieved is assigned the highest ranking and any web sites not having said information to be retrieved are assigned lower rankings;

said speech synthesis engine configured to produce an audio message containing any retrieved information from said pre-selected web sites, and said speech synthesis engine further configured to transmit said audio message to said users via said phone.



**27**. The system of claim **26** wherein said phone comprises a standard telephone, a cellular phone, or an IP phone.

**28**. The system of claim **26** wherein said internet is a local area network.

**29**. The system of claim **26** wherein said internet is a wide area network.

**30**. The system of claim **26** wherein said internet is the Internet.

**31**. The system of claim **26** wherein said computer is configured to establish or adjust said rankings associated with said plurality of web sites when instructed by said user to access said plurality of web sites to retrieve said information.

**32**. The system of claim **26** wherein said computer is configured to establish or adjust said rankings associated with said plurality of web sites based on periodic polling of each of said web sites without being instructed by said user to determine the availability of each said web site, the duration of time for each said web site to respond to a request from said computer, and changes to the location of said information to be retrieved from each said web site.

* * * * *

US009451084B2

(12) **United States Patent**
**Kurganov et al.**

(10) **Patent No.: US 9,451,084 B2**
(45) **Date of Patent: *Sep. 20, 2016**

(54) **ROBUST VOICE BROWSER SYSTEM AND VOICE ACTIVATED DEVICE CONTROLLER**

(75) Inventors: **Alexander Kurganov**, Buffalo Grove, IL (US); **Valery Zhukoff**, Deerfield, IL (US)

(73) Assignee: **Parus Holdings, Inc.**, Buffalo Grove, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 334 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/462,819**

(22) Filed: **May 3, 2012**

(65) **Prior Publication Data**

US 2012/0215545 A1 Aug. 23, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/973,475, filed on Dec. 20, 2010, now Pat. No. 8,185,402, which is a continuation of application No. 12/030,556, filed on Feb. 13, 2008, now Pat. No. 7,881,941, which is a

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***H04M 3/493*** | (2006.01) |
| ***G10L 15/26*** | (2006.01) |
| *G06F 3/16* | (2006.01) |

(52) **U.S. Cl.**

CPC ............ ***H04M 3/4938*** (2013.01); ***G10L 15/26*** (2013.01); *G06F 3/16* (2013.01); *H04M 2201/39* (2013.01); *H04M 2201/40* (2013.01); *Y10S 707/99942* (2013.01); *Y10S 707/99943* (2013.01)

(58) **Field of Classification Search**

CPC ............................ G06F 3/167; G06F 17/3043
USPC ............................................... 704/275, 270.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 174,465 | A | 3/1876 | Bell |
| 3,728,486 | A | 4/1973 | Kraus |
| 4,058,838 | A | 11/1977 | Crager et al. |
| 4,100,377 | A | 7/1978 | Flanagan |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 1329852 | 5/1994 |
| EP | 0 572 544 | 9/1996 |

(Continued)

OTHER PUBLICATIONS

"A PABX that Listens and Talks", Speech Technology, Jan. /Feb. 1984, pp. 74-79.

(Continued)

*Primary Examiner* — Susan McFadden
(74) *Attorney, Agent, or Firm* — Patent Law Works LLP

(57) **ABSTRACT**

The present invention relates to a system for acquiring information from sources on a network, such as the Internet. A voice browsing system maintains a database containing a list of information sources, such as web sites, connected to a network. Each of the information sources is assigned a rank number which is listed in the database along with the record for the information source. In response to a speech command received from a user, a network interface system accesses the information source with the highest rank number in order to retrieve information requested by the user.

**15 Claims, 4 Drawing Sheets**




Google Exhibit 1001
Google v. Parus

**Related U.S. Application Data**

continuation of application No. 11/409,703, filed on Apr. 24, 2006, now Pat. No. 7,386,455, which is a continuation of application No. 10/821,690, filed on Apr. 9, 2004, now Pat. No. 7,076,431, which is a continuation of application No. 09/776,996, filed on Feb. 5, 2001, now Pat. No. 6,721,705.

(60) Provisional application No. 60/233,068, filed on Sep. 15, 2000, provisional application No. 60/180,344, filed on Feb. 4, 2000.

(56) **References Cited**

U.S. PATENT DOCUMENTS


4,158,750 A * 6/1979 Sakoe et al. .................. 704/251
4,313,035 A 1/1982 Jordan et al.
4,327,251 A 4/1982 Fomenko et al.
4,340,783 A 7/1982 Sugiyama et al.
4,340,797 A * 7/1982 Takano et al. ................ 219/707
4,340,800 A * 7/1982 Ueda et al. .................. 219/714
4,371,752 A 2/1983 Matthews et al.
4,481,574 A 11/1984 DeFino et al.
4,489,438 A 12/1984 Hughes
4,500,751 A 2/1985 Darland et al.
4,513,390 A 4/1985 Walter et al.
4,523,055 A 6/1985 Hohl et al.
4,549,047 A 10/1985 Brian et al.
4,584,434 A 4/1986 Hashimoto
4,585,906 A 4/1986 Matthews et al.
4,596,900 A 6/1986 Jackson
4,602,129 A 7/1986 Matthews et al.
4,635,253 A 1/1987 Urui et al.
4,652,700 A 3/1987 Matthews et al.
4,696,028 A 9/1987 Morganstein et al.
4,713,837 A 12/1987 Gordon
4,747,127 A 5/1988 Hansen et al.
4,748,656 A 5/1988 Gibbs et al.
4,755,932 A 7/1988 Diedtrich
4,757,525 A 7/1988 Matthews et al.
4,761,807 A 8/1988 Matthews et al.
4,763,317 A 8/1988 Lehman et al.
4,769,719 A 9/1988 Endo
4,771,425 A 9/1988 Baran et al.
4,776,016 A 10/1988 Hansen
4,782,517 A 11/1988 Bernardis et al.
4,792,968 A 12/1988 Katz
4,799,144 A 1/1989 Parruck et al.
4,809,321 A 2/1989 Morganstein et al.
4,811,381 A 3/1989 Woo et al.
4,837,798 A 6/1989 Cohen et al.
4,847,891 A 7/1989 Kotani
4,850,012 A 7/1989 Mehta et al.
4,852,149 A 7/1989 Zwick et al.
4,852,170 A 7/1989 Bordeaux
4,866,758 A 9/1989 Heinzelmann
4,873,719 A 10/1989 Reese
4,879,743 A 11/1989 Burke et al.
4,893,333 A 1/1990 Baran et al.
4,893,335 A 1/1990 Fuller et al.
4,903,289 A 2/1990 Hashimoto
4,903,291 A 2/1990 Tsurufuji et al.
4,905,273 A 2/1990 Gordon et al.
4,907,079 A 3/1990 Turner et al.
4,918,722 A 4/1990 Duehren et al.
4,922,518 A 5/1990 Gordon et al.
4,922,520 A 5/1990 Bernard et al.
4,922,526 A 5/1990 Morganstein et al.
4,926,462 A 5/1990 Ladd et al.
4,930,150 A 5/1990 Katz
4,933,966 A 6/1990 Hird et al.
4,935,955 A 6/1990 Neudorfer
4,935,958 A 6/1990 Morganstein et al.
4,941,170 A 7/1990 Herbst
4,942,598 A 7/1990 Davis
4,953,204 A 8/1990 Cuschleg, Jr. et al.
4,955,047 A 9/1990 Morganstein et al.
4,956,835 A 9/1990 Grover
4,959,854 A 9/1990 Cave et al.
4,967,288 A 10/1990 Mizutori et al.
4,969,184 A 11/1990 Gordon et al.
4,972,462 A 11/1990 Shibata
4,974,254 A 11/1990 Perine et al.
4,975,941 A 12/1990 Morganstein et al.
4,985,913 A 1/1991 Shalom et al.
4,994,926 A 2/1991 Gordon et al.
4,996,704 A 2/1991 Brunson
5,003,575 A 3/1991 Chamberlin et al.
5,003,577 A 3/1991 Ertz
5,008,926 A 4/1991 Misholi
5,020,095 A 5/1991 Morganstein et al.
5,027,384 A 6/1991 Morganstein
5,029,196 A 7/1991 Morganstein
5,036,533 A 7/1991 Carter et al.
5,054,054 A 10/1991 Pessia et al.
5,065,254 A 11/1991 Hishida
5,086,385 A 2/1992 Launey et al.
5,095,445 A 3/1992 Sekiguchi
5,099,509 A 3/1992 Morganstein et al.
5,109,405 A 4/1992 Morganstein
5,128,984 A 7/1992 Katz
5,131,024 A 7/1992 Pugh et al.
5,133,004 A 7/1992 Heileman, Jr. et al.
5,145,452 A 9/1992 Chevalier
5,146,452 A 9/1992 Pekarske
5,166,974 A 11/1992 Morganstein et al.
5,179,585 A 1/1993 MacMillan, Jr. et al.
5,193,110 A 3/1993 Jones et al.
5,195,086 A 3/1993 Baumgartner et al.
5,233,600 A 8/1993 Pekarske
5,243,643 A 9/1993 Sattar et al.
5,243,645 A 9/1993 Bissell et al.
5,249,219 A 9/1993 Morganstein et al.
5,255,305 A 10/1993 Sattar
5,263,084 A 11/1993 Chaput et al.
5,276,729 A 1/1994 Higuchi et al.
5,287,199 A 2/1994 Zoccolillo
5,291,302 A 3/1994 Gordon et al.
5,291,479 A 3/1994 Vaziri et al.
5,303,298 A 4/1994 Morganstein et al.
5,307,399 A 4/1994 Dai et al.
5,309,504 A 5/1994 Morganstein et al.
5,325,421 A 6/1994 Hou et al.
5,327,486 A 7/1994 Wolff et al.
5,327,529 A 7/1994 Fults et al.
5,329,578 A 7/1994 Brennan et al.
5,333,266 A 7/1994 Boaz et al.
5,347,574 A 9/1994 Morganstein
5,355,403 A 10/1994 Richardson, Jr. et al.
5,359,598 A 10/1994 Steagall et al. ............... 704/275
5,365,524 A 11/1994 Hiller et al.
5,365,574 A 11/1994 Hunt et al.
5,375,161 A 12/1994 Fuller et al.
5,384,771 A 1/1995 Isidoro et al.
5,404,231 A 4/1995 Bloomfield
5,408,526 A 4/1995 McFarland et al.
5,414,754 A 5/1995 Pugh et al.
5,416,834 A 5/1995 Bales et al.
5,426,421 A 6/1995 Gray
5,432,845 A 7/1995 Burd et al.
5,436,963 A 7/1995 Fitzpatrick et al.
5,459,584 A 10/1995 Gordon et al.
5,463,684 A 10/1995 Morduch et al.
5,475,791 A 12/1995 Schalk et al.
5,479,487 A 12/1995 Hammond
5,495,484 A 2/1996 Self et al.
5,497,373 A 3/1996 Hulen et al.
5,499,288 A 3/1996 Hunt et al.
5,515,427 A 5/1996 Carlsen et al.
5,517,558 A 5/1996 Schalk
5,526,353 A 6/1996 Henley et al.
5,533,115 A 7/1996 Hollenbach et al.
5,537,461 A 7/1996 Bridges et al.
5,555,100 A 9/1996 Bloomfield et al.
5,559,611 A 9/1996 Bloomfield et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 5,559,859 A | 9/1996 | Dai et al. | |
| 5,566,236 A | 10/1996 | MeLampy et al. | |
| 5,603,031 A | 2/1997 | White et al. | |
| 5,608,786 A | 3/1997 | Gordon | |
| 5,610,910 A | 3/1997 | Focsaneanu et al. | |
| 5,610,970 A | 3/1997 | Fuller et al. | |
| 5,611,031 A | 3/1997 | Hertzfeld et al. | |
| 5,630,079 A | 5/1997 | McLaughlin | |
| 5,652,789 A | 7/1997 | Miner et al. | |
| 5,657,376 A | 8/1997 | Espeut et al. | |
| 5,659,597 A | 8/1997 | Bareis et al. | |
| 5,666,401 A | 9/1997 | Morganstein et al. | |
| 5,675,507 A | 10/1997 | Bobo, II | |
| 5,675,811 A | 10/1997 | Broedner et al. | |
| 5,689,669 A | 11/1997 | Lynch et al. | |
| 5,692,187 A | 11/1997 | Goldman et al. | |
| 5,699,486 A | 12/1997 | Tullis et al. | |
| 5,712,903 A | 1/1998 | Bartholomew et al. | |
| 5,719,921 A | 2/1998 | Vysotsky et al. | |
| 5,721,908 A | 2/1998 | Lagarde et al. | |
| 5,724,408 A | 3/1998 | Morganstein | |
| 5,737,395 A | 4/1998 | Irribarren | |
| 5,742,596 A | 4/1998 | Baratz et al. | |
| 5,742,905 A | 4/1998 | Pepe et al. | |
| 5,752,191 A | 5/1998 | Fuller et al. | |
| 5,758,322 A | 5/1998 | Rongley | |
| 5,761,294 A | 6/1998 | Shaffer et al. | |
| 5,764,639 A | 6/1998 | Staples et al. | |
| 5,764,736 A | 6/1998 | Shachar et al. | |
| 5,764,910 A | 6/1998 | Shachar | |
| 5,774,860 A | 6/1998 | Bayya et al. | |
| 5,787,298 A | 7/1998 | Broedner et al. | |
| 5,793,993 A | 8/1998 | Broedner et al. | |
| 5,794,205 A | 8/1998 | Walters | |
| 5,796,791 A | 8/1998 | Polcyn | |
| 5,799,063 A | 8/1998 | Krane | |
| 5,799,065 A | 8/1998 | Junqua et al. | |
| 5,809,282 A | 9/1998 | Cooper et al. | |
| 5,809,481 A | 9/1998 | Baron et al. | |
| 5,812,796 A | 9/1998 | Broedner et al. | |
| 5,819,220 A | 10/1998 | Sarukkai et al. | |
| 5,819,306 A | 10/1998 | Goldman et al. | |
| 5,822,727 A | 10/1998 | Garberg et al. | |
| 5,823,879 A | 10/1998 | Goldberg et al. | |
| 5,832,063 A | 11/1998 | Vysotsky et al. | |
| 5,832,440 A | 11/1998 | Woodbridge et al. | |
| 5,835,570 A | 11/1998 | Wattenbarger | |
| 5,838,682 A | 11/1998 | Dekelbaum et al. | |
| 5,867,494 A | 2/1999 | Krishnaswamy et al. | |
| 5,867,495 A | 2/1999 | Elliott et al. | |
| 5,870,550 A | 2/1999 | Wesinger, Jr. et al. | |
| 5,873,080 A | 2/1999 | Coden et al. | |
| 5,881,134 A | 3/1999 | Foster et al. | |
| 5,881,135 A | 3/1999 | Watts et al. | |
| 5,884,032 A | 3/1999 | Bateman et al. | |
| 5,884,262 A | 3/1999 | Wise et al. | |
| 5,884,266 A | 3/1999 | Dvorak | |
| 5,890,123 A | 3/1999 | Brown et al. | |
| 5,914,951 A | 6/1999 | Bentley et al. | |
| 5,915,001 A | 6/1999 | Uppaluru | |
| 5,917,817 A | 6/1999 | Dunn et al. | |
| 5,940,598 A | 8/1999 | Strauss et al. | |
| 5,943,399 A | 8/1999 | Bannister et al. | |
| 5,946,389 A | 8/1999 | Dold | |
| 5,953,392 A | 9/1999 | Rhie et al. | |
| 5,974,124 A | 10/1999 | Schlueter et al. | |
| 5,974,413 A | 10/1999 | Beauregard et al. | |
| 5,991,292 A | 11/1999 | Focsaneanu et al. | |
| 5,995,615 A | 11/1999 | Miloslavsky | |
| 5,999,525 A | 12/1999 | Krishnaswamy et al. | |
| 5,999,611 A | 12/1999 | Tatchell et al. | |
| 5,999,965 A | 12/1999 | Kelly | |
| 6,012,088 A | 1/2000 | Li et al. | |
| 6,014,437 A | 1/2000 | Acker et al. | |
| 6,014,626 A | 1/2000 | Cohen | |
| 6,018,710 A | 1/2000 | Wynblatt et al. | |
| 6,021,181 A | 2/2000 | Miner et al. | |
| 6,021,190 A | 2/2000 | Fuller et al. | |
| 6,031,904 A | 2/2000 | An et al. | |
| 6,038,305 A | 3/2000 | McAllister et al. | |
| 6,044,107 A | 3/2000 | Gatherer et al. | |
| 6,047,053 A | 4/2000 | Miner et al. | |
| 6,052,372 A | 4/2000 | Gittins et al. | |
| 6,067,516 A | 5/2000 | Levay et al. | |
| 6,078,580 A | 6/2000 | Mandalia et al. | |
| 6,081,518 A | 6/2000 | Bowman-Amuah | |
| 6,081,782 A | 6/2000 | Rabin | |
| 6,091,808 A | 7/2000 | Wood et al. | |
| 6,101,472 A | 8/2000 | Giangarra et al. | |
| 6,104,803 A | 8/2000 | Weser et al. | |
| 6,115,737 A | 9/2000 | Ely et al. | |
| 6,115,742 A | 9/2000 | Franklin et al. | |
| 6,130,933 A | 10/2000 | Miloslavsky | |
| 6,131,095 A | 10/2000 | Low et al. | |
| 6,137,863 A | 10/2000 | Brown et al. | |
| 6,157,705 A | 12/2000 | Perrone | |
| 6,161,128 A | 12/2000 | Smyk | |
| 6,178,399 B1 | 1/2001 | Takebayashi et al. | |
| 6,185,535 B1 | 2/2001 | Hedin et al. | |
| 6,188,683 B1 | 2/2001 | Lang et al. | |
| 6,195,357 B1 | 2/2001 | Polcyn | |
| 6,199,076 B1 | 3/2001 | Logan et al. | |
| 6,201,814 B1 | 3/2001 | Greenspan | |
| 6,201,863 B1 | 3/2001 | Miloslavsky | |
| 6,208,638 B1 | 3/2001 | Rieley et al. | |
| 6,215,858 B1 | 4/2001 | Bartholomew et al. | |
| 6,230,132 B1 | 5/2001 | Class et al. | |
| 6,233,318 B1 | 5/2001 | Picard et al. | |
| 6,243,373 B1 | 6/2001 | Turock | |
| 6,252,944 B1 | 6/2001 | Hansen, II et al. | |
| 6,269,336 B1 | 7/2001 | Ladd et al. | |
| 6,285,745 B1 | 9/2001 | Bartholomew et al. | |
| 6,327,572 B1 | 12/2001 | Morton et al. | |
| 6,330,538 B1 | 12/2001 | Breen | |
| 6,349,132 B1 | 2/2002 | Wesemann et al. | |
| 6,353,661 B1 | 3/2002 | Bailey, III | |
| 6,366,575 B1 | 4/2002 | Barkan et al. | |
| 6,366,578 B1 | 4/2002 | Johnson | |
| 6,424,945 B1 | 7/2002 | Sorsa | |
| 6,430,282 B1 | 8/2002 | Bannister et al. | |
| 6,434,529 B1 | 8/2002 | Walker et al. | |
| 6,445,694 B1 | 9/2002 | Swartz | |
| 6,446,076 B1 | 9/2002 | Burkey et al. | |
| 6,456,699 B1 | 9/2002 | Burg et al. | |
| 6,459,910 B1 | 10/2002 | Houston | |
| 6,477,240 B1 | 11/2002 | Lim et al. | |
| 6,477,420 B1 | 11/2002 | Struble et al. | |
| 6,490,627 B1 | 12/2002 | Kalra et al. | |
| 6,501,966 B1 | 12/2002 | Bareis et al. | |
| 6,505,163 B1 | 1/2003 | Zhang et al. | |
| 6,529,948 B1 | 3/2003 | Bowman-Amuah | |
| 6,532,444 B1 | 3/2003 | Weber | |
| 6,539,359 B1 | 3/2003 | Ladd et al. | |
| 6,546,393 B1 | 4/2003 | Khan | |
| 6,560,604 B1 | 5/2003 | Fascenda | |
| 6,584,439 B1 | 6/2003 | Geilhufe et al. | |
| 6,593,944 B1 | 7/2003 | Nicolas et al. | |
| 6,594,348 B1 | 7/2003 | Bjurstrom et al. | |
| 6,594,692 B1 | 7/2003 | Reisman | |
| 6,618,039 B1 | 9/2003 | Grant et al. | |
| 6,618,726 B1 | 9/2003 | Colbath et al. | |
| 6,618,763 B1 | 9/2003 | Steinberg | |
| 6,633,846 B1 * | 10/2003 | Bennett | G06F 17/3043 704/257 |
| 6,636,831 B1 | 10/2003 | Profit, Jr. et al. | |
| 6,654,814 B1 | 11/2003 | Britton et al. | |
| 6,665,640 B1 * | 12/2003 | Bennett | G06F 17/3043 704/257 |
| 6,687,341 B1 | 2/2004 | Koch et al. | |
| 6,704,024 B2 | 3/2004 | Robotham et al. | |
| 6,718,015 B1 | 4/2004 | Berstis | |
| 6,721,705 B2 | 4/2004 | Kurganov et al. | |
| 6,732,142 B1 | 5/2004 | Bates et al. | |
| 6,763,388 B1 | 7/2004 | Tsimelzon | |

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 6,771,732 | B2 | 8/2004 | Xiao et al. | |
| 6,775,264 | B1 | 8/2004 | Kurganov | |
| 6,785,266 | B2 | 8/2004 | Swartz | |
| 6,807,257 | B1 | 10/2004 | Kurganov | |
| 6,812,939 | B1 | 11/2004 | Flores et al. | |
| 6,823,370 | B1 | 11/2004 | Kredo et al. | |
| 6,888,929 | B1 | 5/2005 | Saylor et al. | |
| 6,922,733 | B1 | 7/2005 | Kuiken et al. | |
| 6,941,273 | B1 | 9/2005 | Loghmani et al. | |
| 6,964,012 | B1 | 11/2005 | Zirngibl et al. | |
| 6,964,023 | B2 | 11/2005 | Maes et al. | |
| 6,965,864 | B1 | 11/2005 | Thrift et al. | |
| 6,996,609 | B2 | 2/2006 | Hickman et al. | |
| 6,999,804 | B2 | 2/2006 | Engstrom et al. | |
| 7,003,463 | B1 | 2/2006 | Maes et al. | |
| 7,024,464 | B1 | 4/2006 | Lusher et al. | |
| 7,050,977 | B1 * | 5/2006 | Bennett | G06F 17/2775 704/270.1 |
| 7,075,555 | B1 | 7/2006 | Flores et al. | |
| 7,076,431 | B2 | 7/2006 | Kurganov et al. | |
| 7,089,307 | B2 | 8/2006 | Zintel et al. | |
| 7,145,898 | B1 | 12/2006 | Elliott | |
| 7,327,723 | B2 * | 2/2008 | Kurganov | 370/352 |
| 7,386,455 | B2 * | 6/2008 | Kurganov et al. | 704/270.1 |
| 7,516,190 | B2 * | 4/2009 | Kurganov | 709/217 |
| 7,881,941 | B2 * | 2/2011 | Kurganov et al. | 704/275 |
| 8,098,600 | B2 * | 1/2012 | Kurganov | 370/260 |
| 8,185,402 | B2 * | 5/2012 | Kurganov et al. | 704/275 |
| 2001/0032234 | A1 | 10/2001 | Summers et al. | |
| 2001/0040885 | A1 | 11/2001 | Jonas et al. | |
| 2001/0048676 | A1 | 12/2001 | Jimenez et al. | |
| 2002/0006126 | A1 | 1/2002 | Johnson et al. | |
| 2002/0059402 | A1 | 5/2002 | Belanger | |
| 2002/0064149 | A1 | 5/2002 | Elliott et al. | |
| 2002/0090114 | A1 | 7/2002 | Rhoads et al. | |
| 2004/0160913 | A1 | 8/2004 | Kubler et al. | |
| 2005/0025133 | A1 | 2/2005 | Swartz | |
| 2005/0030179 | A1 | 2/2005 | Script et al. | |
| 2005/0074104 | A1 | 4/2005 | Swartz | |


FOREIGN PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| EP | 0794650 | A2 | 9/1997 |
| GB | 2 211 698 | | 7/1989 |
| GB | 2 240 693 | | 8/1991 |
| GB | 2317782 | | 4/1998 |
| JP | 1-258526 | | 10/1989 |
| WO | WO 91/07838 | | 5/1991 |
| WO | WO 91/18466 | | 11/1991 |
| WO | WO 96/09710 | | 3/1996 |
| WO | 9734401 | | 9/1997 |
| WO | WO 97/37481 | | 9/1997 |
| WO | 97/37481 | | 10/1997 |
| WO | WO 98/23058 | | 5/1998 |
| WO | 9823058 | | 9/1998 |


OTHER PUBLICATIONS


Amended Complaint, *Parus Holdings, Inc.* v. *Web Telephony LLC & Robert Swartz*, Case No. 06-cv-01146 (N.D. III.),, Jul. 10, 2006, 14 pages.

AT&T, Press Release, "AT&T Customers Can Teach Systems to Listen and Respond to Voice", Jan. 17, 1995, pp. 1-2, Basking Ridge, NJ., available at www.lucent.com/press/0195/950117.gbb.html (accessed Mar. 15, 2005).

Bellcore Technology Licensing, "The Electronic Receptionist—A Knowledge-Based Approach to Personal Communications", 1994, pp. 1-8.

Brachman et al., "Fragmentation in Store-and-Forward Message Transfer", IEEE Communications Magazine, vol. 26(7), Jul. 1998, pp. 18-27.

"Business Phone Systems for Advanced Offices", NTT Review, vol. 2 (6), Nov. 1990, pp. 52-54.

Cole et al., "An Architecture for a Mobile OSI Mail Access System", IEEE Journal on Selected Areas in Communications, vol. 7 (2), Feb. 1989, pp. 249-256.

"Data Communications Networks: Message Handling Systems", Fasciele, VIII. 7-Recommendations X.400-X.430, 42 pages, date unknown.

DAX Systems, Inc., Press Release, "Speech Recognition Success in DAX's Grasp", Nov. 22, 1995, pp. 1-2, Pine Brook, NJ.

Defendants Answer to the Amended Complaint and Demand for Jury Trial, *Parus Holdings, Inc.* v. *Web Telephone LLC & Robert Swartz*, Case No. 06-cv-01146 (N.D. III.), Aug. 10, 2006, 14 pages.

"Faxpak Store and Forward Facsimile Transmission Service", Electrical Communication, vol. 54 (3), 1979, pp. 251-255.

Garcia et al., "Issue in Multimedia Computer-Based Message Systems Design and Standardization", NATO ASI Series, vol. 1-6, 1984, 10 pgs.

"GLOBECOM '85 IEEE Global Telecommunications Conference, "New Orleans, LA., Dec. 2-5, 1985, pp. 1295-1300.

Hemphill et al. "Speech-Aware Multimedia," IEEE Multimedia, Spring 1996, vol. 3, No. 1. pp. 74-78, IEEE.

Hunt et al., "Long-Distance Remote Control to the Rescue", Chicago Tribune, Jun. 15, 2002, Section 4, p. 15.

"Introducing PIC SuperFax, First PC/Fax System to Run Under Windows", Pacific Image Communications, Pasadena, CA, Date Unknown, (received at COMDEX show, Nov. 3, 1987). 3 pgs.

"Juggler by Pure Speech," p. 1, available at http://members.aol.com/compqanda/juggler.html (accessed on Dec. 8. 2006).

Kubala et al., BYBLOS Speech Recognition Benchmark Results:, Workshop on Speech & Natural Language, Feb. 19-22, 1991.

Ly, "Chatter: A Conversational Telephone Agent", submitted to Program in Media Arts, & Sciences, MIT, 1993, pp. 1-130.

Maeda, et al., "An Intelligent Customer-Controlled Switching System", IEEE Global Telecommunications Conference, Hollywood, Florida, Nov. 28-Dec. 1, 1988, pp. 1499-1503.

Markowitz, J., "The Ultimate Computer Input Device May Be Right Under Your Nose", Byte, Dec. 1995, pp. 1-13, available at www.byte .com/art/9512/sec8/art1.htm (accessed Mar. 15, 2005).

Marx et al., "Mail Call: Message Presentation and Navigation in a Nonvisual Environment," SIGCHI Conference on Human Factors in Computing Systems, Vancouver, B.C. Canada, Apr. 13-18, 1996.

Marx, M., "Toward Effective Conversational Messaging" (Thesis). As indicated on the cover page, the thesis was presented to the Department Committee on Graduate Students, Program in Media Arts and Sciences, School of Architecture and Planning, Massachusetts Institute of Technology on May 12, 1995.

Oye, Phil, "Juggler", p. 1, available at http://www.philoye.com/work/juggler/index.shtml (accessed on Dec. 8, 2006).

Oye, Phil, "Juggler", p. 1, available at http://www.philoye.com/work/juggler_2.shtml (accessed on Dec. 8, 2006).

Oye, Phil, "Juggler", p. 1, available at http://www.philoye.com/work/juggler_3.shtml (accessed on Dec. 8, 2006).

Perdue et al., "Conversant® 1 Voice System: Architecture and Applications", Jul. 17, 1986, AT&T Technical Journal, pp. 1-14.

Plaintiff Parus Holdings, Inc.'s Supplemental Response to Defendant Web Telephony LLC's First Set of Interrogatories (Nos. 1-12), *Parus Holdings, Inc.* v. *Web Telephony LLC & Robert Swartz*, Case No. 06-cv-01146 (N.D. III.), Oct. 31, 2006, 32 pages.

Plaintiff Parus Holdings, Inc.'s Supplemental Response to Defendant Web Telephony LLC's Second Set of Interrogatories (Nos. 13-17), *Parus Holdings, Inc.* v. *Web Telephony LLC & Robert Swartz*, Case No. 06-cv-01146 (N.D. III.), Oct. 31, 2006, 31 pages.

Print outs of Internet web site, "Wildfire Communications, Inv.", Nov. 5, 1997, including print outs of the following web pages: http://www.wildfire.com; http://www.wildfire.com/consumerhome.html; http://www.wildfire.com/106.html; http://www.wildfire.com/carrierhome.html; http://www.wildfire.com/sfandb.html; http://www.wildfire.com/about.html; http://www.wildfire.com/abtmgmt.html; http://www.wildfire.com/scoop.html; http://www.wildfire.com/intel.html; and http://www.wildfire.com/msft.html.

"Proceedings of the IFIP World Computer Congress", Dublin, Ireland, Sep. 1-5, 1986.

(56) **References Cited**

OTHER PUBLICATIONS

"PureSpeech Announces Juggler PC System for First Quarter of 1997", HighBeam Research, Sep. 19, 1996, pp. 1-3, available at http://www.highbeam.com/doc/1G1-186909545.html (accessed on Dec. 8, 2006).
PureSpeech, "Meet the Voice of Juggler!", the date of Nov. 18, 1996 is shown on the top of p. 1.
Ross, Randy, "Retrieve E-Mail from a Telephone", Oct. 7, 1996, pp. 1-2, available at http://resna.org/ProfessOrg?Sigs?SIGSites/sig11/archive/juggler.htm (accessed on Dec. 8, 2006). Printout indicates that the article was originally printed in PC World.
Sartori, M., "Speech Recognition", Apr. 1995, pp. 1-9, Mercury Communications, available at www.gar.co.uk/technology_watch/speech.htm (accessed Mar. 15, 2005).
Schmandt et al., "A Conversational Telephone Messaging Systems", IEEE Transactions on Consumer Electronics, 1984, vol. CE-30, No. 3, pp. xxi-xxiv.
Schmandt, et al., "Phone Shell: The Telephone as Computer Terminal", ACM Multimedia, 1993, 11 pages.
Schmandt, et al., "Phone Slave: A Graphical Telecommunications Interface", Proceedings of the SID, 1985, vol. 26/1, pp. 79-82.
"Secretarial Branch Exchange", IBM Technical Disclosure Bulletin, vol. 26 (5), Oct. 1983, pp. 2645-2647.
Shimamura, et al., "Review of the Electrical Communication Laboratories", vol. 418, (33), No. 1, Tokyo, Japan, 1985, pp. 31-39.
"The VMX Systems Product Reference Manual: Product Description Volume", May 1994, vol. 1, release 7.1, VMX, Inc. (Octel Communications Corp.) San Jose, CA, USA.
"VMXworks Product Reference Manual: vol. 3 Programmer's Guide", Jul. 1994, vols. 3 & 4, Release 3.1, Octel Communications Corp.) Milpitas, CA, USA.
"Wildfire Communication, Inc.", Harvard Business School, Mar. 21, 1996, Publ. No. 9-396-305, pp. 1-22.
"WordPerfect: New Telephony Features Boost Office", WordPerfect Office TechBrief, 1994, Info-World Publishing Co., vol. 10, Issue 2, pp. 2-3.
Yang, E., "INETPhone—Telephone Services and Servers on the Internet", Apr. 1995, University of North Texas, pp. 1-6.
Hemphill et al., "Surfing the Web by Voice," ACM Multimedia 95—Electronic Proceedings, Nov. 5-9, 1995. San Francisco, CA.
Ly, "Chatter A: A Conversational Telephone Agent," submitted to Program in Media Arts and Sciences, Massachusetts Institute of Technology, (1993), pp. 1-130.
Schmandt, "Phoneshell: the Telephone as Computer Terminal," Proceedings of ACM Multimedia '93 Conference (1993), pp. 373-382.
Schmandt et al., "Phone Slave: A Graphical Telecommunications Interface," Proceedings of the SID (1985), vol. 26/1, pp. 79-82.
Examples: Abstract Ideas, 2014, 20 pages.
IBM AIX DirectTalk/6000 Version 1 Release 6 Improves Your Voice Processing Services to Callers and Customers, Announcement No. 295-489, Nov. 28, 1995, 27 pages.
IBM Announcement Letter No. A95-893, retrieved on Mar. 9, 2015, 10 pages.
IBM, AIX DirectTalk/6000 Release 6: Speech Recognition with the BBN Hark Recognizer, SC33-1734-00, Feb. 1996, 250 pages.
IBM, AIX DirectTalk/6000: General Information and Planning, Release 6, GC33-1720-00, Dec. 1995, 162 pages.
IBM, DirectTalkMail: Administration, Release 6, SC33-1733-00, Feb. 1996, 274 pages.
"McGraw-Hill Dictionary of Scientific & Technical Terms 1101, 6th ed. 2003," (Referenced in Amendment and Reply Under 37 CFR 1.111 filed for U.S. Appl. No. 10/877,366 on Apr. 24, 2009) No copy is provided but please inform if a copy of this dictionary is required.
Newton, Harry, Newtons Telecom Dictionary—The Official Glossary of Telecommunications and Voice Processing Terms, Dec. 1992, 6 pages.
Paper No. 10, Denying Institution of Covered Business Method Patent Review CBM2015-00109 and CBM2015-00149, Nov. 9, 2015, 19 pages.
Paper No. 10, Denying Institution of Covered Business Method Patent Review CBM2015-00110 and CBM2015-00150, Nov. 9, 2015, 20 pages.
Paper No. 10, Denying Institution of Covered Business Method Patent Review CBM2015-00111 and CBM2015-00151, Nov. 9, 2015, 19 pages.
Paper No. 10, Denying Institution of Covered Business Method Patent Review CBM2015-00112 and CBM2015-00152, Nov. 9, 2015, 18 pages.
Putz, Steve, Interactive Information Services Using World-Wide Web Hypertext, First Int'l Conference on World-Wide Web (May 25-27, 1994), 10 pages.
Memorandum Opinion and Order, Oct. 8, 2015, 27 pages.
Update Subject Matter Eligibility, Jul. 2015, 33 pages.
Wikipedia Definition of "Internet", available at http://en.wikipedia.org/wiki/Internet Retrieved on Feb. 10, 2016, pp. 24-26.
Opening Brief of Appellant Parus Holdings, Inc., submitted on Mar. 8, 2016, to the United States Court of Appeals for the Federal Circuit, 236 pages.
Brief of Appellees, submitted on Jun. 20, 2016, to the United States Court of Appeals for the Federal Circuit, 53 pages.

* cited by examiner

FIG. 1


WEB SITE N
WEB SITE 2
WEB SITE 1
114
INTERNET
110
FIREWALL
108
WEB BROWSING SERVER
102
WEB BROWSING SERVER
102
TCP/IP
FIREWALL
104
MEDIA SERVER
106
MEDIA SERVER
106
T1 LINE
PSTN
116
112
112
DATABASE
100
118


200
RANK NUMBER
URL
EXTRACTION AGENT COMMAND
TIMESTAMP
202
204
206
208

FIG. 2


6
SPEECH RECOGNITION ENGINE
300
SPEECH SYNTHESIS ENGINE
302
IVR APPLICATION
304
CALL PROCESSING SYSTEM
306
TELEPHONY AND VOICE HARDWARE
308
MEDIA SERVER

FIG. 3


102
CONTENT EXTRACTION AGENT
400
CONTENT FETCHER
402
POLLING AND RANKING AGENT
404
CONTENT DESCRIPTOR FILES
406
WEB BROWSING SERVER

FIG. 4


500
SECURITY SYSTEM
INDOOR LIGHTING
OUTDOOR LIGHTING
TV
VCR
DEVICE N
NETWORK
502
DEVICE BROWSING SERVER
506
DEVICE BROWSING SERVER
506
TCP/IP
MEDIA SERVER
510
MEDIA SERVER
510
T1 LINE
DATABASE
508
514
PSTN
512
504
504

*FIG. 5*

# ROBUST VOICE BROWSER SYSTEM AND VOICE ACTIVATED DEVICE CONTROLLER

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 12/973,475, entitled "Robust Voice Browser System And Voice Activated Device Controller," filed Dec. 20, 2010, which is a continuation of application Ser. No. 12/030,556, entitled "Robust Voice Browser System And Voice Activated Device Controller," filed Feb. 13, 2008, now U.S. Pat. No. 7,881,941, which is a continuation application of application Ser. No. 11/409,703, entitled "Robust Voice Browser System And Voice Activated Device Controller," filed Apr. 24, 2006, now U.S. Pat. No. 7,386,455, which is a continuation application of application Ser. No. 10/821,690, entitled "Robust Voice Browser System And Voice Activated Device Controller," filed Apr. 9, 2004, now U.S. Pat. No. 7,076,431, which is a continuation application of application Ser. No. 09/776,996, entitled "Robust Voice Browser System And Voice Activated Device Controller," filed Feb. 5, 2001, now U.S. Pat. No. 6,721,705, which claims priority to U.S. Provisional Application Ser. No. 60/180,344, entitled "Voice Activated Information Retrieval System," filed Feb. 4, 2000 and U.S. Provisional Application No. 60/233,068, filed Sep. 15, 2000, entitled "Robust Voice Browser System and Voice Activated Device Controller, all assigned to the assignee of the present application. The subject matter in the above-identified co-pending and commonly owned applications is incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to a robust and highly reliable system that allows users to browse web sites and retrieve information by using conversational voice commands. Additionally, the present invention allows users to control and monitor other systems and devices that are connected the Internet or any other network by using voice commands.

## BACKGROUND OF THE INVENTION

Currently, three options exist for a user who wishes to gather information from a web site accessible over the Internet. The first option is to use a desktop or a laptop computer connected to a telephone line via a modem or connected to a network with Internet access. The second option is to use a Personal Digital Assistant (PDA) that has the capability of connecting to the Internet either through a modem or a wireless connection. The third option is to use one of the newly designed web-phones or web-pagers that are now being offered on the market. Although each of these options provide a user with access to the Internet to browse web sites, each of them have their own drawbacks.

Desktop computers are very large and bulky and are difficult to transport. Laptop computers solve this inconvenience, but many are still quite heavy and are inconvenient to carry. Further, laptop computers cannot be carried and used everywhere a user travels. For instance, if a user wishes to obtain information from a remote location where no electricity or communication lines are installed, it would be nearly impossible to use a laptop computer. Oftentimes, information is needed on an immediate basis where a computer is not accessible. Furthermore, the use of laptop or desktop computers to access the Internet requires either a



direct or a dial-up connection tan an Internet Service Provider (ISP). Oftentimes, such connections are not available when a user desires to connect to the Internet to acquire information.

The second option for remotely accessing web sites is the use of PDAs. These devices also have their own set of drawbacks. First, PDAs with the ability to connect to the Internet and access web sites are not readily available. As a result, these PDAs tend to be very expensive. Furthermore, users are usually required to pay a special service fee to enable the web browsing feature of the PDA. A further disadvantage of these PDAS is that web sites must be specifically designed to allow these devices to access information on the web site. Therefore, a limited number of web sites are available that are accessible by these web-enabled PDAs. Finally, it is very common today for users to carry cell phones, however, users must also carry a separate PDA if they require the ability to gather information from various web sites. Users are therefore subjected to added expenses since they must pay for both cellular telephone service and also for the web-enabling service for the PDA. This results in a very expensive alternative for the consumer.

The third alternative mentioned above is the use of web-phones or web-pagers. These devices suffer many of the same drawbacks as PDAs. First, these devices are expensive to purchase. Further, the number of web sites accessible to these devices is limited since web sites must be specifically designed to allow access by these devices. Furthermore, users are often required to pay an additional fee in order to gain wireless web access. Again, this service is expensive. Another drawback of these web-phones or web-pagers is that as technology develops, the methods used by the various web sites to allow access by these devices may change. These changes may require users to purchase new web-phones or web-pagers or have the current device serviced in order to upgrade the firmware or operating system stored within the device. At the least, this would be inconvenient to users and may actually be quite expensive.

Therefore, a need exists for a system that allows users to easily access and browse the Internet from any location. Such a system would only require users to have access to any type of telephone and would not require users to subscribe to multiple services.

In the rapidly changing area of Internet applications, web sites change frequently. The design of the web site may change, the information required by the web site in order to perform searches may change, and the method of reporting search results may change. Web browsing applications that submit search requests and interpret responses from these web sites based upon expected formats will produce errors and useless responses when such changes occur. Therefore, a need exists for a system that can detect modifications to web sites and adapt to such changes in order to quickly and accurately provide the information requested by a user through a voice enabled device, such as a telephone.

When users access web sites using devices such as personal computers, delays in receiving responses are tolerated and are even expected, however, such delays are not expected when a user communicates with a telephone. Users expect communications over a telephone to occur immediately with a minimal amount of delay time. A user attempting to find information using a telephone expects immediate responses to his search requests. A system that introduces too much delay between the time a user makes a request and the time of response will not be tolerated by users and will lose its usefulness. Therefore, it is important that a voice browsing system that uses telephonic communications

selects web sites that provide rapid responses since speed is an important factor for maintaining the system's desirability and usability. Therefore, a need exists for a system that accesses web sites based upon their speed of operation.

## SUMMARY OF THE INVENTION

It is an object of an embodiment of the present invention to allow users to gather information from web sites by using voice enabled devices, such as wireline or wireless telephones.

An additional object of an embodiment of the present invention is to provide a system and method that allows the searching and retrieving of publicly available information by controlling a web browsing server using naturally spoken voice commands.

It is an object of another embodiment of the present invention to provide a robust voice browsing system that can obtain the same information from several web sites based upon a ranking order. The ranking order is automatically adjusted if the system detects that a given web site is not functioning, is too slow, or has been modified in such a way that the requested information cannot be retrieved any longer.

A still further object of an embodiment of the present invention is to allow users to gather information from web sites from any location where a telephonic connection can be made.

Another object of an embodiment of the present invention is to allows users to browse web sites on the Internet using conversational voice commands spoken into wireless or wireline telephones or other voice enabled devices.

An additional object an embodiment of the present invention is to provide a system and method for using voice commands to control and monitor devices connected to a network.

It is an object of an embodiment of the present invention to provide a system and method which allows devices connected to a network to be controlled by conversational voice commands spoken into any voice enabled device interconnected with the same network.

The present invention relates to a system for acquiring information from sources on a network, such as the Internet. A voice browsing system maintains a database containing a list of information sources, such as web sites, connected to a network. Each of the information sources is assigned a rank number which is listed in the database along with the record for the information source. In response to a speech command received from a user, a network interface system accesses the information source with the highest rank number in order to retrieve information requested by the user.

The a preferred embodiment of the present invention allows users to access and browse web sites when they do not have access to computers with Internet access. This is accomplished by providing a voice browsing system and method that allows users to browse web sites using conversational voice commands spoken into any type of voice enabled device (i.e., any type of wireline or wireless telephone, LP phone, wireless PDA, or other wireless device). These spoken commands are then converted into data messages by a speech recognition software engine running on a user interface system. These data messages are then sent to and processed by a network interface system. This network interface system then generates the proper requests that are transmitted to the desired web site over the Internet. Responses sent from the web site are received and processed by the network interface system and then converted into an audio message via a speech synthesis engine or a pre-recorded audio concatenation application and finally transmitted to the user's voice enabled device.

A preferred embodiment of the voice browser system and method uses a web site polling and ranking methodology that allows the system to detect changes in web sites and adapt to those changes in real-time. This enables the voice browser system of a preferred embodiment to deliver highly reliable information to users over any voice enabled device. This ranking system also enables the present invention to provide rapid responses to user requests. Long delays before receiving responses to requests are not tolerated by users of voice-based systems, such as telephones. When a user speaks into a telephone, an almost immediate response is expected. This expectation does not exist for non-voice communications, such as email transmissions or accessing a web site using a personal computer. In such situations, a reasonable amount of transmission delay is acceptable. The ranking system of implemented by a preferred embodiment of the present invention ensures users will always receive the fastest possible response to their request.

An alternative embodiment of the present invention allows users to control and monitor the operation of a variety of household devices connected to a network using speech commands spoken into a voice enabled device.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a depiction of the voice browsing system of the first embodiment of the present invention;

FIG. **2** is a block diagram of a database record used by the first preferred embodiment of the present invention;

FIG. **3** is a block diagram of a media server used by the preferred embodiment;

FIG. **4** is a block diagram of a web browsing server used by the preferred embodiment; and

FIG. **5** is a depiction of the device browsing system of the second embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

A first embodiment of the present invention is a system and method for allowing users to browse information sources, such as web sites, by using naturally spoken, conversational voice commands spoken into a voice enabled device. Users are not required to learn a special language or command set in order to communicate with the voice browsing system of the present invention. Common and ordinary commands and phrases are all that is required for a user to operate the voice browsing system. The voice browsing system recognizes naturally spoken voice commands and is speaker-independent; it does not have to be trained to recognize the voice patterns of each individual user. Such speech recognition systems use phonemes to recognize spoken words and not predefined voice patterns.

The first embodiment allows users to select from various categories of information and to search those categories for desired data by using conversational voice commands. The voice browsing system of the first preferred embodiment includes a user interface system referred to as a media server. The media server contains a speech recognition software engine. This speech recognition engine is used to recognize natural, conversational voice commands spoken by the user and converts them into data messages based on the available recognition grammar. These data messages are then sent to a network interface system. In the first preferred

embodiment, the network interface system is referred to as a web browsing server. The web browsing server then accesses the appropriate information source, such as a web site, to gather information requested by the user.

Responses received from the information sources are then transferred to the media server where speech synthesis engine converts the responses into audio messages that are transmitted to the user. A more detailed description of this embodiment will now be provided.

Referring to FIG. **1**, a database **100** designed by Webley Systems Incorporated is connected to one or more web browsing servers **102** as well as to one or more media servers **106**. The database may store information on magnetic media, such as a hard disk drive, or it may store information via other widely acceptable methods for storing data, such as optical disks. The database **100** contains a separate set of records for each web site accessible by the system. An example of a web site record is shown in FIG. **2**. Each web site record **200** contains the rank number of the web site **202**, the associated Uniform Resource Locator (URL) **204**, and a command that enables the appropriate "extraction agent" **206** that is required in order to generate proper requests sent to and to format data received from the web site. The database record **200** also contains the timestamp **208** indicating the last time the web site was accessed. The extraction agent is described in more detail below. The database **100** categorizes each database record **200** according to the type of information provided by each web site. For instance, a first category of database records **200** may correspond to web sites that provide "weather" information. The database **100** may also contain a second category of records **200** for web sites that provide "stock" information. These categories may be further divided into subcategories. For instance, the "weather" category may contain subcategories depending upon type of weather information available to a user, such as "current weather" or "extended forecast". Within the "extended forecast" subcategory, a list of web site records may be stored that provide weather information for multiple days. The use of subcategories may allow the web browsing feature to provide more accurate, relevant, and up-to-date information to the user by accessing the most relevant web site. The number of records contained in each category or subcategory is not limited. In the preferred embodiment, three web site records are provided for each category.

Table 1 below depicts two database records **200** that are used with the preferred embodiment. These records also contain a field indicating the "category" of the record, which is "weather" in each of these examples.

TABLE 1

```
category: weather
URL:URL=http: //cgi .cnn.com/cgi-
bin/weather/redirect?zip=_zip
rank: 1
command:   web_dispatch .pl weather_cnn
browsingserver: wportal1
browsingServerBackup: wportal2
dateTime:   Dec 21 2000   2:15PM
category: weather
URL: URL= http: //weather.lycos.com/wcfiveday.asp?city=zip
rank:        2
command:   web_dispatch.pl weather_lycos
browsingServer: wportal1
browsingserverBackup:   wportal2
dateTime:   Dec 21 2000 1:45PM
```

The database also contains a listing of pre-recorded audio files used to create concatenated phrases and sentences. Further, database **100** may contain customer profile information, system activity reports, and any other data or software servers necessary for the testing or administration of the voice browsing system.

The operation of the media servers **106** will now be discussed in relation to FIG. **3**. The media servers **106** function as user interface systems. In the preferred embodiment, the media servers **106** contain a speech recognition engine **300**, a speech synthesis engine **302**, an Interactive Voice Response (IVR) application **304**, a call processing system **306**, and telephony and voice hardware **308** required to communicate with the Public Switched Telephone Network (PSTN) **116**. In the preferred embodiment, each media server is based upon Intel's Dual Pentium III 730 MHz microprocessor system.

The speech recognition function is performed by a speech recognition engine **300** that converts voice commands received from the user's voice enabled device **112** (i.e., any type of wireline or wireless telephone, Internet Protocol (IP) phones, or other special wireless units) into data messages. In the preferred embodiment, voice commands and audio messages are transmitted using the PSTN **116** and data is transmitted using the TCP/IP communications protocol. However, one skilled in the art would recognize that other transmission protocols may be used for either voice or data. Other possible transmission protocols would include SIP/VoIP (Session Initiation Protocol/Voice over IP), Asynchronous Transfer Mode (ATM) and Frame Relay. A preferred speech recognition engine is developed by Nuance Communications of 1380 Willow Road, Menlo Park, Calif. 94025 (www.nuance.com). The Nuance engine capacity is measured in recognition units based on CPU type as defined in the vendor specification. The natural speech recognition grammars (i.e., what a user can say that will be recognized by the speech recognition engine) were developed by Webley Systems.

Table 2 below provides a partial source code listing of the recognition grammars used by the speech recognition engine of the preferred embodiment for obtaining weather information.

TABLE 2

```
?WHAT_IS ?the weather?[info information report conditions]
        ? ( (?like in )
        ]
UScities:n
        {<param1 $n.zip> <param2   $n.city> <param3
        $n.state>}
         ( (area code) AREA_CODE:n ) {<param1 $n>}
         ( AREA_CODE:n (area code) ) {<param1 $n>}
         ( (ZIP_CODE:n (zip ?code) ) {<param1 $n>}
        ]
        )
            ) {<menu 194>}
```

The media server **106** uses recognition results generated by the speech recognition engine **300** to retrieve a web site record **200** stored in the database **100** that can provide the information requested by the user. The media server **106** processes the recognition result data identifying keywords that are used to search the web site records **200** contained in the database **100**. For instance, if the user's request was "What is the weather in Chicago?", the keywords "weather" and "Chicago" would be recognized. A web site record **200** with the highest rank number from the "weather" category within the database **100** would then be selected and trans-

mitted to the web browsing server **102** along with an identifier indicating that Chicago weather is being requested.

The media servers **106** also contain a speech synthesis engine **302** that converts the data retrieved by the web browsing servers **102** into audio messages that are transmitted to the user's voice enabled device **112**. A preferred speech synthesis engine is developed by Lernout and Hauspie Speech Products, 52 Third Avenue, Burlington, Mass. 01803 (www.lhsl.com).

A further description of the web browsing server **102** will be provided in relation to FIG. **4**. The web browsing servers **102** provide access to any computer network such as the Internet **110**. These servers are also capable of accessing databases stored on Local Area Networks (LANs) or Wide Area Networks (WANs). The web browsing servers receive responses from web sites and extract the data requested by the user. This task is also known as "content extraction." The web browsing servers **102** also perform the task of periodically polling or "pinging" various web sites and modifying the ranking numbers of these web sites depending upon their response and speed. This polling feature is further discussed below. The web browsing server **102** is comprised of a content extraction agent **400**, a content fetcher **402**, a polling and ranking agent **404**, and the content descriptor files **406**. Each of these are software applications and will be discussed below.

Upon receiving a web site record **200** from the database **100** in response to a user request, the web browsing server **102** invokes the "content extraction agent" command **206** contained in the record **200**. The content extraction agent **400** allows the web browsing server **102** to properly format requests and read responses provided by the web site **114** identified in the URL field **204** of the web site record **200**. Each content extraction agent command **206** invokes the content extraction agent and identifies a content description file associated with the web page identified by the URL **204**. This content description the directs the extraction agent where to extract data from the accessed web page and how to format a response to the user utilizing that data. For example, the content description for a web page providing weather information would indicate where to insert the "city" name or ZIP code in order to retrieve Chicago weather information. Additionally, the content description file for each supported URL indicates the location on the web page where the response information is provided. The extraction agent **400** uses this information to properly extract from the web page the information requested by the user.

Table 3 below contains source code for a content extraction agent **400** used by the preferred embodiment.

TABLE 3

```
#!/usr/local/www/bin/sybper15
#$Header:
/usr/local/cvsroot/webley/agents/service/web_dispatch.pl,v
1.6
# Dispatches all web requests
#http://wcorp.itn.net/cgi/flstat?carrier=ua&flight_no=155&mo
n_abbr=jul&date=
6&stamp=OhLN~PdbuuE*itn/ord,itn/cb/sprint_hd
#http://cgi.cnnfn.com/flightview/r1m?airline=amt&number=300
require "config_tmp.pl";
#check parameters
die "Usage: $0 service [params]\n" if $#ARGV < 1;
#print STDERR @ARGV;
#get parameters
my %Services = (
    weather_cnn => 'webget.pl weather_cnn',
    weather_lycos => 'webget.pl
```

TABLE 3-continued

```
weather_lycos',
    weather_weather => 'webget.pl
weather_weather',
    weather_snap => 'webget.pl
weather_snap',
    weather_infospace => 'webget.pl
weather_infospace',
    stockQuote_yahoo => 'webget.pl stock',
    flightStatus_itn => 'webget.pl
flight_delay',
    yellowPages_yahoo => 'yp_data.p1',
    yellowPages_yahoo => 'yp_data.p1',
    newsHeaders_newreal => 'news.p1',
    newsArticle_newsreal => 'news.p1',
    );
# test param
my $date = 'date';
chop ( $date );
my ( $short_date ) = $date =~ / \s+ (\w{3}\s+\d{1,2}\s+/;
my %Test = (
    weather_cnn => '60053',
    weather_lycos => '60053',
    weather_weather => '60053',
    weather_snap => '60053',
    weather_infospace => '60053',
    stockQuote_yahoo => 'msft',
    flightStatus_itn => 'ua 155'.
$short_date,
    yellowPages_yahoo => 'tires 60015',
    newsHeaders_newsreal => '1',
    newsArticle_newsreal => '1 1',
    );
die "$date: $0: error: no such service: $service (check this
script)\n"
unless $Services {$service };
# prepare absolute path to run other scripts
my ( $path, $script ) = $0 =~ ml^ */) ([^/]*)|
# store the service to compare against datatable
my $service_stored = $service;
# run service
While ( !( $response = '$path$Services [$service }@param') )
{
   # response failed
   # check with test parameters
   $response = '$path$ Services {service }$Test{$service
}";
   if (    $response ) {
           $service = &switch_service ( $service );
#          print "Wrong parameter values were supplied:
$service –
@param\n";
#          die "$date: $0: error: wrong parameters: $service
–
@param\n";
   }
   else    {
           #change priority and notify
            $service = &increase_attempt ( $service ) ;
  }
}
# output the response
print $response;
sub increase_attempt {
   my ( $service ) = @_;
   my ( $service_name ) + split ( /_/, $service );
   print STDERR "$date: $0: attn.: changing priority for
service:
$service\n";
   # update priority
   &db_query( "update mcServiceRoute"
      / "set priority = ( select max ( priority )
from
mcServiceRoute "
      ."where service = '$service_name') + 1
"
      . "date = getdate( ), "
      . "attempt = attempt + 1 "
      . "where route = '$script $service'");
   #  print "---$route===\n";
      # find new route
```

TABLE 3-continued

```
    my $route = @{&db_query ( "select route from
  mcServiceRoute "
                . "where service =
  '$service_name'"
                . "and attempt < 5
"
                . "order by
  priority ")
                }->[0]{route };
    &db_query ( "update mcServiceRoute "
            . "set attempt =) "
          . "where route = '$script $service'")
        if ( $route eq "$script $service_stored") ;
            or $route eq "$script $service_stored") ;
    ( $service_name, $service ) = split ( / \ s + /, $route );
    die "$date: $0: error: no route for the service:
$service (add
more) \n"
          unless $service;
    return $service;
}
sub switch_swervice {
  my ( $service ) = @_;
my ( $service_name ) = split ( /_/, $service );
print STDERR "$date: $0: attn.: changing priority for
service:
$service\n";
  # update priority
  &db_query ( "update mcServiceRoute "
   . "set priority = ( select max ( priority )
```



TABLE 3-continued

```
from
mcServiceRoute"
    . "where service = '$service_name' ) + 1,
"
    . "date = getdate ( ) "
    . "where route = '$script $service'") ;
#   print "---$route===\n";
   # find new route
   my $route = @ {$db_query ( "select route from
mcServiceRoute "
            . "where service =
'$service_name'"
            . "and attempt < 5
"
            . "order by priority ")
      } -> [0]{route };
   die " $date: $0: error: there is the only service:
$route (add
more) \n"
   if ( $route eq "$script $service"
    or $route eq "$script $service_stored") ;
  ( $service_name, $service ) = split ( / \s+/, $route );
  die "$date: $0: error: no route for the service:
$service (add
more) \n"
    nless $service;
   return $service;
}  -
```

Table 4 below contains source code of the content fetcher **402** used with the content extraction agent **400** to retrieve information from a web site.

TABLE 4

```
# !/usr/local/www/bin/sybperl5
# -T
# -w
# $Header:
/usr/local/cvsroote/Webley/agents/service/webget.pl,v 1.4
# Agent to get info from the web.
# Parameters: service_name [service_parameters], i.e. stock
msft or weather
60645
# Configuration stored in files service_name.ini
# if this file is absent the configuration is received from
mcServices table
# This script provides autoupdate to datatable if the .ini
file is newer.
$debug = 1;
use URI : : URL;
use LWP : : UserAgent;
use HTTP : : Request : : Common;
use Vail : : VarList;
use Sybase : : CTlib;
use HTTP : : Cookies;
#print "Sybase: : CTlib $DB_USER, $DB_PWD, $DB_SRV;";
open (STDERR, ">>$0.log" ) if $debug;
#open ( STDERR, ">&STDOUT" ) ;
$log = 'date';
#$response = './url.pl
http://cgi.cnn.com/cgi-bin/weather/redirect?zip=60605"';
#$response = 'pwd';
#print STDERR " ls = $response\n" ;
#$response = 'ls';
#print STDERR "ls = $response\n";
chop ( $log ) ;
$log .= "pwd=" . 'pwd';
chop ( $log );
#$debug2 = 1;
my $service = shift;
$log .= " $service: ". Join(' : ', @ARGV ) . "\n" ;
Print STDERR $log if $debug;
#$response = './url.pl
"/http://cgi.cnn.com/cgi-bin/weather/redirect?zip=60605" ';
my @ini = &read_ini ( $service );
chop ( @ini );
my $section = " " ;
do ($section = &process_section ( $section ) }while $section;
```

TABLE 4-continued

```
#$response = './url/pl
"http://cgi.cnn.com/cgi-bin/weather/redirect?zip=60605" ';
exit;
sub read_ini {
  my ( $service ) = @_;
  my @ini= ( );
  # first, try to read file
  $0 =~ m|^ (.*/) [^/]*|;
  $service = $1 . $service;
  if ( open ( INI, "$service.ini" ) ) {
    @ini = ( <INI> );
    return @ini unless ( $DB_SRV );
    # update datatable
    My $file_time = time - int ( ( -M "$service.ini" )
* 24*
3600 ) ;
    # print "time $file_time\n";
    my $dbh = new Sybase: : CTlib $DB_USR, $DB_PWD,
$DB_SRV;
    unless ( $dbh ) {
      print STDERR "webget.pl: Cannot connect to
dataserver $DB_SRV: $DB_USR: $DB_PWD\n";
      return @ini;
    }
    my @row_refs = $dbh ->ct_sql ( "select lastUpdate
from
mcServices where service = '$service' ", undef, 1 );
  if ($dbh -> RC } == CS_FAIL ) {
    print STDERR "webget.pl: DB select from
mcServices
failed\n";
    return @ini;
  }
  unless (defined @ row_refs ) {
    # have to insert
    my ( @ini_escaped ) = map {
      (my $x = $_ )=~ s/ \'/ \ '/ ' /g;
      $x;
    }@ini;
    $dbh-> ct_sql ( "insert mcServices values (
'$service',
'@ini_escaped', $file_time )" );
    if ( $dbh-> {RC } =- CS_FAIL ) {
      print STDERR "webget,pl: DB insert to
mcServices failed\n";
}
    return @ini;
  }
Print "time $file_time:".$row_refs [ 0 ]=
>{'lastUpdate'
}. "\n" ;
    if ( $file_time > $row_refs [0] => {'lastUpdate' })
{
      # have to update
      my ( @ini_escaped ) = map {
        (my $x = $_) =~s/ \'/ \'\'/g;
        $x;
      }@ini;
      $dbh->ct_sql ( "update mcServices set config =
'@ini_escaped', lastUpdate = $file_time where service =
'$service' " );
      if ( $dbh ->{RC } ==CS_FAIL ) {
        print STDERR "webget.pl: DB update to
mcServices failed\n";
      }
    }
    return @ini;
  }
  else {
    print STDERR "$0: WARNING: $service.ini n/a in" .
'pwd'
      . "Try to read DB\n";
  }
  # then try to read datatable
  die "webget.pl: Unable to find service $service\n"
unless ( $DB_SRV)
) ;
```

TABLE 4-continued

```
  my $ dbh = new Sybase : : CTlib $DB_USR, $DB_PWD, $DB_SRV;
  die "webgetlpl: Cannot connect to dataserver
$DB_SRV : $DB_USR: $DB_PWD\n" unless ( $dbh );
  my @row_refs = $dbh -> ct_sql ( "select config from
mcServices where
service = '$service' ", undef, 1);
  die "webget.pl: Unable to find service $service\n"
unless ( defined
@row_refs ) ;
  $row_refs [0] -> {'config' } =~ s/ \n / \n\r/g;
  @ini = split ( / \ r /, $row_refs [0] -> {'config' } );
  return @ini;
} -
# # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # #
# # # # # #
sub process_section {
  my ( $prev_section) = @_;
  my ( $section, $output, $content );
  my %Param;
  my %Content;
#   print"# # # # # # # # # # # # # # # # # # # # # # \n";
  foreach ( @ini ) {
#     print;
#     chop;
    s/ \s+ $ / / ;
    s/ ^\s + //;
    # get section name
    if ( /^\ [(.*) / ] ) {
#     print "$_: $section:$prev_section\n";
      last if $section;
      next if $1 eq "print";
      next if $prev_section ne " " and $prev_section
ne $1;
      if ( $prev_section eq $1 ) {
        $prev_section = " "
        next;
      }
      $section = $1;
    }
    # get parameters
    push ( @{$Param{$1 }}, $2) if $section and
/ ([^]=+) – (.*) / ;
  }
#   print" ++++++++++++++++++++++++++++++++++\n";
  return 0 unless $section;
#   print "section $section\n";
    # substitute parameters with values
  map {$Param{URL } -> [0 ] =~ s/$Param{Input } ->[$_
] / $ARGV [$_
]/ g
  }0 . . $# {$Param{ Input } };
  # get page content
  ( $Content{'TIME' }, $content ) =&get_url_content (
${$ Param {URL
} } [0 ] ) ;
  # filter it
  map {
    if ( / \" ([^\"] + ) \ " ([^\"]*) \ "/ or
/ \ /([ \ / ] + )\ /([ \ /]*) \ / /)
{
      my $out = $2; $content =~ s/$1/$out/g;
    }
  -}@{$Param {"Pre-filter" } };
# print STDERR $content;
  # do main regular expression
  unless ( @values = $content =~
/$ {$Param {Regular_expression } } [0
]/ ) {
    &die_hard ( ${$Param{Regular_expression } } [0 ],
$content
);
    return $section;
  }
  %Content = map {( $Param[Output } -> [ $_], $values [$_
] )
  }0 . . $# {$Param{Output }} ;
  # filter it
  map {
    if ( / ([ \"]+) \ "([ \"] +)\ = ([ \"] +)\ " /
    or/([ \ /]+)\ /([ \ /] + )\ /([ \ /] * )\ //) {
```

TABLE 4-continued

```
   my $out = $3;
   $Content {$1 } =~ s/$2/$out/g;
   }
  _}@{Param {"Pre-filer" } };
# print STDERR $content;
  # do main regular expression
  unless ( @values = $content =~
/${$Param{Regular_expression } } [ 0
] / ) {
  &die_hard( ${$Param {Regular_expression}} [ 0 ],
$content
);
   return $section;
  }
  %Content= map { ( $Param{Output }->[ $_], $values [ $_
] )
  }0 .. $# {$Param {Output }};
  # filter it
  map {
   if(/ ([ \"] + )\ " ([ \"]+)\" ([  \ " ] * )\ " /
     or/([ \ /] + )\ /([ \ / + )\ /([ \ /] * ) \ / / ){
     my $out = $3;
     $Content {$1 } =~ s/$2/$out/g;
   }
  }@{$Param{"Post-filter" } };
  # calculate it
  map {
   if{ /( [^=] + ) = (.*) / ){
     my $eval = $2;
     map {$eval =~ s/$_/$Content {$ _ } / g
     } keys %Content;
   $Content {$1 } = eval ($eval ) ;
   }
  }@{$Param{Calculate }};
# read section [print]
foreach $i ( 0 . . $#ini ) {
  next unless $ini [ $i ] =~ / ^\ [print \ ]/;
  foreach ( $i + 1 . . $ #ini ) {
    last if $ini [ $_] =~ / ^\ [.+\]/;
   $output .= $ini [ $_] . "\n";
  }
  last;
}
# prepare output
map {$output =~ s/$Content{$_} / g
}keys %Content;
print $output;
-return 0;
}
# # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # #
# # # # # #
sub get_url_content {
  my ( $url ) = @_;
  print STDERR $url if $debug;
  # $response='./url.pl'$url';
  $response='./url.pl '$url';
  return( $time - time, $response );
  my $ua = LWP: :UserAgent->new;
  $ua->agent ( 'Mozilla/4.0 [en] (X11; I; freeBSD 2.2.8-
STABLE i386)'
) ;
#  $ua->proxy( ['http', 'https'],
'http://proxy.webley:3128/') ;
#  $ua->no_proxy( 'webley', 'vail' );
  my $cookie= HTTP::Cookies->new;
  $ua->cookie_jar( $cookie ) ;
  $url = url $url;
   print "$url \n" if $debug2;
  my $time = time;
  my $res= $ua->request( GET $url ) ;
  print "Response: " . ( time - $time "sec\n" if
$debug2;
  return ( $time - time, $res->content ) ;
}]
# # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # # #
# # # # # #
sub die_hard {
  my ( $re, $content ) = @_;
  my ( $re_end, $pattern ) ;
```

TABLE 4-continued

```
  while ( $content !~ /$re/ ) {
   if ($re=~ s/(\([^\(\))+\) [^\(\) | *$) / / ) {
    $re_end = $1 . $re_end;
   }
   else {
    $re_end = $re;
    last;
   }
  }
  $content =~ /$re/;
  Print STDERR "The regular expression did not match:\n
$ re\n
Possible misuse:
$re end: \n
Matched:
$&\n
Mismatched:
$'\n
"if $debug;
  if ( $debug ) {
   print STDERR "Content: \n $content\n" unless
$'; -
  }
}
##########################################
######
```

Table 5 below contains the content descriptor file source code for obtaining weather information from the web site www.cnn.com that is used by the extraction agent **400** of the preferred embodiment.

TABLE 5

```
[cnn]
Input=_zip
URL=http://cgi.cnn.com/cgi-bin/weather/redirect?zip=_zip
Pre-filter="\n" "
Pre-filter="<[^< >]+>""
Pre-filter=/ \s+/ /
Pre-filter=" [\ ( \) \ | ] " !"
Output=_location
Output=first_day_name
Output=first_day_weather
Output=first_day_ high_F
Output=first_day_high_C
Output=first_day_low_F
Output=first_day_low_C
Output=second_day_name
Output=second_day_weather
Output=second_day_high_F
Output=second_day_high_C
Output=second_day_low_F
Output=second_day_low_C
Output=third_day_name
Output=third_day_weather
Output=third_day_high_F
Output=third_day_high_C
Output=third_day_low_F
Output=third_day_low_C
Output=fourth_day_name
Output=fourth_day_weather
Output=fourth_day_high_F
Output=fourth_day high _C
Output=fourth_day_low_F
Output=fourth_day_low_C
Output=undef
Output=_current_time
Output=_current_month
Output=_current_day
Output=_current_weather
Output=_current_temperature_F
Output=_current_temperature_C
Output=_humidity
Output=_wind
Output=_pressure
Output=_sunrise
```

TABLE 5-continued

```
Output=_sunset
Regular_expression=Author  (.+) Four Day Forecast
(\S+) (\S+) HIGH
(\S+) F (\S+) C LOW (\S+) F (\S+) C (\S+) (\S+) HIGH (\S+) F
( \S+) C LOW
(\S+) F (\S+) C (\S+) (\S+) HIGH (\S+) F (\S+) C LOW (\S+) F
(\S+) C (\S+)
(\S+) HIGH (\S+) F (\S+J C LOW (\S+) F (\S+) C ( .+) Current
Conditions (. +)
! local !, (\S+) (\S+) (. t) Temp: (\S+) F, (\S+) C Rel.
Humidity: ( \S+) Wind:
(. +) Pressure: ( .+) Sunrise: ( .+) Sunset: ( .+) Related Links
Post-filter=_current_weather"p/" partly "
Post-filter=_current weather"l/"little "
Post-filter=_current weather"m/"mostly "
Post-filter=_current weather"t-/"thunder"-
Post-filter=_wind"N"North"
Post-filter=_wind"E"East "
Post-filter=_wind"S"South "--
Post-filter=_wind"W"West fl
Post-filter=_wind/mph/miles per hour/
Post-filter=_wind/kph!/kilometers per hour/
Post-filter=_wind"\s+ !", "
[print]
Current weather in_location is_current_weather.
Temperature is_current_temperature_F Fahrenheit,
_current_temperature_C
Celsium.
Humidity is_humidity.
Wind from the_wind.
```

Table 6 below contains the content descriptor file source code for obtaining weather information from the web site www.lycos.com that is used by the extraction agent **400** of the preferred embodiment.

TABLE 6

```
[lycos]
Input=zip
Input=_city
URL=http://weather.lycos.com/wcfiveday.asp?city=zip
Pre-filter="\n" "
Pre-filter="</TD>"td"
Pre-filter="<!.*?->""
Pre-filter="<br>"_br_"
Pre-filter=/alt="/>alt=/
```

TABLE 6-continued

```
Pre-filter="<[^< >]+>""
Pre-filter=" " "
Pre-filter=/ \s+/ /
Output=_location
Output=_current_weather
Output=_current_temperature_F
Output=_humidity
Output=_winddir
Output=_windspeed
Output=_windmeasure
Output=_pressure
Output=first_day_name
Output=second_day_name
Output=third_day_name
Output=fourth_day_name
Output=fifth_day_name
Output=first_day_weather
Output=second_day_weather
Output=third_day_weather
Output=fourth_day_weather
Output=fifth_day_weather
Output=first_day_high_F
Output=first_day_low_F
Output=second_day_high_F
Output=second_day_low_F
Output=third_day_high_F
Output=third_day_low_F
Output=fourth_day_high_F
Output=fourth_day_low_F
Output=fifth_day_high_F
Output=fifth_day_low_F
Output=_windkmh
Regular expression=Guide My Lycos (.+) Click image to
enlarge
alt=([^"]+) " (?:.+) Temp: (\(d+) (?:.+)F_br_Humidity:
(\S+) (?: .+) Wind: ( .+?)
_br_
Output=_current temperature_C
Post-filter=_location"_br_""
Post-filter=_current_weather"p/"partly "
Post-filter=_current_weather"m/"mostly "
Post-filter=_current weather"t-/"thunder "
Post-filter=_winddir"@" at"
Post-filter=_winddir/mph/miles per hour/
Post-filter=_wind/kph!/kilometers per hour/
Calculate=_current_temperature_C=int ( (_current_temperature_F
-32) * 5/9)
Calculate=_windkmh=int(_windspeed*1.6)
[print]
The current weather in_location is_current_weather.
The current temperature is_current_temperature_F_Farenheit
_current_temperature_C Celcius.
Humidity is _humidity.
Winds_winddir.
```

Once the web browsing server **102** accesses the web site specified in the URL **204** and retrieves the requested information, the information is forwarded to the media server **106**. The media server uses the speech synthesis engine **302** to create an audio message that is then transmitted to the user's voice enabled device **112**. In the preferred embodiment, each web browsing server **102** is based upon Intel's Dual Pentium III 730 MHz microprocessor system.

Referring to FIG. **1**, the operation of the robust voice browser system will be described. A user establishes a connection between his voice enabled device **112** and a media server **106**. This may be done using the Public Switched Telephone Network (PSTN) **116** by calling a telephone number associated with the voice browsing system **118**. Once the connection is established, the media server **106** initiates an interactive voice response (WR) application **304**. The IVR application plays audio messages to the user presenting a list of options, such as, "stock quotes", "flight status", "yellow pages", "weather", and "news". These options are based upon the available web site



categories and may be modified as desired. The user selects the desired option by speaking the name of the option into the voice enabled device **112**.

As an example, if a user wishes to obtain restaurant information, he may speak into his telephone the phrase "yellow pages". The FIR application would then ask the user what he would like to find and the user may respond by stating "restaurants". The user may then be provided with further options related to searching for the desired restaurant. For instance, the user may be provided with the following restaurant options, "Mexican Restaurants", "Italian Restaurants", or "American Restaurants". The user then speaks into the telephone **112** the restaurant type of interest. The IVR application running on the media server **106** may also request additional information limiting the geographic scope of the restaurants to be reported to the user. For instance, the IVR application may ask the user to identify the zip code of the area where the restaurant should be located. The media server **106** uses the speech recognition engine **300** to interpret the speech commands received from the user. Based upon these commands, the media server **106** retrieves the appropriate web site record **200** from the database **100**. This record and any additional data, which may include other necessary parameters needed to perform the user's request, are transmitted to a web browsing server **102**. A firewall **104** may be provided that separates the web browsing server **102** from the database **100** and media server **106**. The firewall provides protection to the media server and database by preventing unauthorized access in the event the firewall for web browsing server **108** fails or is compromised. Any type of firewall protection technique commonly known to one skilled in the art could be used, including packet filter, proxy server, application gateway, or circuit-level gateway techniques.

The web browsing server **102** then uses the web site record and any additional data and executes the extraction agent **400** and relevant content descriptor file **406** to retrieve the requested information.

The information received from the responding web site **114** is then processed by the web browsing server **102** according to the content descriptor file **406** retrieval by the extraction agent. This processed response is then transmitted **30** to the media server **106** for conversion into audio messages using either the speech synthesis software **302** or selecting among a database of prerecorded voice responses contained within the database **100**.

As mentioned above, each web site record contains a rank number **202** as shown in FIG. **2**. For each category searchable by a user, the database **100** may list several web sites, each with a different rank number **202**. As an example, three different web sites may be listed as searchable under the category of "restaurants". Each of those web sites will be assigned a rank number such as 1, 2, or 3. The site with the highest rank (i.e., rank=1) will be the first web site accessed by a web browsing server **102**. If the information requested by the user cannot be found at this first web site, then the web browsing server **102** will search the second ranked web site and so forth down the line until the requested information is retrieved or no more web sites left to check.

The web site ranking method and system of the present invention provides robustness to the voice browser system and enables it to adapt to changes that may occur as web sites evolve. For instance, the information required by a web site **114** to perform a search or the format of the reported response data may change. Without the ability to adequately monitor and detect these changes, a search requested by a user may provide an incomplete response, no response, or an

error. Such useless responses may result from incomplete data being provided to the web site **114** or the web browsing server **102** being unable to recognize the response data messages received from the searched web site **114**.

The robustness and reliability of the voice browsing system of the present invention is further improved by the addition of a polling mechanism. This polling mechanism continually polls or "pings" each of the sites listed in the database **100**. During this polling function, a web browsing server **102** sends brief data requests or "polling digital data" to each web site listed in database **100**. The web browsing server **102** monitors the response received from each web site and determines whether it is a complete response and whether the response is in the expected format specified by the content descriptor file **406** used by the extraction agent **400**. The polled web sites that provide complete responses in the format expected by the extraction agent **400** have their ranking established based on their "response lime". That is, web sites with faster response times will be will be assigned higher rankings than those with slower response times. If the web browsing server **102** receives no response from the polled web site or if the response received is not in the expected format, then the rank of that web site is lowered. Additionally, the web browsing server contains a warning mechanism that generates a warning message or alarm for the system administrator indicating that the specified web site has been modified or is not responsive and requires further review.

Since the web browsing servers **102** access web sites based upon their ranking number, only those web sites that produce useful and error-free responses will be used by the voice browser system to gather information requested by the user. Further, since the ranking numbers are also based upon the speed of a web site in providing responses, only the most time efficient sites are accessed. This system assures that users will get complete, timely, and relevant responses to their requests. Without this feature, users may be provided with information that is not relevant to their request or may not get any information at all. The constant polling and reranking of the web sites used within each category allows the voice browser of the present invention to operate efficiently. Finally, it allows the voice browser system of the present invention to dynamically adapt to changes in the rapidly evolving web sites that exist on the Internet.

It should be noted that the web sites accessible by the voice browser of the preferred embodiment may use any type of mark-up language, including Extensible Markup Language (XML), Wireless Markup Language (WML), Handheld Device Markup Language (HDML), Hyper Text Markup Language (HTML), or any variation of these languages.

A second embodiment of the present invention is depicted in FIG. **5**. This embodiment provides a system and method for controlling a variety of devices **500** connected to a network **502** by using conversational speech commands spoken into a voice enabled device **504** (i.e., wireline or wireless telephones, Internet Protocol (EP) phones, or other special wireless units). The networked devices may include various household devices. For instance, voice commands may be used to control household security systems, VCRs, TVs, outdoor or indoor lighting, sprinklers, or heating and air conditioning systems.

Each of these devices **500** is connected to a network **502**. These devices **500** may contain embedded microprocessors or may be connected to other computer equipment that allow the device **500** to communicate with network **502**. In the preferred embodiment, the devices **500** appear as "web sites" connected to the network **502**. This allows a network interface system, such as a device browsing server **506**, a database **508**, and a user interface system, such as a media server **510**, to operate similar to the web browsing server **102**, database **100** and media server **106** described in the first preferred embodiment above. A network **502** interfaces with one or more network interface systems, which are shown as device browsing servers **506** in FIG. **5**. The device browsing servers perform many of the same functions and operate in much the same way as the web browsing servers **102** discuss above in the first preferred embodiment. The device browsing servers **506** are also connected to a database **508**.

Database **508** lists all devices that are connected to the network **502**. For each device **500**, the database **508** contains a record similar to that shown in FIG. **2**. Each record will contain at least a device identifier, which may be in the form of a URL, and a command to "content extraction agent" contained in the device browsing server **506**. Database **508** may also include any other data or software necessary to test and administer the device browsing system.

The content extraction agent operates similarly to that described in the first embodiment. A device descriptor file contains a listing of the options and functions available for each of the devices **500** connected on the network **502**. Furthermore, the device descriptor file contains the information necessary to properly communicate with the networked devices **500**. Such information would include, for example, communication protocols, message formatting requirements, and required operating parameters.

The device browsing server **506** receives messages from the various networked devices **500**, appropriately formats those messages and transmits them to one or more media servers **510** which are part of the device browsing system. The user's voice enabled devices **504** can access the device browsing system by calling into a media server **510** via the Public Switched Telephone Network (PSTN) **512**. In the preferred embodiment, the device browsing server is based upon Intel's Dual Pentium III 730 MHz microprocessor system.

The media servers **510** act as user interface systems and perform the functions of natural speech recognition, speech synthesis, data processing, and call handling. The media server **510** operates similarly to the media server **106** depicted in FIG. **3**. When data is received from the device browser server **506**, the media server **510** will convert the data into audio messages via a speech synthesis engine that are then transmitted to the voice enabled device of the user **504**. Speech commands received from the voice enabled device of the user **504** are converted into data messages via a speech recognition engine running on the media server **510**. A preferred speech recognition engine is developed by Nuance Communications of 1380 Willow Road, Menlo Park, Calif. 94025 (www.nuance.com). A preferred speech synthesis engine is developed by Lernout and Hauspie Speech Products, 52 Third Avenue, Burlington, Mass. 01803 (www.lhsl.com). The media servers **510** of the preferred embodiment are based on Intel's Dual Pentium III 730 MHz microprocessor system. A specific example for using the system and method of this embodiment of the invention will now be given.

First, a user may call into a media server **510** by dialing a telephone number associated with an established device browsing system. Once the user is connected, the IVR application of the media server **510** will provide the user with a list of available systems that may be monitored or controlled based upon information contained in database **508**.

For example, the user may be provided with the option to select "Home Systems" or "Office Systems". The user may then speak the command "access home systems". The media server **510** would then access the database **508** and provide the user with a listing of the home subsystems or devices **500** available on the network **502** for the user to monitor and control. For instance, the user may be given a listing of subsystems such as "Outdoor Lighting System", "Indoor Lighting System", "Security System", or "Heating and Air Conditioning System". The user may then select the indoor lighting subsystem by speaking the command "Indoor Lighting System". The IVR application would then provide the user with a set of options related to the indoor lighting system. For instance the media server **510** may then provide a listing such as "Dining Room", "Living Room", "Kitchen", or "Bedroom". After selecting the desired room, the IVR application would provide the user with the options to hear the "status" of the lighting in that room or to "turn on", "turn off", or "dim" the lighting in the desired room. These commands are provided by the user by speaking the desired command into the users voice enabled device **504**. The media server **510** receives this command and translates it into a data message. This data message is then forwarded to the device browsing server **506** which routes the message to the appropriate device **500**.

The device browsing system **514** of this embodiment of the present invention also provides the same robustness and reliability features described in the first embodiment. The device browsing system **514** has the ability to detect whether new devices have been added to the system or whether current devices are out-of-service. This robustness is achieved by periodically polling or "pinging" all devices **500** listed in database **508**. The device browsing server **506** periodically polls each device **500** and monitors the response. If the device browsing server **506** receives a recognized and expected response from the polled device, then the device is categorized as being recognized and in-service. However, if the device browsing server **506** does not receive a response from the polled device **500** or receives an unexpected response, then the device **500** is marked as being either new or out-of-service. A warning message or a report may then be generated for the user indicating that a new device has been detected or that an existing device is experiencing trouble.

Therefore, this embodiment allows users to remotely monitor and control any devices that are connected to a network, such as devices within a home or office. Furthermore, no special telecommunications equipment is required for users to remotely access the device browser system. Users may use any type of voice enabled device (i.e., wireline or wireless telephones, IP phones, or other wireless units) available to them. Furthermore, a user may perform these functions from anywhere without having to subscribe to additional services. Therefore, no additional expenses are incurred by the user.

The descriptions of the preferred embodiments described above are set forth for illustrative purposes and are not intended to limit the present invention in any manner. Equivalent approaches are intended to be included within the scope of the present invention. While the present invention has been described with reference to the particular embodiments illustrated, those skilled in the art will recognize that many changes and variations may be made thereto without departing from the spirit and scope of the present invention. These embodiments and obvious variations thereof are contemplated as falling within the scope and spirit of the claimed invention.



What is claimed is:

**1**. A system for acquiring information from one or more sources maintaining a listing of web sites by receiving speech commands uttered by users into a voice-enabled device and for providing information retrieved from the web sites to the users in an audio form via the voice-enabled device, the system comprising:

at least one computing device, the computing device operatively coupled to one or more networks;

at least one speaker-independent speech-recognition device, the speaker-independent speech-recognition device operatively connected to the computing device and configured to receive the speech commands;

at least one speech-synthesis device, the speech-synthesis device operatively connected to the computing device;

memory operatively associated with the computing device with at least one instruction set for identifying the information to be retrieved, the instruction set being associated with the computing device, the instruction set comprising:

a plurality of web site addresses for the listing of web sites, each web site address identifying a web site containing the information to be retrieved;

at least one recognition grammar associated with the computing device, each recognition grammar corresponding to each instruction set and corresponding to a speech command, the speech command comprising an information request provided by the user, the speaker-independent speech-recognition device configured to receive the speech command from the users via the voice-enabled device and to select the corresponding recognition grammar upon receiving the speech command;

the computing device configured to retrieve the instruction set corresponding to the recognition grammar provided by the speaker-independent speech-recognition device;

the computing device further configured to access at least one of the plurality of web sites identified by the instruction set to obtain the information to be retrieved, wherein the computing device is further configured to periodically search via the one or more networks to identify new web sites and to add the new web sites to the plurality of web sites, the computing device configured to access a first web site of the plurality of web sites and, if the information to be retrieved is not found at the first web site, the computer configured to access the plurality of web sites remaining in an order defined for accessing the listing of web sites until the information to be retrieved is found in at least one of the plurality of web sites or until the plurality of web sites have been accessed;

the speech synthesis device configured to produce an audio message containing any retrieved information from the plurality of web sites, and

the speech synthesis device further configured to transmit the audio message to the users via the voice-enabled device.

**2**. The system of claim **1**, wherein the one or more networks include the Internet.

**3**. The system of claim **1**, wherein the one or more networks include a local-area network.

**4**. The system of claim **1**, wherein the voice-enabled device is at least one of a standard telephone, an IP telephone, a cellular phone, a PDA, a personal computer, a DVD player, a television or other video display device, a CD

player, a MP3 player, and any other device capable of transmitting the audio message.

**5**. The system of claim **1**, wherein the speaker-independent speech recognition device is configured to analyze phonemes to recognize the speech commands.

**6**. The system of claim **1**, wherein the speaker-independent speech-recognition device is configured to recognize naturally spoken speech commands.

**7**. The system of claim **1**, wherein the instruction set further comprises: a content descriptor associated with each web site address, the content descriptor pre-defining a portion of the web site containing the information to be retrieved.

**8**. The system of claim **1**, wherein the computing device is further configured to periodically poll each of the web sites without being instructed by the user to determine at least one or more of 1) the availability of each web site, 2) the duration of time for each web site to respond to a request from the computing device, and changes to the location of the information to be retrieved from each web site, the computing device further configured to create the order of access to the plurality of web sites based on the periodic polling.

**9**. The system of claim **1**, wherein the computing device is configured to search each of the new web sites without being instructed by the user to determine the availability of each new web site, the duration of time for each new web site to respond to a request from the computer, and changes to the location of the information to be retrieved from each new web site, the computing device further configured to create an order for access to the plurality of new web sites based on the periodic searches.



**10**. The system of claim **1**, wherein the instruction set further comprises a pre-defined order of access associated with each web site address, the pre-defined order of access indicating the order in which the plurality of web sites are accessed.

**11**. The system of claim **10**, wherein the computing device is configured to modify the pre-defined order for access to a particular web site, based upon at least one of a plurality of criteria, the plurality of criteria comprising: 1) the availability of each web site; 2) the duration of time for each web site to respond to a request from the computing device; and 3) changes to the location of the information to be retrieved from each web site.

**12**. The system of claim **11**, wherein the computing device is configured to weigh the criteria with respect to one another when modifications to the pre-defined order for access are based on more than one of the plurality of criteria.

**13**. The system of claim **12**, wherein the computing device is configured to access the plurality of web sites in the order pre-defined to retrieve the information requested by the user, the computing device further configured to access first the web site that is highest in the order pre-defined.

**14**. The system of claim **1**, further comprising:

a database operatively connected to the computing device, the database configured to store the information gathered from the web sites in response to the information requests.

**15**. The system of claim **14**, wherein each recognition grammar and each instruction set are stored in the database.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-1269, 22-1270

**Short Case Caption:** Parus Holdings, Inc. v. Google LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,048 words.

☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.

☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 04/27/2022

Signature: /s/ Joel L. Thollander

Name: Joel L. Thollander